IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA

  -v-                                       20-CR-05

CHRISTOPHER D. CASACCI,
d/b/a Exotic Cubs.com,

                    Defendant.
_____

### GOVERNMENT'S RESPONSE TO THE DEFENDANT'S PRETRIAL MOTION

**THE UNITED STATES OF AMERICA**, by and through its attorney, James P. Kennedy, Jr., United States Attorney for the Western District of New York, and the undersigned Assistant United States Attorney and Trial Attorney, respectfully file this response in opposition to the defendant's pretrial motion (Dkt. #20).

## I.   BACKGROUND

On November 22, 2017, Defendant Christopher D. Casacci, a resident of Amherst, New York, applied to the New York State Department of Environmental Conservation (NYSDEC) for a License to Collect or Possess Wildlife for Education/Exhibition Purposes. Attached hereto as **Exhibit 1** is a copy of the defendant's November Application for a NYSDEC License.[1] The purpose of the requested License was limited to education and exhibition activities, and it did not allow for use of an animal as a pet, nor did it allow for the sale of animals. New York does not issue permits for the sale of non-native or regulated

---

[1] This Exhibit is also included as an attachment to Defense Exhibit F, Dkt. #20-7, p. 22, but is included as an Exhibit here for the Court's convenience.

animals as pets. *See* https://www.dec.ny.gov/permits/28633.html; N.Y. Envtl. Conserv. Law (NYECL) § 11-0512. The defendant's application stated that he intended to import a single female caracal from a Ukrainian/Russian breeder. The application made no mention of commerce, sale, or use as a pet. On November 30, 2017, NYSDEC denied the permit, stating that a caracal presents a danger to people and local wildlife. NYECL § 11-0511.

On December 14, 2017, the defendant applied for the same NYSDEC Educational/Exhibitor License, but stated that he intended to import one male "caracat," listed as *Caracal caracal/Felis catus*, which is a caracal/domestic cat hybrid. Attached hereto as **Exhibit 2** is the defendant's December Application for a NYSDEC License.[2] The defendant included a separate letter explaining the difference between caracals and caracats, and claimed that the caracat would be neutered, sterile, and declawed. *See* Exhibit 2, p. 3. Again, the defendant's application stated that the caracat would be used for education purposes in local schools through Nickel City Reptiles. On December 19, 2017, NYSDEC rejected his application for the caracat, though the denial includes the term "*Caracal caracal*" without the hybrid designation. In the denial, NYSDEC stated that the defendant only needed a U.S. Department of Agriculture (USDA) Class C Exhibitor's license, not a New York State license, for the exhibition of the animal. This application, like the previous, made no mention of commerce, sale, or use as a pet.

On December 20, 2017, the defendant applied for and received a U.S. Fish and Wildlife Service (USFWS) Import/Export License ("Import License"). Def. Exhibit A, Dkt. #20-2. The Import License allows only for the importation of animals into the United States

---

[2] This Exhibit is also included as an attachment to Defense Exhibit F, Dkt. #20-7, p. 28, but is included as an Exhibit here for the Court's convenience.

through designated ports, and imparts no other authority or permissions. The Import License is further conditioned upon the permitee's "observance of all applicable foreign, state, local, tribal, or other federal law." An Import License is only necessary for commercial imports, and is not required for humane, educational, or exhibition purposes.

In January, 2018, the defendant created the website "Exoticcubs.com," on which he offered various non-native exotic large cats for sale as pets. Attached hereto as **Exhibit 3** is a complete copy of the Exoticcubs.com website.[3] Nowhere on the Exoticcubs.com website are the cats described as rescued, re-homed, or part of a humane society in any manner. The website offered servals and caracals for sale at $7,500 and $10,000 respectively, described the value of servals and caracals as pets, and stated that the animals were "farm raised and bottle fed by humans." The website also stated that the defendant had "access" to numerous endangered and rare cats, such as black-footed kittens, cheetah cubs, leopards, lions, white tigers, sand cat kittens, and African wild cat kittens. Exoticcubs.com was primarily focused on the sale of exotic cats as pets, but there was one page that alleged Casacci was involved in "re-homing" unwanted large cats. The page stated that Ecoticcubs.com does "not PURCHASE animals for sanctuaries, only help re-home them." There has been no evidence thus far showing that the defendant engaged in efforts to rescue or re-home animals.

On January 17, 2018, the defendant created "Exotic Cats Humane Society, Limited Liability Company," pursuant to New York for-profit business law. These same laws define a Limited Liability Company as an "*unincorporated* organization of one or more persons . . ."

---

[3] Though defense Exhibit B includes portions of this same document, the pages with Bates Stamps Casacci-GOV-0000649 - 659 appear to have been removed. Those pages relate to pricing, commercial sale, quantity, logistics, and other "rare exotic cats" occasionally available. The missing pages are included in Exhibit 3 for clarity.

N.Y. Ltd. Liab. Co. Law § 102(m) (emphasis added). At no point was Exotic Cats Humane Society, LLC, incorporated in New York State.

On January 25, 2018, the defendant imported two caracals through John F. Kennedy Airport in New York, New York. The imports were declared under his USFWS Import License, and declared the purpose of the animals as "commercial." Attached hereto as **Exhibit 4** is the defendant's USFWS import declarations for servals and caracals.[4] In February 2018, after selling multiple animals, the defendant requested a "Class C exhibitor permit" application from the USDA, but cancelled the application prior to completion. The defendant's initial request stated that he was an individual requesting an application for a single caracal to be exhibited for educational purposes, and requested an electronic copy of the relevant regulations. A USDA Class C Exhibitor permit differs from a USDA "Class B Dealer permit" in that Class C permits do not allow sale or commerce.

Between January 25, 2018 and June 6, 2018, the defendant imported 18 caracals and 12 servals from the same registered commercial breeder in South Africa. *See* Exhibit 4. Each of these imports was declared under the defendant's USFWS Import License and each declared that the cats were being imported for commercial purposes. The defendant's website included regular updates on incoming shipments, how many caracals and servals were available, pricing, and other commercial information. The animals for sale were never described as rescued or re-homed.

During the first half of 2018, the defendant sold the animals throughout the United States as described in the Indictment. The defendant declared that he imported a total of 30 animals, but not all sales or animals are included in the Indictment. Some animals were sold

---

[4] The purpose code "T" denotes commercial purpose.

within New York State, and some animals passed away prior to sale, while in the defendant's care.

Many of the animals sold within the U.S. were transported via airlines or cargo carriers. On interstate commercial manifests, the defendant did not describe any shipments as containing a caracal or a serval, though all sales included in the Indictment were sales of either a caracal or a serval. Many shipments were merely described as "live cats," and those included in Counts 15-18 were labeled as completely different species, as set forth in the Indictment.

On June 3, 2018, a prospective caracal buyer in Florida requested a copy of the defendant's USDA license via email. That buyer forwarded the defendant's email response to the USDA Animal and Plant Health Inspection Service (USDA-APHIS), requesting that USDA-APHIS review his credentials to determine if a purchase would be legal. Attached hereto as **Exhibit 5** is a copy of the email exchange between the prospective buyer and the USDA, including a previous email from the defendant. The next day, the defendant began an application for a USDA Class B Dealer's License. On June 6, USDA alerted the NYSDEC that the defendant was potentially selling exotic cats without a USDA license in New York State. On June 8, 2018, USDA received the defendant's application for a Class B Dealer's license, and consistent with standard procedure, scheduled an inspection of his facility (which was a sunroom in his home).

USDA-APHIS personnel conducted a pre-license inspection at the defendant's home on June 21, 2018. The inspectors observed six servals and two caracals. The Inspector's report notes that two animals appeared undernourished and ill, and describes a strong odor uncharacteristic of these animals. Attached hereto as **Exhibit 6** is a copy of the USDA-APHIS Inspector's report. The inspector advised the defendant that the animals should be taken to a

veterinarian as soon as possible; that an additional inspection would be necessary; and instructed the defendant not to conduct any regulated activity.

On July 3, 2018, NYSDEC applied for and received a search warrant for the defendant's residence. Attached hereto as **Exhibit 7** is a copy of the search warrant application, warrant, and return. On July 5, 2018, at approximately 10:00 a.m., the search warrant was executed by NYSDEC personnel along with licensed veterinary personnel and USFWS Special Agent (SA) Lee Schneckenberger. At the time of the warrant execution, the defendant answered the door and was provided a copy of the search warrant. At the outset, the defendant was explicitly told he was free to leave. As the warrant was being executed, the defendant freely and voluntarily stated to NYSDEC Environmental Conservation Officer Scott Marshall the following information while standing outside: (i) "I have been doing this business for 3 months and have sold 14 cats to people all around the country;" (ii) "I sell them for between $7,500.00 and $10,000.00 each;" (iii) "I pay between $3,500.00 and $5,000 each;" (iv) "I usually make about $2,000.00 profit per cat;" (v) "I found my distributer online from a video. I freeze framed the video and zoomed in to get his telephone number in Africa;" (vi) "That one is my house cat, it is an F1 Savannah;" and (vii) "Two cats died and I sent them via FedEx to Cornell University for Pathology and necropsy." Attached hereto as **Exhibit 8** is a copy of the NY CPL 710.30 form memorializing the statements made by the defendant. Later during the search warrant, at approximately 11:42 am, USFWS SA Schneckenberger attempted to interview the defendant, at which time the defendant requested an attorney. *See* Def. Exhibit E, Dkt. #20-6. No statements were subsequently obtained from the defendant which the government intends to introduce before a petit jury.

Between the USDA inspection on June 21, 2018, and the search on July 5, 2018, two of the animals had passed away in the defendant's care, and only six animals were present. The deceased animals had been sent by the defendant's veterinarian to a laboratory for necropsy analysis. Attached hereto as **Exhibit 9** is a copy of the necropsy reports from Cornell University Animal Health Diagnostic Center. The six remaining animals were seized, along with various business records and electronic records. The seized animals were provided with emergency veterinary attention, and were transferred to the care of appropriate, accredited, large cat rescue facilities[5] with the necessary expertise to care for these animals.

On September 18, 2018, the defendant petitioned the Supreme Court of New York to order the NYSDEC to return the cats pursuant to New York Civil Practice Law and Rules (CPLR) Article 78, alleging that NYSDEC had improperly retained the seized animals. Attached hereto as **Exhibit 10** is a copy of the NY CPL Article 78 Petition filed by the defendant. The defendant submitted a sworn affidavit to that Court, arguing that he was an incorporated Humane Society, and that the seizure of animals was causing those animals to lose financial value. Attached hereto as **Exhibit 11** is a copy of the defendant's sworn affidavit in the Article 78 proceeding. The Court denied the defendant's requests, finding, in part, that the defendant was not a humane society under New York law; that the defendant provided no evidence of humane treatment or proper licensing; and that the defendant had failed to include material information in his petition. Attached hereto as **Exhibit 12** is a copy of Justice Mark J. Gristanti's ruling in the defendant's Article 78 proceeding.

---

[5] Employees of Turpentine Creek Wildlife Refuge (Eureka Springs, Arkansas), and Safe Haven Wildlife Sanctuary (Imlay, Nevada), traveled to Amherst and received the animals. After documenting the transfer and stabilizing the animals, the groups drove the animals back to their respective sanctuaries.

On January 8, 2020, a Grand Jury sitting in the Western District of New York indicted the defendant in this matter. *See* Dkt. #1. On May 9, 2020, the defendant filed the instant Omnibus Motion (hereinafter "Motion") seeking various forms of relief. *See* Dkt. #20. The following is the government's response to the defendant's Motion.

## II.  <u>ARGUMENT</u>

The defendant has attempted to paint a picture that bears little resemblance to the prevailing law or the facts of this case. This Motion sets forth the reality: the defendant purchased, imported, possessed, and sold internationally-protected exotic cats for use as pets in contravention of New York and federal law. Further, it was a for-profit business that bore no resemblance to a rescue or humane society. Defendant Casacci purchased captive-bred animals that he then illegally sold as pets throughout the United States for as much as $11,000 each. He took extensive measures to shield the truth from authorities, by falsely describing his activities and by including the words "humane society" in his for-profit LLC.

In addition to factual misrepresentations, the defendant's Motion fails to address the prevailing law as set forth in the Indictment. The Motion repeatedly mentions New York law, yet completely omits the fact that New York law prohibits *all entities* – regardless of whether a zoo, veterinarian, ASPCA, or Humane Society – from possessing or selling these animals for use as pets. NYECL § 11-0512. Likewise, the Animal Welfare Act prohibits unlicensed sale of animals *as pets*. 7 U.S.C. § 2134. Throughout the entire Motion, the defendant never mentions that the animals at issue were all sold for use as pets, and in fact, the Motion does not even use the word "pet" except where quoting statutes and government documents. Instead, the defendant describes his business, which was solely dedicated to importing and

selling exotic cats as pets, as an "African cat project," a "rescue," or a "humane society." None of the terms used by the defendant are remotely accurate in law or fact.

The defendant's Motion attempts to rely on written sleight-of-hand to argue challenges to the Indictment, Search Warrant, and various other aspects of the allegations. Based on the evidence and arguments below, the Motion should be denied in whole. For the convenience of the Court and counsel, the government's response follows the order of arguments presented in the defendant's Motion.

## A. Counts 1 through 14 Sufficiently Allege a Felony Violation of the Lacey Act.

The defendant moves to dismiss Counts 1 to 14 of the Indictment, which charge the defendant with violating the Lacey Act, Title 16, United States Code, Sections 3372(a)(2)(A) and 3373(d)(1)(B). *See* Dkt. #20, pp. 3-8. Specifically, the defendant appears to argue that he was mistaken regarding the law, that the Indictment does not provide a sufficient factual explanation of the defendant's *mens rea*, and that the essential elements of the Lacey Act were not alleged. All of those assertions are incorrect.

### 1.  Knowledge and Intent are Factual Matters for a Jury.

In the Motion, the defendant appears to argue that he was mistaken regarding the law in New York, and thus cannot have had the requisite knowledge or intent to have committed a Lacey Act crime. Dkt. #20, p. 6. Putting aside substantial evidence of the defendant's actual knowledge, the "deeply rooted" rule in American jurisprudence is that "ignorance of the law or a mistake of law is no defense to criminal prosecution." *Cheek v. United States*, 498 U.S. 192, 199 (1991). Even when a crime requires proof of specific knowledge, dismissal of the charges would be inappropriate relief – there is no summary judgment in criminal law. The defendant's knowledge is a factual issue properly evaluated by a jury after hearing all of the

evidence. *United States v. Crowley*, 318 F.3d 401, 409 (2d Cir. 2003) ("The state of a person's mind is rarely susceptible to proof by direct evidence . . . but it is no less a question of fact for that."). In *U.S. v. Romano*, on which the defendant relies, the Court denied defendant Romano's challenges to the Indictment, and his knowledge was determined by a jury. *See* 137 F.3d at 680. This Court should do the same, and allow a jury to be the finder of facts.

2.     Counts 1-14 Contain Sufficient Specificity Regarding *Mens Rea.*

The defendant argues that the Indictment should be dismissed because it does not include "factual assertions about Mr. Casacci's conduct, knowledge, or intent." Dkt. #20-9 p. 7. This request should be denied because the Indictment contains sufficient factual basis to fairly inform the defendant "of the charge against which he must defend," and "enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974). The Federal Rules of Criminal Procedure advise that an indictment should be "a plain, concise, and definite written statement of the essential facts constituting the offense charged . . . ." Fed. R. Crim. P. 7(c)(1). The Second Circuit has repeatedly confirmed that "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (quoting *United States v. Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975)). An indictment must also "be read to include facts which are necessarily implied by the specific allegations made." *Id.* (quoting *United States v. Silverman*, 430 F.2d 106, 111 (2d Cir. 1970)). The defendant relies upon *U.S. v. Pirro*, which provides clarification that "where an indictment charges a crime that depends in turn on violation of another statute," the indictment need only "identify the underlying offense." *Id.,* 212 F.3d 86, 93 (2d Cir. 2000).

Here, the Indictment informs the defendant that the Grand Jury charged him with violating the Lacey Act by selling animals that he knew were possessed illegally pursuant to NYECL § 11-0512(1)(a). Dk t. #1 p. 2. The Indictment satisfies the legal requirement to fairly put the defendant on notice of the conduct for which he is charged and the mental state of which he is accused. Contrary to the defendant's claims, the government is not required to allege the specific evidence of the defendant's knowledge in an Indictment, merely the fact that he is being charged with having the requisite knowledge. Further, the government's detailed evidence that supports the charges alleged in the indictment has been given to the defendant as part of the government's discovery. The defendant may challenge the evidence of his mental state at trial, but that is a matter for the jury, and the defendant's motion should be denied.

3.     <u>Counts 1-14 Allege All Essential Elements of the Lacey Act.</u>

In his Motion, in addition to the claimed mental state charging deficiency, the defendant also argues that Counts 1 to 14 do not allege the "essential elements" of a Lacey Act crime. Dkt. #20-9, p. 5. The Indictment properly charges a Lacey Act felony violation, includes all necessary elements, and the defendant's motion for dismissal or other relief should be denied.

Specifically, the defendant argues that the Indictment does not specify "an initial illegal taking, possession, transportation or sale of [wildlife]..." that is separate from the defendant's subsequent illegal sale of wildlife in interstate commerce. Dkt. #20-9, p. 8. The Lacey Act is often used as a "federal tool to aid states in enforcing their own fish and wildlife laws by imposing federal sanctions for interstate or foreign commerce in fish and wildlife that have been taken, possessed, transported, or sold in violation of any state, federal, or foreign

law." *United States v. McDougall*, 25 F. Supp. 2d 85, 89 (N.D.N.Y. 1998). The prohibitions are indeed split into two steps: first, a person must have taken, possessed, transported, or sold wildlife in violation of some law. 16 U.S.C. § 3372(a)(2)(A). Second, the defendant must have imported, exported, transported, sold, received, acquired or purchased that wildlife in interstate or foreign commerce. 16 U.S.C. § 3372(a)(2); *See, e.g., United States v. Santillan,* 243 F.3d 1125, 1129 (9th Cir. 2001) (discussing two independent steps required under Lacey Act, and ruling that defendant need not know which specific law was violated); *United States v. Fountain*, 277 F.3d 714, 718 (5th Cir. 2001) (finding that violation of Louisiana law was valid predicate offense for Lacey Act conviction); *United States v. Gay-Lord,* 799 F.2d 124, 125–26 (4th Cir. 1986) (affirming conviction where state law was predicate offense under Lacey Act and where illegal fish was purchased from undercover agents).

Here, the first step, as alleged in the Indictment, is that the servals and caracals were possessed and transported, in New York, by the defendant in violation of NYECL § 11-0512(1)(a). Dkt. #1, p. 3. The second step, as alleged in the Indictment, is that the defendant sold and transported the illegal servals and caracals in interstate commerce. *Id*. The Indictment charges two distinct acts in which the defendant engaged: the illegal possession and transportation under New York law when the defendant acquired and held them within the State of New York, and then his later transport and sale of these cats in interstate commerce when he sold them to persons located in other states.[6] As the courts found in *McDougall*, *Santillan*, *Fountain*, *Gay-Lord*, and many others, the Indictment properly charges

---

[6] Elsewhere in his Motion the defendant appears to argue that since his import into the United States was legal under Federal law, the indictment is defective. *See* Dk t. #20-9, p. 6. But the Indictment does not charge or allege that the defendant illegally imported the animals into the United States. Rather, it charges that he violated New York law when he transported and possessed them, after they had already entered the United States. So the alleged legality of the federal importation into the United States is irrelevant to the charges in the Indictment.

the elements necessary to support a Lacey Act charge, and the defendant's argument otherwise is without merit. *See McDougall*, 25 F. Supp. 2d at 89; *Santillan*, 243 F.3d at 1129; *Fountain*, 277 F.3d at 718; *Gay-Lord*, 799 F.2d at 125–26. The defendant also asserts that 16 U.S.C. § 3372(a) only relates to civil infractions, and that 16 U.S.C. 3373 is the applicable criminal statute, which is incorrect. See Dkt. #20-9, p. 5. Section § 3372(a) sets forth the elements of criminal *and* civil infractions, which are then differentiated by the attendant circumstances in the penalties section of the Lacey Act, 16 U.S.C. § 3373. *See McDougall*, 25 F. Supp. 2d at 90. The penalties section delineates felonies, misdemeanors, and civil infractions depending on what circumstances surrounded the violation of the prohibitions in § 3372(a). To be guilty of felony, in addition to taking the acts prohibited in 3372(a), the defendant must have known the wildlife at issue was somehow illegal; the wildlife must be valued at more than $350; and the overall conduct must be commercial in nature ("conduct that involves the sale or purchase of, the offer of sale or purchase of, or the intent to sell or purchase, fish or wildlife."). 16 U.S.C. § 3373(d)(2), *see also*, First Circuit Pattern Jury Instruction 4.16.3372 (*Receiving Fish, Wildlife, Plants Illegally Taken (Lacey Act)*) (2016)).

Counts 1 to 14 of the Indictment in this matter allege all essential elements of a Lacey Act felony. Specifically, that the defendant possessed and transported wildlife in violation of a specific New York law; that he knew the wildlife was possessed and transported in violation of New York law; that the wildlife was then knowingly sold in interstate or foreign commerce; that the conduct was commercial in nature; and that the wildlife was valued at more than $350. Dkt. #1 p. 2. Counts 1-14 of the Indictment are therefore sufficient, and the defendant's Motion should be denied.

**B.** **Counts 15 to 18 of the Indictment Concisely State the Essential Elements of Felony False Labeling Under the Lacey Act.**

In his Motion, the defendant argues that counts 15 to 18 do not contain the "essential elements" of a crime, though no further details as to the alleged defect are provided. Counts 15 to 18, which charge the defendant with false labeling under the Lacey Act, contain all essential elements of that crime. The elements of the crime are: (1) The defendant knowingly made, submitted, or caused another to make or submit, a false record, account, label, or identification of wildlife; (2) the wildlife was or was intended to be moved in interstate or foreign commerce; and (3) The defendant knew the record was false. 16 U.S.C. § 3372(d); 18 U.S.C. § 2. In order for the crime to be punished as a felony, the shipment must be valued at more than $350 and must be commercial in nature. 16 U.S.C. § 3373(d)(3)(A); *See also McDougall,* 25 F. Supp. 2d at 90-91 ; *United States v. Allemand*, 34 F.3d 923, 927 (10th Cir. 1994) (ruling that a record does not have to be submitted and that "making or submitting false records is illegal regardless of whether one has a duty to submit those records.")

Pursuant to Fed.R.Crim.P. 7(c)(1), an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . ." To comply with the pleading requirements of Fed.R.Crim.P. 7(c)(1), "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *See e.g., Stavroulakis*, 952 F.2d at 693; *see* discussion *infra*, p. 10.

Using the standard articulated above, there is no question that Counts 15 to 18 of the Indictment satisfy the pleading requirement. A plain reading of those counts unequivocally sets forth the required elements of a Lacey Act false labeling offense. The counts specifically provide the date of the false labeling and a description of the false label at issue, and are

therefore valid charges. Dkt. #1, p. 5. As such, the defendant's Motion on this basis should be denied.

**C.   Counts 19 through 33 of the Indictment Concisely State the Essential Elements of Misdemeanor Violations of the Animal Welfare Act.**

In his Motion, the defendant argues that Counts 19 to 33, which are violations of the Animal Welfare Act, fail to state the "essential elements" of a crime, but he provides no further detail as to which elements are missing. *See* Dkt. #20-9, p. 10. The elements of a violation of the Animal Welfare Act are: (1) The defendant was a "dealer" as defined by 7 U.S.C. § 2132; (2) The defendant did not have a valid license issued by USDA; (3) The defendant sold, transported, or offered for sale or transport, animals for use as pets; and (4) the sale was commercial. 7 U.S.C. § 2134. In order to be a criminal penalty, the defendant must have known he did not have the relevant license. 7 U.S.C. § 2149(d). Counts 19 to 33 of the Indictment set forth all of these elements, specifically alleging that the defendant was a "dealer," that he knowingly sold, transported, and offered to sell and transport, servals and caracals for use as pets, in interstate commerce, without demonstrating compliance with relevant humane standards and receiving the appropriate dealer's license. Consequently, all essential elements are alleged in Counts 19 to 33, and therefore the defendant's request to dismiss should be denied.

**D.   The Indictment Contains no Multiplicitous Counts.**

In his Motion, the defendant argues that Counts 1 to 14 are multiplicitous to Counts 19 to 33, and moves this Court for an order to compel the government to elect which counts

it will proceed to trial on, and to dismiss the other counts. The substance of the defendant's argument is completely without merit.[7]

Pursuant to Fed. R. Crim. P. 8(a), it is clear that an indictment "may charge a defendant in separate counts with 2 or more offenses if the offenses charged ... are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." However, the Double Jeopardy Clause of the Fifth Amendment prohibits a court from "imposing multiple punishments for the same offense." *Brown v. Ohio*, 432 U.S. 161, 165 (1977). An indictment that "charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed," violates the Fifth Amendment and is considered multiplicitous. *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999). Under a multiplicity analysis, "[i]t is not determinative whether the same conduct underlies the counts; rather, it is critical whether the 'offense' – in the legal sense, as defined by Congress – complained of in one count is the same as that charged in another." *Id*. at 146.

"To determine whether separate counts charge the same offense more than once, we apply the test set out by the Supreme Court in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932)." *United States v. Finley*, 245 F.3d 199, 205 (2d Cir. 2001). *Blockburger* establishes, "the test to be applied to determine whether there are two offenses or

---

[7] Although the government proceeds to discuss the substance of the defendants' multiplicity arguments, the issue before the Court is premature this time. The Supreme Court "has long acknowledged the Government's broad discretion to conduct criminal prosecutions, including its power to select the charges to be brought in a particular case." *Ball v. United States*, 470 U.S. 856, 859 (1985) *(citing United States v. Goodwin*, 457 U.S. 368, 382 (1982); *Confiscation Cases*, 7 Wall. 454, 457-459 (1869)). Thus, even assuming *arguendo* that a defendant may not be properly convicted and sentenced under both statutes, the defendant is, nevertheless, not entitled to dismissal of any of the charges against him. Instead, any remedy available to defendant may be provided following trial. *See United States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006) (noting that if "the jury convicts on more than one multiplicitous count, the defendant's right not to suffer multiple punishments for the same offense will be protected by having the court enter judgment on only one of the multiplicitous counts."); *Ball*, 470 U.S. at 865.

only one, is whether each provision requires proof of a fact which the other does not." *Blockburger*, 284 U.S. at 304. The purpose of the *Blockburger* analysis is "to determine whether Congress intended the same conduct to be punishable under two criminal provisions." *Ball v. United States*, 470 U.S. 856, 861 (1985).

As already set forth in the previous sections regarding the facial sufficiency of the Indictment with respect to Counts 1 to 14 and 19 to 33, those two sets of charges involve entirely different elements, and are parts of different statutory schemes. Although the defendant asserts that all of the Animal Welfare Act elements are included in the Lacey Act charges, the defendant cites no case law in support of such a proposition. Rather, it is clear just by reading the two statutes that they require proof of different elements. Notably, the Animal Welfare Act charges only apply if someone is a "dealer" who does not have a license from the USDA, neither of which are included in the Lacey Act trafficking charges. The Lacey Act counts require a showing of underlying illegality under state law, which the Animal Welfare Act counts do not require. Therefore, Counts 1 to 14 are not multiplicitous to Counts 19 to 33, and as such, the defendant's Motion to dismiss should be denied.

      1.     <u>The Indictment Language is Relevant and Should Remain.</u>

The defendant has, in the alternative, moved this Court to strike language from the Indictment because he believes the language to be immaterial, irrelevant, argumentative, and unfairly prejudicial. *See* Dkt. #20-9, pp. 13-14. The defendant also argues that the language "appears nowhere in the statute." *Id.* In fact, the relevant language is in the statute, and regardless of whether the defendant believes the language to be prejudicial, it is appropriate under the "exacting" standard set forth by the Second Circuit. *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990).

The test for whether language should be struck as surplus is whether evidence of the allegation is admissible and relevant to the charge. *Id.* A motion to strike surplus language "will be granted only where it is clear that the allegations are not relevant to the crime charged, and are inflammatory and prejudicial." *United States v. DePalma*, 461 F.Supp. 778, 797 (S.D.N.Y. 1979) (noting that the standard is "exacting ... and only rarely has alleged surplusage been stricken."). If evidence of the language would be admissible, then it may not be struck "regardless of how prejudicial the language is." *United States v. Rastelli*, 653 F. Supp. 1034, 1055 (E.D.N.Y. 1986).

Here, the defendant is accused of failing to receive a license that can be issued only after an applicant demonstrates compliance with minimum standards for the humane treatment of animals. Evidence supporting Counts 19-33 would necessarily include a description of the license he failed to receive. While the defendant may argue that the language "humane treatment of animals" is unnecessary, it is necessary to denote *which* license he failed to receive. The USDA issues various licenses – for research facilities, exhibitors, dealers, breeders, and zoos, among others. In addition, a person can fail to receive a license, have a license application denied, or have a license revoked, for reasons such as prior convictions, failure to pay fees, or failure to demonstrate compliance with relevant humane standards. At trial, the government would present evidence that the defendant failed to receive the specific Class B license conditioned upon his facilities having been approved as meeting minimum standards for humane treatment of animals.[8]

_____

[8] The same evidence would be admissible and relevant to refute the defendant's claim he was operating a "humane society." In particular, Exhibit 6 shows that the USDA inspectors did not find that the defendant's facilities met minimum standards for humane treatment, and Exhibit 9 notes significant health issues for animals in the defendant's care. Though the government does not believe the defendant's argument is relevant or accurate, he has now raised it in both state and federal court, making it more likely that government evidence to the contrary would be admissible.

Contrary to the defendant's assertion, the Indictment language comes from the statute itself. The Animal Welfare Act, 7 U.S.C. § 2133, states that a license shall not be issued to a dealer "until the dealer or exhibitor shall have demonstrated that his facilities comply with the standards promulgated by the Secretary pursuant to section 2143." Section 2143 is titled "Standards and Certification Process for Humane Handling, Care, Treatment, and Transportation of Animals," and sets forth various standards, including "minimum requirements . . . for humane handling, care, or treatment of animals." 7 U.S.C. § 2143(2)(A). Though Section 2134 requires a license, Sections 2133 and 2143 set forth the standards for the specific license the defendant failed to receive. *Id.*; 7 U.S.C. § 2134.

Counts 19-33 contain relevant, admissible, concise descriptions of the crimes charged. Notwithstanding potential prejudice, the phrase at issue sits squarely within the "exacting" bounds laid down by the Second Circuit, and the defendant's request should be denied.

## E. The Defendant is not Entitled to a Bill of Particulars.

In his Motion, the defendant moves for a bill of particulars. *See* Dkt. #20-9, pp. 14-17. However, the defendant's request is unjustified given the detail provided in the Indictment and the substantial, organized, and indexed discovery that has already been provided by the United States.

A bill of particulars "is not a discovery tool and is not intended to allow defendants a preview of the evidence or the theory of the government's case." *United States v. Guerrerio*, 670 F.Supp. 1215, 1225 (S.D.N.Y. 1987) (*citing United States v. Andrews*, 381 F.2d 377, 377-78 (2d Cir. 1967) (*per curiam*); *United States v. Remy*, 658 F.Supp. 661, 670 (S.D.N.Y. 1987)). The government is not obligated to disclose either the manner in which it will attempt to prove

the charges or the precise manner in which the defendant committed the crime charged. *See*

*id.*

> While it is within this Court's sound discretion to order the filing of a Bill of Particulars, the burden is upon defendants to show that non-disclosure of the requested particulars would lead to prejudicial surprise at trial or would adversely affect defendants' rights. Any particularization confines the Government's proof to the particulars furnished.

*United States v. Anguiera*, No. 11CR116S, 2012 WL 1232096, at *2 (W.D.N.Y. Apr. 12, 2012)

(*citing Wong Tai v. United States*, 273 U.S. 77, 82 (1927), *United States v. Glaze*, 313 F.2d 757,

759 (2d Cir. 1963); *United States v. Murray*, 297 F.2d 812, 819 (2d Cir. 1962), *cert. denied*, 369

U.S. 828 (1962)). In exercising this discretion, the Court can consider such factors as: (1) the

complexity of the charges, (2) the clarity and level of detail in the indictment, and (3) the

degree of discovery available to the defendant. *United States v. Santiago*, 174 F.Supp.2d 16, 34

(S.D.N.Y. 2001) (*citing United States v. Shoher*, 555 F.Supp. 346, 349 (S.D.N.Y. 1983)).

Moreover, "a bill of particulars is not necessary where the government has made sufficient

disclosures concerning its evidence and witnesses by other means." *United States v. Ojeda*, 412

Fed. Appx. 410, 411 (2d Cir. 2011) (citation omitted); *see also United States v. Bortnovsky*, 820

F.2d 572, 574 (2d Cir. 1987) ("[I]f the information sought by defendant is provided in the

indictment or in some acceptable alternate form, no bill of particulars is required.").

Here, the level of detail contained in the Indictment alone serves as an adequate basis

to deny the defendant's motion for a bill of particulars. Where a charging document, such as

the Indictment, identifies all the particulars of the charged crimes, such as the dates, the

elements of the offense charged, the manner and methods used to commit the violations, the

subject matter of the alleged crimes, and the statutory citations for the violations, the Court is

well within its discretion to deny a motion for a bill of particulars. A careful review of that

charging document reveals a detailed discussion of the criminal offenses spanning seven pages. Pages 1 to 3 of the Indictment contain a detailed recitation (including ample citations) to background information and introductory allegations, including the various laws and regulations pertinent to the crimes charged in the various counts that follow. Counts 1 to 14 charge the defendant with Lacey Act trafficking offenses, which specifically name the defendant, set forth the elements of the offenses, and for each of the 14 transactions, the date of the transaction, the type of wildlife involved, and the purchaser of the wildlife. Counts 15 to 18 of the Indictment charge the defendant with Lacey Act false labeling offenses, and explicitly indicate the date of the false label and a description of the false label. Finally, Counts 19 to 33 charge the defendant with violations of the Animal Welfare Act, and for each charge, specifies the date, the type of wildlife involved, and the purchaser of the wildlife. All of the counts provide precise statutory citations to the crimes charged. In short, the Indictment is highly detailed and that level of precision alone is a sufficient basis for this Court to deny the defendant's demand for a bill of particulars. *See Santiago*, 174 F.Supp.2d at 36. This coupled with the amount and organized nature of the discovery countenances denying the defendant's request for a bill of particulars.

Moreover, if there has been full disclosure by the government, as there has been in the instant case, the need for a bill of particulars is obviated. *See Santiago*, 174 F.Supp.2d at 35-36 (holding that a court should also consider the availability of other sources of information to the defendant, including the discovery provided, when determining whether a bill of particulars should be issued); *United States v. Chalmers*, 410 F.Supp.2d 278, 286 (S.D.N.Y. 2006) ("[T]he Government has provided extensive discovery, minimizing the need for a bill of particulars ...."); *United States v. Kemp*, No. CRIM.A.04 370, 2004 WL 2757867, at *8 (E.D.

Pa. Dec. 2, 2004) (collecting cases) ("Courts are especially reluctant to direct the filing of a bill of particulars when the government has provided the defendant with extensive pretrial discovery"); *United States v. Cowan*, No. 3:09 CR 37 KSF, 2009 WL 2613950, at *6 (E.D. Tenn. Aug. 24, 2009) (denying the defendant's request for a bill of particulars on the basis that the government turned over substantial discovery on a disk that facilitated review of information thereby obviating need for bill of particulars). The need for a bill of particulars is further undermined where an index and/or computer search modalities are provided that facilitate the review of even voluminous discovery. *United States v. Ferguson*, 478 F.Supp.2d 220, 227 (D. Conn. 2007) ("Given the degree of detail in the indictment and the government's provision of searchable discovery databases and a list of its key documents, the defendants have not proven that they require more particularization to adequately prepare their defenses, avoid prejudicial surprise at trial, and protect against future double jeopardy."); *see also United States v. Kahale*, 789 F.Supp.2d 359, 375-77 (E.D.N.Y. 2009) (denying request for bill of particulars where government provided an index for its discovery).

Here, the government has been very cooperative in providing voluminous and computer searchable discovery prior to the deadline set by the Court. The government facilitated this production by providing a DVD loaded with electronic discovery. Importantly, the discovery materials include all documents relating to the wildlife transactions covered in the Indictment, and include all witness statements, investigative reports, statements of the defendant, and search warrant documents. The government also provided an index of these materials to the defendant to allow for review of the discovery provided. As in all of the cases cited above, the government has been cooperative in furnishing discovery and in guiding the defendant in reviewing the same; the discovery has been provided in an indexed and

electronically searchable format; and most, if not all, of the information the defendant seeks through a bill of particulars is already available to him in this discovery. As such, the voluminous, searchable discovery already provided by the government obviates the need for any additional particularization.

## F.     The Defendant's Voluntary Statement to NYSDEC Officer Marshall Should not be Suppressed.

The defendant has filed a motion to suppress statements he made to law enforcement during the execution of the search warrant which he claims were made "while he was in police custody" and after he invoked his right to counsel. *See* Dkt. #20-1, p. 5. The defendant's argument is wholly without merit as it confuses the sequence of events that led to the statements referenced above. Specifically, while the search warrant was proceeding, and after the defendant was advised that he was free to leave the property, the defendant voluntarily made the incriminatory statements referenced above. The defendant was not in custody at this time, nor was he being interrogated.[9] Following these statements, and near the end of the execution of the search warrant, USFWS Special Agent Lee Schneckenberger attempted a recorded interview of the defendant, at which time the defendant requested an attorney. No information provided during this encounter with Agent Schneckenberger will be used by the government during its case in chief.

In determining whether a defendant is in custody for Miranda purposes, "the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of

---

[9] Although the defendant claims in his supporting memorandum of law that "law enforcement told Mr. Casacci he was not permitted to leave his home during the search warrant execution," *see* Dkt. #20-9, p. 19, and then cites to paragraph 16 of defense counsel's declaration for support, a review of paragraph 16 of defense counsel's declaration does not contain such information. Moreover, the declaration filed by the defendant with his Motion, *see* Dkt. #20-8, contains no assertions by the defendant that he was not free to leave the property during the search warrant, or was being interrogated by Officer Marshall.

the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983). "This inquiry focuses upon the presence or absence of affirmative indications that the defendant was not free to leave." *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992). The test is an objective one, based upon the perspective of a reasonable person in the defendant's position. *See Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). Similarly, in "evaluating a claim by a defendant that statements were coerced and obtained involuntarily, therefore, a court must make three factual findings to determine whether a statement was voluntarily made: 1) the characteristics of the accused; 2) the conditions of the interrogation; and 3) the conduct of law enforcement." *United States v. Wilkes*, 2013 WL 212588, *2 (D.Conn., Jan. 20, 2013), *citing Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).

In the present case, the defendant, after being explicitly told he was free to leave the property during the search warrant, voluntarily provided information to Officer Marshall. The information was provided while both of them were standing outside of the defendant's residence. The defendant was under no physical restraint at the time he made the statements, and at all times, was treated fairly by law enforcement. Under these circumstances, it is beyond question that a reasonable person would have felt free to leave or terminate the interview, therefore the defendant was not in "custody." The defendant additionally requests an evidentiary hearing to determine the propriety of the statements provided by the defendant. *See* Dkt. #20-9, p. 20. A defendant is entitled to an evidentiary hearing on a motion to suppress if the defendant's papers raise a sufficiently definite, specific, detailed, and non-conjectural factual basis for the motion. *United States v. Pena*, 961 F.2d 333, 339 (2d Cir 1992). However, this Court also has the discretion to deny a hearing where the defendant's papers fail to create a dispute over material facts or where the defendant fails to support the factual allegations of

the motion with an affidavit from a witness with personal knowledge. *United States v. Gillette*, 383 F.2d 843, 848 (2d Cir. 1967); *United States v. Caming*, 968 F.2d 232, 236 (2d Cir. 1992).

The defendant has failed to outline specific facts as to why the defendant believes the statements he made to Officer Marshall were custodial in nature. Neither has the defendant submitted an affidavit of an individual with personal knowledge of the circumstances of the defendant's statements. In *Wilkes*, the court easily denied the defendant's motion to suppress his statement which was unsupported by an affidavit with personal knowledge, and held that the defendant was not entitled to an evidentiary hearing. *Wilkes*, 2013 WL 212588 at *3-4. Similarly, based on the record before the Court, the defendant's motion to suppress the statements he made to Officer Marshall should be denied, and the Court should deny the defendant's request for a hearing.

## G. The Defendant's Motion to Suppress Evidence Obtained from the State Search Warrant Should be Denied.

In his Motion, the defendant makes a variety of arguments to controvert the search warrant issued by Amherst Town Justice Kara A. Buscaglia. *See* Dkt. #20-9, pp. 20-29. However, as set forth below, the search warrant here did not mislead the magistrate, was supported by probable cause, and law enforcement faithfully abided by and executed the warrant. As such, the defendant's arguments are without merit.

### 1.    The Search Warrant Did Not Omit Material Facts

In his first attack on the search warrant, the defendant argues that the search warrant application omitted material facts by failing to state that the defendant had registered a for-profit LLC that happened to include the phrase "humane society" in its name. Based on this perceived omission, the defendant argues that the warrant application was "recklessly misleading." *See* Dkt. #20-9, p. 23. The defendant summarily concludes that the issuing

magistrate "surely ... would not have issued the warrant for a search of Mr. Casacci's residence" if she was aware of his "humane society" status. Dkt. #20-9, p. 23. The defendant's argument appears to be a continuation of his argument addressed above, where at various points throughout the Motion, the defendant refers to his unlawful pet-dealing business as an "African cat project," a "rescue," or an "Exotic Cat Humane Society." He relies on these inaccurate descriptions to support many claims, including that the NYSDEC omitted the fact that the defendant ran a "humane society" which "exempted" him from any regulation. The defendant further requests a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), to explore the circumstances giving rise to the alleged omissions.

Affidavits in support of search warrants carry a "presumption of validity." *See Franks*, 438 U.S. at 171. The test for overcoming such validity is not whether every statement in an affidavit is true. *See United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000) (*quoting United States v. Trzaska*, 111 F.3d 1019, 1027 (2d Cir. 1997)). Rather, "[t]he ultimate inquiry is whether, after putting aside erroneous information and material omissions, 'there remains a residue of independent and lawful information sufficient to support probable cause.'" *Id.* at 718 (*quoting United States v. Ferguson*, 758 F.2d 843, 849 (2d Cir. 1985)). By its own terms, *Franks* requires a substantial preliminary showing demonstrating the need for a hearing. *Franks*, 438 U.S. at 171; *United States v. One Parcel of Property Located at 15 Black Ledge Drive, Marlborougho, CT*, 897 F.2d 97, 100 (2d Cir. 1990) ("To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine."). A defendant is entitled to a hearing only if (1) a "deliberate falsehood or statement made with reckless disregard for the truth was included in the warrant

affidavit and [2] the statement was necessary to the judge's finding of probable cause." *United States v. Falso*, 544 F.3d 110, 125 (2d. Cir. 2008).

In addressing omissions in a search warrant application, the Second Circuit has held that "an affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *United States v. Awadallah*, 349 F.3d 42, 67–68 (2d Cir. 2003) (*quoting United States v. Colkley*, 899 F.2d 297, 300–01 (4th Cir. 1990)). Moreover, for a defendant to succeed in arguing that material omissions negate a finding of probable cause, the defendant "must demonstrate that [the agent] made these omissions 'deliberately, or with reckless disregard for the truth.'" *United States v. Harris*, 144 F. Supp. 3d 406, 411 (W.D.N.Y. 2015), *aff'd*, No. 16-3246, 2018 WL 3387528 (2d Cir. July 11, 2018) (*quoting United States v. Vilar*, No. S305CR621KMK, 2007 WL 1075041, at *25 (S.D.N.Y. Apr. 4, 2007)). "An inaccuracy that is the result of negligence or innocent mistake is insufficient." *United States v. Perez*, 247 F.Supp.2d 459, 472–73 (S.D.N.Y. 2003). In reviewing whether omissions in a search warrant affidavit cast doubt on a probable cause finding, the "omitted information and the information in the affidavit must be considered as a whole in determining if probable cause continues to exist." *United States v. Mandell*, 710 F. Supp. 2d 368, 374 (S.D.N.Y. 2010) (*quoting United States v. Marin–Buitrago*, 734 F.2d 889, 895 (2d Cir. 1984)).

Here, the defendant's argument about omitting any mention of his for-profit LLC is baseless on many levels. First, there was no material omission - the search warrant affidavit accurately described the defendant's true dealings in exotic cats. Second, even legitimate humane societies cannot sell animals for use as pets in New York, making his claims of "exemption" irrelevant. Third, the defendant was not an incorporated humane society in law or practice, negating his meritless reliance on an inapplicable defense.

The search warrant affidavit presented material facts, the relevant law, as well as a description and link to the defendant's website, Exoticcubs.com. *See* Exhibit 7, Exhibit 3. The website was predominately dedicated to the sale of servals and caracals as pets, with pricing, availability, logistics, and videos extolling the benefit of these wild animals as pets. Exoticcubs.com also included the phrases "U.S. Fish and Wildlife Importer/Exporter" and "Exotic Cat Humane Society, LLC" in the footer, along with a page describing the rescue services in which the defendant purportedly intended to engage. The affiant did not hide any reference to humane societies, he provided the only evidence supporting a claim that the defendant operated such a society, which amounted to a phrase on his website. Since that time, through state court proceedings and the instant Motion, there has been no further evidence showing that the defendant operated an incorporated humane society, engaged in any activities related to a humane society, or acted through a humane society. Instead, the issuing magistrate was presented with the evidence that existed: the defendant imported wild animals from South Africa, possessed those animals in his home, and offered the animals for sale as pets though his website, which included 13 photographs of individuals who recently purchased a pet. The search warrant application was appropriate based on the evidence, did not omit any material facts, and the Court's analysis need go no further than this.

Should the Court desire to delve into the defendant's claims of "exemption" as a humane society, his arguments become even more attenuated. The defendant states that he was "exempted" from NYECL 11-0512(2)(d), but only provides the second clause of the statute. *See* Dkt. #20-9, p. 22. What the defendant omitted is the first clause, which qualifies all exemptions as follows: "[The prohibition] shall not apply to the following persons and entities with respect to wild animals owned or harbored by them *solely for a purpose other than*

*for use as a pet.*" NYECL § 11-0512(2) (emphasis added). As shown by the defendant's website, transactions, and communications, the only intended or actual use for the servals and caracals he possessed was for use as pets. Whether or not he was a humane society is irrelevant, as the exemption only applies if the possession or sale is solely for a use other than as a pet. It is safe to assume that Justice Buscaglia was aware of the entire provision, as opposed to only a single subsection, and was therefore aware that no entity can possess wild animals for use as pets.

Yet for the sake of clarity, the government also notes that the defendant was in no way an "incorporated humane society." He was not incorporated at all, and he was not a humane society. As noted above, an LLC is not incorporated and is not a corporation. This is not just a paper distinction – had the defendant attempted to become an incorporated humane society, the New York Department of State would have required him to file under not-for-profit laws, and would have required a waiver from the American Society for the Prevention of Cruelty to Animals. New York Not-For-Profit Corporation Law (NYNPC) § 404(g).

This Court need not start from scratch; the defendant has unsuccessfully tried to claim humane society exemption in related legal proceedings. The defendant first advanced this argument in New York Supreme Court pursuant to his CPLR Article 78 petition, going so far as to submit a sworn affidavit claiming that he had "helped place unwanted animals, such as serval cats, into sanctuaries," that the South African breeder was a "dealer," and that the breeder provided servals and caracals that had been "designated to be killed on hunting preserves." *See* Exhibit 11. After reviewing the defendant's petition and evidence, New York Supreme Court Justice Mark J. Grisanti noted that the defendant had "made no mention" of the cubs being sold commercially for thousands of dollars. *See* Exhibit 12, p. 5. Justice Grisanti then ruled that the defendant's claims of being a humane society were legally "without merit,"

and he had not even provided "proof that his actions are humane in any way." *Id.*, p. 7. Justice Grisanti's ruling was largely based on the fact that the defendant's business was for-profit and did not have the waiver required of societies' for the prevention of cruelty to animals under New York law. *Id.*, pp. 3-7; NYNPC § 404(g). The fact that Justice Grisanti wholly rejected the defendant's claim to be a humane society is particularly relevant, as the defendant's Motion assumes the exact opposite conclusion – that Justice Buscaglia "surely" would not have issued a warrant if she had known he claimed to be a humane society.

Since that lawsuit, the South African breeder has expressly denied the defendant's claims. The breeder told USFWS SA Schneckenberger that he was not a "dealer," did not rescue the cats, and would never send his cats to a hunting preserve (both for humane reasons and because it would not be financially sustainable). Attached hereto as **Exhibit 13** is a copy of the USFWS investigative report detailing communications with the breeder.

Finally, the defendant's practices were in direct contradiction to the principles and guidance of the Humane Society of the United States (HSUS). For instance, the HSUS has an entire campaign dedicated to stopping the trade in wild animals as pets, focusing specifically on exotic cats. The HSUS emphasized their position against exotic cat ownership in a detailed 2016 article describing the many health and safety dangers caused by an Albany man who kept servals as pets. *See* Which Cat is living next door, The Humane Society of the United States, April 16, 2016, available at www.humanesociety.org/news/which-cat-living-next-door (last accessed May 27, 2020), *see also* Position Statements on Exotic Animals as Pets, ASPCA, available at www.aspca.org/about-us/aspca-policy-and-position-statements/position-statements-exotic-animals-pets (last accessed May 27, 2020). The HSUS also campaigns against the declawing of cats – a procedure that involves amputating the last

digit of the animal's toes in order to remove the nails. *See* The clawful truth, The Humane Society of the United States, July 1, 2016, available at [www.humanesociety.org/news/clawful-truth-about-declawing](www.humanesociety.org/news/clawful-truth-about-declawing) (last accessed May 27, 2020). New York Governor Cuomo has called declawing cats "archaic," "inhumane," and "unnecessary" when New York banned the practice in 2019. *See* Pressroom, July 22, 2019, available at [www.governor.ny.gov/news/governor-cuomo-signs-legislation-banning-cat-declawing](www.governor.ny.gov/news/governor-cuomo-signs-legislation-banning-cat-declawing) (last accessed May 27, 2020); N.Y. Ag. Mkts. L. § 381. Yet the defendant had cats declawed prior to delivering them, and his "care sheet" recommended declawing the cats "100% if the caracal/serval will be around people." Attached hereto as **Exhibit 14** is a veterinary bill for declawing a caracal, and **Exhibit 15** is a copy of the defendant's "Care sheet" available from his ndant's website). Even the defendant's personal care for the animals was questionable: necropsy reports for two cubs who died in Casacci's care describe sepsis, emaciation, "severe lymphoid depletion [ ] most likely attributable to severe stress," necrosis, and many other ailments. *See* Exhibit 9. This, in addition to the aforementioned unsatisfactory conditions reported by USDA inspectors and the blatantly commercial nature of the entire operation, makes it very clear that the defendant's business was an illegal exotic pet store, not a humane society.

Based on the foregoing, this Court should readily conclude that no material omission was made in the search warrant application, and as such, the defendant's motion to suppress on that ground should be denied without the holding of a *Franks* hearing.

2.    Law Enforcement Did Not Exceed the Scope of the Warrant.

In his Motion, the defendant argues that in seizing and searching certain items, law enforcement exceeded the scope of the warrant issued by the magistrate. *See* Dkt. #20-9, pp.

24-26. Based on application of the reasonableness standard, the defendant's argument lacks merit.

"A search must be confined to the terms and limitations of the warrant authorizing it," *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988), and a reviewing court must "look directly to the text of the search warrant to determine the permissible scope of an authorized search." *United States v. Bershchansky*, 788 F.3d 102, 111 (2d Cir. 2015). "However, when items outside the scope of a valid warrant are seized, the normal remedy is suppression and return of those items, not invalidation of the entire search." *Matias*, 836 F.2d at 747. The Second Circuit has noted that "suppression of all evidence seized is a drastic remedy, which is not justified unless those executing the warrant acted in flagrant disregard of the warrants terms." *United States v. Persico*, 2012 WL 2017224, at *8 (E.D.N.Y. June 4, 2012) (internal quotations omitted). In conducting the review, "[t]he general touchstone of reasonableness which governs Fourth Amendment analysis, governs the method of execution of the warrant." *United States v. Ramirez*, 523 U.S. 65, 71 (1998) (internal citation omitted).

In the present case, the defendant has generically argued that the law enforcement officers executing the warrant exceeded the scope of that warrant by seizing certain documentary items and a forensic image of the defendant's computer. However, the defendant fails to outline with specificity what physical items the defendant believed were seized that exceeded the scope of the warrant. Rather, the warrant application makes clear that the defendant was in the business of importing and selling wild African cats, and the request made to the magistrate was to seize business records evidencing the defendant's sale of cats. All of the physical items included on the search warrant return are arguable business related material that are well within the scope of the warrant. *See* Exhibit 7, p. 43. Moreover,

the government has been informed that that there were only two NYSDEC Investigators who seized evidence at the defendant's residence, and that they did so only after making a preliminary assessment that the seized material fell within the scope of the warrant. All of the physical evidence seized from the defendant's residence has been digitized and provided to the defendant as discovery. A review of that material confirm that the items were all related to the defendant's business activity of selling African cats, and are not overly voluminous. For example, for the items marked "Folder with 'Northwest IRS details,'" there were only five documents seized, which include documents for a business account with Northwest Bank for "Exotic Cat Humane Society Single Member LLC," business cards for individuals at Northwest Bank, and an IRS Employer Identification letter for "Exotic Cat Humane Society LLC." The government fails to see how these items were not within the scope of the warrant.

With respect to the forensic image of the defendant's computer, the warrant application specifically set forth probable cause to believe that business records relating to the defendant's sale of wild African cats would be in electronic format on a computer. *See* Exhibit 7, pp. 7-8. Although the defendant argues that the warrant does not use the term "computer," it is clear from the warrant that electronic items were authorized to be seized, and as mentioned, the application specifically referenced a computer. "Search warrants must be read in a common sense way," *United States v. Harding*, 273 F.Supp.2d 411, 425, n. 73 (S.D.N.Y.2003) (*citing Steele v. United States*, 267 U.S. 498, 503–04 (1925)), and "the question whether the evidence seized falls within the scope of the warrant ultimately turns on the substance of the item seized 'and not the label assigned to it by the defendant.'" *United States v. Hill*, 19 F.3d 984, 988 (5th Cir. 1994) (*quoting United States v. Word*, 806 F.2d 658, 661 (6th Cir. 1986)). The term "electronic" is defined, in part, as "implemented on or by means of a

computer : involving a computer;" and "of, relating to, or being a medium (such as television) by which information is transmitted electronically." *See* Merriam-Webster, definition of "electronic," available at www.merriam-webster.com/dictionary/electronic (last accessed May 27, 2020). Here, the items seized from the defendant's computer are electronic files, which is exactly what the warrant authorized.

Moreover, to minimize the impact to any of the defendant's lawful business pursuits, law enforcement was able to obtain a forensic image of the defendant's computer on-site without the need to remove it from the scene. Thereafter, the investigation team then created a list of key word (all related to the defendant's sale of servals and caracals), which were then used to search the forensic image of the defendant's computer. Only those results were reviewed by the investigative team, which were also produced to the defendant in discovery. Similar to the physical files seized, the defendant has failed to set forth with specificity which files he believes were seized outside the scope of the warrant.

Therefore, the defendant has failed to set forth any valid basis to believe that law enforcement exceeded the scope of the search warrant in seizing items from the defendant's residence, and as such, the defendant's Motion on this ground should be denied.

3.     <u>The Contraband Wildlife was Appropriately Seized from The defendant's Residence.</u>

In his Motion, the defendant argues that law enforcement improperly seized four servals and two caracals from the defendant's residence during execution of the warrant, and further violated the Fourth Amendment by sending those cats to wildlife sanctuaries in Nevada and Arkansas. See Dkt. #20-9, pp. 26-27. The defendant's argument is entirely without merit.

In the search warrant application, the affiant specifically outlined how the defendant's possession of servals and caracals were contrary to New York State law, and referenced the expectation that such cats were expected to be located at the defendant's residence. Moreover, the application set forth that if servals and caracals were present at the defendant's residence at the time the warrant was executed, that law enforcement intended to seize those cats, provide them with veterinary care, and then place then with sanctuaries specifically authorized to possess them. *See* Exhibit 7. In the search warrant signed by the magistrate, law enforcement was specifically authorized by the court to "Enter and search the above premises and seize six (6) Serval kittens and two (2) Caracal kittens and any other illegally possessed regulated wild animals." *Id.* at p. 40. Therefore, there is no question that the warrant allowed seizure of the wild African cats from the defendant's residence.

The gravamen of the defendant's argument is that the transportation of the wild animals to out-of-state sanctuaries authorized to possess the wildlife violated the defendant's "constitutional due process rights under the Fourth, Fifth, and Sixth Amendments, and Federal Rule of Criminal Procedure 16(a)1(E)." Dkt. #20-9, p. 27. Yet, the defendant presents no case law to the Court to support this argument. The defendant also neglects to note that the four servals and two caracals do not give rise to any present charges in Indictment. Although the defendant's possession of these cats for future sale will be offered by the government at trial as likely 404(b) evidence, these cats themselves do not form the basis for any federal charges. Therefore, there is no valid basis for the defendant to seek suppression of evidence, and the defendant's Motion on this ground should be denied.

4.      The Good Faith Doctrine Applies to the Search and Seizure of Items from the Defendant's Residence.

In passing, the defendant asserts in his Motion that the good faith doctrine set forth in *United States v. Leon*, 468 U.S. 897 (1984) is inapplicable here. *See* Dkt. #20-9, pp. 27-28. However, the defendant does not identify with specificity why the Court should disregard the good faith doctrine. The defendant's Motion is without merit.

The Fourth Amendment commands that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." In *Weeks v. United States*, 232 U.S. 383 (1914), the Supreme Court adopted the exclusionary rule as "the principal judicial remedy to deter Fourth Amendment violations," which if applied, "requires trial courts to exclude unlawfully seized evidence in a criminal trial." *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016). However, the "exclusionary rule generates 'substantial social costs,'" and as a result, "[s]uppression of evidence … has always been our last resort, not our first impulse." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) (*quoting Leon*, 468 U.S. at 907). Application of the exclusionary rule "exacts a heavy toll on both the judicial system and society at large," including that it "almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence," where the "bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment." *Davis v. United States*, 564 U.S. 229, 237 (2011). The exclusionary rule's costs to society "presents a high obstacle for those urging [its] application," and only applies "where its deterrence benefits outweigh its 'substantial social costs.'" *Pennsylvania Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 363-65 (1998) (*quoting Leon*, 468 U.S. at 907).

Focusing on the deterrent value of the exclusionary rule, the Supreme Court developed a good faith exception to application of the rule, which provides that a police officer relying

in "good faith" on a warrant should not bear the consequences of a magistrate's error in issuing that warrant unless the officer misled the magistrate in his affidavit; the magistrate "wholly abandoned his judicial role" such that "no reasonably well trained officer should rely on the warrant;" or the warrant was "based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Leon*, 468 U.S. at 923 (*quoting Brown v. Illinois*, 422 U.S. 590, 610-11 (1975) (Powell, J., *concurring* in part)). In arriving at this holding, the Court acknowledged the following three factors:

> First, the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates. Second, there exists no evidence suggesting that judges and magistrates are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion. Third, and most important, we discern no basis, and are offered none, for believing that exclusion of evidence seized pursuant to a warrant will have a significant deterrent effect on the issuing judge or magistrate.

*Leon*, 468 U.S. at 916.

The Second Circuit fully embraces the good faith doctrine from *Leon*, and has held that because a suppression of evidence "remedy exacts a heavy toll on the justice system, the exclusionary rule will apply only to deter 'deliberate, reckless, or grossly negligent conduct' by law enforcement." *United States v. Boles*, 914 F.3d 95, 103 (2d Cir. 2019) (*quoting Herring v. United States*, 555 U.S. 135, 144, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009)). "When an officer genuinely believes that he has obtained a valid warrant from a magistrate and executes that warrant in good faith, there is no conscious violation of the Fourth Amendment, 'and thus nothing to deter.'" *United States v. Raymonda*, 780 F.3d 105, 118 (2d Cir. 2015) (*quoting Leon*, 468 U.S. at 920-21).

Here, the defendant does not articulate why the good faith doctrine should not apply. As such, unless and until the defendant can specify the basis for his objection to application of the good faith doctrine, the defendant's Motion on this ground should be rejected.

> 5. The Defendant has Failed to Identify Any Fruit of the Poisonous Tree Evidence that Should be Suppressed.

In his Motion, the defendant makes a fleeting argument relating to suppression of evidence derived as a result of Fourth Amendment violations. *See* Dkt. #20-9, pp. 28-29. However, the defendant does not identify any such evidence for the Court to consider, and only speculatively concludes that the government "may have obtained derivative evidence from the illegal search and seizure from Mr. Casacci." *Id.* at 29. As already addressed above, there has been no illegal search or seizure from the defendant, and without additional specification from the defendant regarding the nature of the fruit of the poisonous tree evidence he is referring to, the defendant's Motion on this ground should be denied without the holding of an evidentiary hearing.

## H. The Defendant's Motion for Rule 16, Jencks Act, and Expert Discovery Should be Denied.

The defendant acknowledges that voluntary discovery has been provided, and now makes additional specific requests for discovery information, witness statements, and expert discovery. *See* Dkt. #20-9, pp. 30-34, 42-43, and 44-45. The government generally responds to the defendant's request by stating that it has, to date, fully complied with Rule 16 and has made available for inspection and copying by the defendant and defense counsel all items falling within Rule 16. With respect to the defendant's request for the disclosure of expert witnesses intended to be called at trial, such a request is premature at this point, as no experts have been designated by the government for this case. In the event that the government does

designate expert witnesses, it will comply with the discovery obligations pursuant to Fed. R. Crim. P. 16 (a)(1)(G). With respect to Jencks Act material, the government responds that it has already provided all witness statements in this case that the government intends to call at trial, and as additional witnesses and/or witness statements are identified, that material will be provided to the defendant. Therefore, the defendant's Motion for Rule 16 discovery and witness statements should be denied.

## I.    The Defendant's Motion to Compel the Production of Brady Material Should be Denied.

The defendant seeks production of materials under the authority of *Brady v. Maryland*, 373 U.S. 83 (1963). *See* Dkt. #20-9, pp. 34-42. The government acknowledges its affirmative continuing duty to provide the defendant with exculpatory evidence, as well as evidence that the defense might use to impeach the government's witnesses at trial. *See United States v. Bagley*, 473 U.S. 667 (1985); *Giglio v. United States*, 405 U.S. 150 (1972). The government believes it has already disclosed all *Brady/Giglio* material currently in the government's possession. Should any further *Brady/Giglio* material arise, the government acknowledges its duty to provide that material to the defendant.

## J.    The Government Agrees to the Preservation of Rough Notes.

The defendant moves this Court to issue an order requiring all government agents to preserve their rough notes. *See* Dkt. #20-9, pp. 43-44. The government agrees to, and has already instructed the criminal agents involved in this matter to preserve their rough notes. Therefore, this issue is moot.

**K.** **The Defendant's Motion for Disclosure of Evidence Pursuant to Federal Rules of Evidence 404(B), 608, and 609 Should be Denied.**

The defendant requests the Court to compel the disclosure of evidence pursuant to Rules 404(b), 608, and 609 of the Federal Rules of Evidence. *See* Dkt. #20-9, p. 45.

Rule 404(b) of the Federal Rules of Evidence provides that the prosecution "shall provide reasonable notice in advance of trial ... of the general nature of any such evidence [of other crimes, wrongs, or acts] it intends to introduce at trial." Fed. R. Evid. 404(b). What constitutes reasonable notice "depends on the circumstances of the particular case." *United States v. Reddy*, 190 F.Supp.2d 558, 577 (S.D.N.Y. 2002). The District Court judge assigned in this case typically requires such disclosure by a date certain prior to trial. The United States will provide notification of any Rule 404(b) evidence it intends to introduce at trial well in advance of trial. The trial in this matter, however, has not yet been scheduled. The defendant's motions, thus, should be denied as premature. *See United States v. Birkett*, 1999 WL 689992, *6 (S.D.N.Y.) (denying as premature defendants' motion for 404(b) evidence).

With respect to the defendant's requests under Rule 609, the defendant does have prior convictions that the government would seek to introduce if the defendant elects to testify at trial. The government believes that the defense is aware of these convictions, however, a criminal history of the defendant will be provided as part of discovery. Defendant is not entitled to pretrial disclosure of additional evidence the government intends to use to cross-examine him should he testify at trial. *See, e.g., United States v. Tomblin*, 46 F.3d 1369, 1388 n.51 (5th Cir. 1995) (indicating that Rule 608(b) does not require advance notice of the prosecutor's intent to use specific instances of defendant's conduct to impeach the defendant when he testifies); *United States v. Baskes*, 649 F.2d 471, 477 (7th Cir. 1980) (same); *United States v. Messino*, 855 F. Supp. 955, 965 (N.D. Ill. 1994) (same).

Further, any impeachment evidence concerning the government's witnesses will be provided in accordance with the scheduling order set by the District Court for the trial of this action. Therefore, the government respectfully moves this Court to deny the defendant's motion on the ground that it is unwarranted.

## L. The Government Agrees to Provide Advance Notice of an Intention to Offer Evidence Pursuant to Federal Rule of Evidence 807.

The defendant has moved this Court for an order compelling the government to provide advance notice of any intent to offer evidence pursuant to Federal Rule of Evidence 807. *See* Dkt. #20-9, p. 45. The government is not opposed to this request, and if the government intends to offer evidence subject to the residual hearsay exception, the notice required by FRE 807(b) shall be provided.

## M. The Defendant's Motion Pursuant to Federal Rule of Evidence 806 Should be Denied as Unwarranted.

In his Motion, the defendant separately moves this Court for an order to compel the government to produce evidence pursuant to Federal Rule of Evidence 806. The government views this request for relief as an offshoot of its *Brady* obligations. The government will continue to comply with its obligations under *Brady*, and as such, no court order of the sort requested here is warranted.

## III.  CONCLUSION

For the foregoing reasons, the government respectfully submits that the defendant's motions should be denied in their entirety.


DATED: Buffalo, New York, May 29, 2020.

Respectfully submitted,

JAMES P. KENNEDY, JR.
United States Attorney

*S/ AARON J. MANGO*

BY:    _____

AARON J. MANGO
Assistant U.S. Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
(716) 843-5882
aaron.mango@usdoj.gov

*S/ PATRICK M. DUGGAN*

_____

PATRICK M. DUGGAN
Trial Attorney
United States Department of Justice
Environmental Crimes Section
150 M Street NE
Washington, DC 20002
(202) 305-0366
patrick.duggan@usdoj.gov