1      **UNITED STATES DISTRICT COURT**
       **WESTERN DISTRICT OF NEW YORK**
2
       _____
3      UNITED STATES OF AMERICA,
                                        Case No. 1:20-CR-5
4                     Plaintiff,              (LJV)(MJR)

5      vs.                              August 21, 2020

6      CHRISTOPHER D. CASACCI, d/b/a
       EXOTIC CUBS.COM,
7      _____Defendant._____

8

          **DIGITALLY-RECORDED TRANSCRIPT OF EVIDENTIARY HEARING**
9            **BEFORE THE HONORABLE MICHAEL J. ROEMER**
                **UNITED STATES MAGISTRATE JUDGE**
10
       APPEARANCES:          JAMES P. KENNEDY, JR.
11                           UNITED STATES ATTORNEY
                             BY: AARON J. MANGO, ESQ.
12                               CAITLIN HIGGINS, ESQ.
                             Assistant United States Attorneys
13                           Federal Centre
                             138 Delaware Avenue
14                           Buffalo, New York 14202
                                    and
15                           PATRICK M. DUGGAN, ESQ.
                             U.S. Department of Justice
16                           601 D Street NW
                             Washington, DC 20535
17                           Via Telephone
                             For the Plaintiff
18
                             JAMES W. GRABLE, JR., ESQ.
19                           NICHOLAS A. ROMANO, ESQ.
                             Connors LLP
20                           1000 Liberty Building
                             Buffalo, New York 14202
21                           For the Defendant

22     PRESENT:              CARLY DURST, Paralegal

23     DEPUTY CLERK:         ROSALIE A. ZAVARELLA

24     RECORDER:             FTR GOLD

25     TRANSCRIBER:          ANN M. SAWYER, FCRR, RPR, CRR,
                             NYRCR, NYACR, Notary Public

 1          (Proceedings commenced at 10:25 a.m.)

 2          DEPUTY CLERK:  All rise.

 3          MAGISTRATE JUDGE ROEMER:  Have a seat, please.

 4          DEPUTY CLERK:  United States District Court for the

 5  Western District of New York is now in session.  The Honorable

 6  Michael J. Roemer presiding.

 7          We're here on the matter of United States versus

 8  Christopher D. Casacci, case number 20-CR-5, for an

 9  evidentiary hearing.

10          Counsel for the government, please state your name

11  for the record.

12          MR. MANGO:  Good morning, Your Honor.  Aaron Mango

13  for the United States.

14          MS. HIGGINS:  Good morning, Your Honor.  Caitlin

15  Higgins on behalf of the United States.

16          MR. MANGO:  And I would note, Judge, trial attorney

17  Patrick Duggan is on the phone.  He's under the weather, so

18  that's why he did not make the trip.

19          MAGISTRATE JUDGE ROEMER:  Okay.

20          DEPUTY CLERK:  Counsel for the defendant, please

21  state your name for the record.

22          MR. GRABLE:  Good morning, Your Honor, James Grable

23  appearing for Mr. Casacci.  I have with me Carly Durst, who is

24  the paralegal managing defense exhibits, and Nick Romano for

25  Mr. Casacci.

1          MAGISTRATE JUDGE ROEMER:  Okay.  Good morning.  We're

2     here for an evidentiary hearing on the motion to suppress

3     statements.

4          Before we get started, I -- before we get started, I

5     looked at these exhibits lists.  I guess I'm concerned,

6     what -- what's going on with pictures Mr. Mango?

7          MR. MANGO:  Well, Your Honor, we had, I believe,

8     there's seven or eight pictures.  Those pictures relate to

9     areas in the residence where certain -- certain activity

10    occurred that there's going to be testimony about.  I know in

11    the defense exhibits, they -- they -- exhibited every single

12    picture, I think most of them --

13         MAGISTRATE JUDGE ROEMER:  Mr. Grable, what's the deal

14    with the pictures?  To be honest with you, I'm not going to

15    sit here today and look at 183 pictures.

16         MR. GRABLE:  I don't expect you to, Judge.  We wanted

17    to include any potential exhibit.  I suspect that I may need

18    four or five just to orient witnesses to time and place.

19         MAGISTRATE JUDGE ROEMER:  Okay.

20         MR. GRABLE:  I don't anticipate using all of them,

21    and I may not need any of them.  I just don't know.  But I

22    didn't not want to have them on the list.

23         MAGISTRATE JUDGE ROEMER:  I understand.  So we're

24    going to, I mean, we narrowed the focus of the hearing, right?

25    It's the statements that he allegedly made to law enforcement.

1   So if they're relevant to that, like he was in this room and

2   you want to show me that room, I don't know, is he going to be

3   in the pictures?

4          MR. MANGO:  He's not in the pictures.

5          MAGISTRATE JUDGE ROEMER:  Okay.  You know, if you

6   want to show me the chair he sat in or something like that,

7   that's okay.  But, I mean, there's stuff here about his

8   daughter's room and all that, and I'm not going to look at all

9   these pictures.  If you want to submit them all to me without

10  opposition from the government just so I have them, that's

11  fine with me, also, but I don't want to go through this.

12         Now, what about can we agree that all the exhibits

13  are going to be admissible?  You know, I'd like to save time

14  and don't go through the --

15         MR. MANGO:  We would not object to any of the defense

16  exhibits.  I don't think, I don't believe we --

17         MAGISTRATE JUDGE ROEMER:  Okay.  So we can forego

18  that.  So, all right.  So all the exhibits listed are admitted

19  into evidence.  Okay.

20         MR. GRABLE:  Thank you.

21         MR. MANGO:  Thank you, Your Honor.

22         MAGISTRATE JUDGE ROEMER:  Okay.  All right.  I knew

23  there was a request to take off masks.  I'm not a -- I think

24  we should stick with the masks on.  I keep my mask on, so

25  we'll go for that because people got to, you know, clean these

1  places up, so the less possible contamination of them, the

2  better.

3          So, are you ready to go, Mr. Mango?

4          MR. MANGO:  Yes, Judge, we are.

5          MR. GRABLE:  Your Honor, may I make one request?

6          MAGISTRATE JUDGE ROEMER:  Sure.  You can stay seated.

7          MR. GRABLE:  May we exclude any witnesses who haven't

8  yet testified?

9          MAGISTRATE JUDGE ROEMER:  Yeah.  Are there any

10 witnesses in here?

11         MR. MANGO:  No, Judge, we're going to pull three

12 witnesses:  Retired Lieutenant Robert O'Connor, he's outside;

13 we're going to call Investigator Robert Peinkofer, he's

14 outside; and Environmental Conservation Officer Scott

15 Marshall, he's outside.  So --

16         MAGISTRATE JUDGE ROEMER:  Okay.

17         MR. MANGO: -- the other witnesses are just interested

18 parties.

19         MAGISTRATE JUDGE ROEMER:  Okay.  Is that okay,

20 Mr. Grable?

21         MR. GRABLE:  Okay.

22         MAGISTRATE JUDGE ROEMER:  Okay.

23         MR. MANGO:  Great.  We'll call Retired Lieutenant

24 Robert O'Connor.

25         MAGISTRATE JUDGE ROEMER:  Okay.  As he's coming in,

1  after each witness, we're going to take a little bit of a

2  break so that Rosalie has time to wipe everything down and

3  have it dry up, okay?

4

5  **R O B E R T   O ' C O N N O R**, having been duly called and

6  sworn, testified as follows:

7         MAGISTRATE JUDGE ROEMER:  Mr. Grable, do you need to

8  ask something?

9         MR. GRABLE:  We -- it's my understanding that Officer

10  Schneckenberger, who prepared one of the reports, is in the

11  courtroom.

12         I think it's about a 1 percent chance that he might

13  be called by the defense at some point in this hearing.  It is

14  very unlikely, but not impossible, and so I would ask that he

15  be excluded.

16         MR. MANGO:  If -- if that's the case, Judge, he's

17  Special Agent Lee Schneckenberger, he worked alongside

18  Lieutenant O'Connor.  He's not on our witness list.  He wasn't

19  identified by defense.

20         MAGISTRATE JUDGE ROEMER:  Okay.  Let's have him step

21  out.

22         MR. MANGO:  Okay.  Lee?  (Unintelligible.)

23         (Officer Schneckenberger exited courtroom.)

24         MR. MANGO:  May I proceed, Your Honor?

25         MAGISTRATE JUDGE ROEMER:  Sure.

1          MR. MANGO:  Thank you.

2          **DIRECT EXAMINATION BY MR. MANGO:**

3   Q.  Good morning.

4   A.  Good morning.

5   Q.  How are -- are you currently employed right now?

6   A.  I'm not currently employed, I'm retired.

7   Q.  And how long have you been retired?

8   A.  I retired at the end of March of this year.

9   Q.  And if you can tell the Court how were you last employed?

10  A.  My last employment was as lieutenant with the New York

11  State Environmental Conservation Police in the Bureau of

12  Environmental Crimes Investigation in Buffalo, New York.

13  Q.  Okay.  How long did you serve in that capacity as a

14  lieutenant with the Department of Environmental Conservation,

15  New York State agency?

16  A.  Yes, that's correct, I was -- I became a lieutenant in

17  2013.

18  Q.  And can you describe for the Court what duties you had

19  while you were a lieutenant?

20  A.  My duties were to supervise that unit.  The unit is the

21  Bureau of Environmental Crimes Investigation.  So they

22  were -- over the course of the time I was there, five or six

23  investigators that I supervised conducting investigations

24  into environmental crimes, wildlife issues, those kinds of

25  things.

1  Q.  Okay.  Can you just, for the judge and the Court, is

2  there also a different sort of uniformed division at DEC,

3  we'll call it the Department of Environmental Conservation,

4  DEC.  So is there a uniformed division at DEC, and then the

5  investigative division?

6  A.  Yes, there is.  The DEC is a state agency.  And within

7  the agency is what's called the Division of Law Enforcement.

8  The Division of Law Enforcement is made up of uniformed

9  officers and plain clothes investigators.

10 Q.  Okay.  And the uniformed officers, are those called

11 environmental conservation officers?

12 A.  That's right, that's their title.

13 Q.  Now, prior to becoming a lieutenant, did you hold any

14 other position for DEC?

15 A.  Yes, prior to becoming a lieutenant, I was an

16 investigator in that unit.  I was about -- I became an

17 investigator in 2005.

18 Q.  2005 until 2013, you testified?

19 A.  That's correct.

20 Q.  You were an investigator.

21 A.  That's right.

22 Q.  And then 2013 until you retired earlier this year, you

23 were a lieutenant?

24 A.  Yes.

25 Q.  Okay.  And then did you, prior to becoming an

1    investigator, did you have any other law enforcement work or

2    experience with the Department of Environmental Conservation?

3    A.  Yes, I was an environmental conservation officer starting

4    in 1989.

5    Q.  So from 1989 until 2005, you were a ECO, environmental

6    conservation officer?

7    A.  That's correct.

8    Q.  So just for the Court and the government, how long in

9    total have you been a law enforcement officer with DEC?

10   A.  Just over 31 years.

11   Q.  Now, prior to becoming a law enforcement officer with

12   DEC, did you receive any type of training?  And if so, please

13   describe that for the Court.

14   A.  Upon being hired, I received the training, so it wasn't

15   before.  But upon hiring, conservation officers go to a six

16   months residential academy.

17   Q.  Essentially, a police academy?

18   A.  It's a police academy, yes.

19   Q.  And following that police academy, did you engage in

20   continuing training as a law enforcement officer?

21   A.  Yes.  From there, it would be services conducted out of

22   the department, as well as many other trainings that were

23   conducted by various other entities not by the department,

24   but lots of different trainings over the years.

25   Q.  Did the trainings involve the mechanics of executing a

1    search warrant?

2    A.  Yes, they did.

3    Q.  Did the trainings involve the taking of witness

4    statements?

5    A.  Yes.

6    Q.  Are you, Lieutenant O'Connor, familiar with Miranda

7    warnings and a suspect's constitutional rights?

8    A.  I am.

9    Q.  Do you understand under what circumstances you must

10   provide Miranda warnings?

11   A.  Yes, I do.

12   Q.  Let me bring your attention to the name Christopher

13   Casacci.  Are you familiar with an investigation involving

14   that individual?

15   A.  Yes, I am.

16   Q.  Can you tell the Court how you were involved in that

17   investigation?

18   A.  Investigator Peinkofer was the lead investigator in the

19   case, and I was his supervisor.  So, that's how I'm familiar

20   with the case.

21   Q.  Okay.

22   A.  As a supervisor.

23   Q.  In a supervisory capacity, you oversaw the investigation?

24   A.  Yes, I did.

25   Q.  Now, did there come a time when you met Mr. Casacci?

1   A.  Yes, there was a time where I met him.

2   Q.  And do you see him here in court?

3   A.  Yes, I do.

4   Q.  Can you please point to him?  Let's identify him.  Can

5   you point to him and identify an article of clothing, please?

6   A.  Yeah.  He's standing to the right of Mr. Romano wearing a

7   blue tie and a white shirt.

8           MR. MANGO:  Thank you.  Your Honor, may the record

9   reflect that identification?

10          MAGISTRATE JUDGE ROEMER:  The record will so reflect.

11          BY MR. MANGO:

12  Q.  Let's move ahead.  Did you participate in an execution of

13  a search warrant at the defendant's residence on July 5th of

14  2018?

15  A.  Yes, I did.

16  Q.  And can you tell the Court what your role was during that

17  search warrant?

18  A.  In general, my role was to supervise the execution of the

19  warrant, and more specifically, I greeted Mr. Casacci upon

20  arrival at the residence.

21  Q.  Can you tell the Court what you were wearing that day?

22  A.  I was wearing business attire.  It was a shirt and tie.

23  I had a police ballistic vest on with a shield with a lanyard

24  around my neck.  I was wearing a firearm.

25  Q.  You had a firearm?

1   A.   I did.

2   Q.   And prior to this search warrant, approximately how many

3   search warrants had you participated in during your law

4   enforcement career?

5   A.   I would estimate that at approximately 30 to 35.

6   Q.   And I imagine probably more during your time as an

7   investigator and a lieutenant, and less so as an ECO; is that

8   right?

9   A.   That's correct.

10  Q.   So approximately of those 30 search warrants, how many

11  did you act as a supervisor in?

12  A.   I would say between 15 and 20 of the 30 to 35.

13  Q.   Okay.  Did you have any role in drafting of the search

14  warrant?

15  A.   I did, yes.

16  Q.   Can you tell the Court what role you had in drafting the

17  search warrant?

18  A.   Investigator Peinkofer and I worked on that together.  He

19  primarily drafted it, but he did so with some assistance from

20  me.

21  Q.   So were you the affiant on the search warrant?

22  A.   I was not the affiant, Investigator Peinkofer was the

23  affiant.

24  Q.   And at the time the search warrant was executed, were you

25  or anybody else planning to arrest the defendant?

1   A.  There was no plan to arrest the defendant.

2   Q.  Okay.  Why not?

3   A.  The search warrant is a tool to gain evidence, and we

4   weren't at the point in the investigation where we were

5   prepared to make an arrest.

6   Q.  Did you have an arrest warrant in hand?

7   A.  No, I didn't.

8   Q.  Tell the Court approximately what time the warrant was

9   executed.

10  A.  The arrival was a few minutes before 10:00 in the

11  morning.

12  Q.  And tell -- walk the Court through what happened when the

13  search warrant was executed.  What -- what did you do

14  essentially, initially?

15  A.  There were several members of the department that

16  approached the door with me.  It was myself, Investigator

17  Piwko, Investigator Peinkofer, Investigator -- or, correction

18  on that, Officer Machnica, and Lieutenant, who's our Captain,

19  Haag.  So that group of members stood on the doorstep.

20      I knocked on the door, or rang the bell.  I don't

21  remember whether I rang the bell or knocked on the door.  But

22  the defendant Casacci answered the door.

23  Q.  All right.  Now, would you call this -- this team that

24  approached sort of the initial contact team?

25  A.  That would be an appropriate way to describe it.

1  Q.  And who was in the lead of that initial contact team?

2  A.  I was.

3  Q.  Can you tell the Court what the purpose of having a -- so

4  there's other law enforcement behind you then?

5  A.  That's correct.

6  Q.  What's the purpose of having an initial contact team?

7  A.  To establish contact and to advise anybody that might be

8  present what the purpose and intent of our being there was.

9  Q.  Okay.  So you mentioned at some point you knocked or rang

10  the doorbell, you don't recall that, and the defendant

11  answered the door?

12  A.  Yes.

13  Q.  Did you then have a conversation with the defendant?

14  A.  I did.

15  Q.  Can you tell the judge what your demeanor was like when

16  you started to talk with the defendant?

17  A.  Yes, my demeanor was professional.  It was calm,

18  collected, businesslike.

19  Q.  And how about the defendant's demeanor when you first

20  started talking to him?

21  A.  He was receptive, but very quiet.

22  Q.  Can you tell the Court what you told the defendant when

23  you started speaking with him?

24  A.  I told him who I was, that I was Lieutenant O'Connor with

25  the environmental conservation police.  We had a warrant to

1  search his residence.

2      Then I introduced some of the people that were up on the

3  step with me.  I told them how we were going to proceed.

4  That he was going to be checked for weapons or firearms,

5  asked him if he had any.

6      I told him that he was not under arrest.  I told him that

7  he was free to leave.  I told him that if he did leave, that

8  he wouldn't be able to return to the residence until after

9  the completion of the warrant, and that if he stayed, he

10  would be escorted throughout the duration of the execution of

11  the warrant.

12  Q.  Where did this conversation occur?

13  A.  I was on the front step, and Mr. Casacci was in the

14  threshold of the door.

15  Q.  Was the defendant given a copy of the search warrant at

16  this time?

17  A.  He was.

18  Q.  Okay.  Was the defendant in your initial remarks, was the

19  defendant told that the search warrant was focused on exotic

20  African cats, or Caracals or Servals, or anything like that?

21  A.  Yeah, I told him that it involved his business,

22  ExoticCubs.com.

23  Q.  And when you first were speaking with the defendant, did

24  he have any questions for you?

25  A.  I asked him if he had any questions.  And he didn't

1  really respond, that I recall.  He didn't ask me any

2  questions.

3  Q.  Okay.  Do you recall explicitly telling him that he was

4  not under arrest?

5  A.  Yes, I do.

6  Q.  Explicitly telling him he was free to leave?

7  A.  Yes.

8  Q.  And telling him if he left, that he couldn't come back?

9  A.  Yes.

10  Q.  And that if he stayed -- what did you tell him if he

11  stayed?

12  A.  If he stayed, he would be escorted through the duration

13  of the warrant for security purposes.

14  Q.  Is it standard procedure to have someone sort of shadow

15  individuals at the scene around?

16  A.  Yes, it is.  It's a very standard practice in the

17  execution of a search warrant.

18  Q.  Why would that be a standard practice.  What is the

19  purpose of that?

20  A.  The purpose of that is the safety of all involved, the

21  defendant as well as those executing the warrant.  And also

22  to help mitigate against any interference with whatever

23  evidence might be there.

24  Q.  Now, did -- did the defendant affirmatively indicate

25  whether he would stay or leave, if you recall?

1  A.  I don't recall him affirmatively indicating either way,

2  but he did stay.

3  Q.  Okay.  And so at some point, did somebody else accompany

4  the defendant around the premises, or just shadow him?

5  A.  Yes, at that point, and then throughout the duration,

6  Officer Marshall, ECO Marshall was assigned to escort and

7  shadow the defendant.

8  Q.  Okay.  So ECO -- that's Scott Marshall?

9  A.  That's correct.

10 Q.  And he's in uniform?

11 A.  Yes.

12 Q.  All right.  If you know then, during the search warrant,

13 did the defendant move around the residence?

14 A.  Yes, he did.

15 Q.  And he was shadowed by ECO Marshall?

16 A.  Yes, he was.

17 Q.  Now, during this initial conversation at the door, okay,

18 did the defendant mention anything to you about an attorney?

19 A.  No, he did not.

20 Q.  All right.  Did he mention anything to you that he did

21 not want to speak with you?

22         MR. GRABLE:  Objection, Your Honor, it's been asked

23 and answered, he said he doesn't know.

24         MAGISTRATE JUDGE ROEMER:  Overruled.  You may ask

25 your questions.

1          THE WITNESS:  Would you repeat the question?

2          MR. MANGO:  Yeah.

3          BY MR. MANGO:

4   Q.  During this initial conversation, did the defendant

5   mention anything to you about not wanting to speak to you?

6   A.  I don't recall him saying anything about not wanting to

7   speak to me.

8   Q.  Now, did you take any notes from the execution of the

9   search warrant?

10  A.  No, I did not.

11  Q.  Are you familiar with something called an entry and exit

12  log?

13  A.  Yes, I am.

14  Q.  Okay.  What's the purpose of an entry and exit log?

15  A.  The purpose is to document what members of the

16  department, other people involved in the warrant, people who

17  were present at the scene, who was there, what time they

18  arrived, what time they left.

19  Q.  And do you know if an entry and exit log was created for

20  this search on July 5th, 2018?

21  A.  Yes, there was.

22  Q.  And did you review that document?

23  A.  I have.

24          MR. MANGO:  Judge, just one moment.

25          BY MR. MANGO:

1   Q.  Okay.  So, Lieutenant O'Connor, there should be a

2   document on your screen.  Do you see that?

3   A.  I do.

4           MR. MANGO:  Okay.  Judge, I would move -- I believe

5   there are already -- I don't know if I would need to move them

6   into evidence?

7           MAGISTRATE JUDGE ROEMER:  They're already in

8   evidence.

9           MR. MANGO:  Thank you.

10          BY MR. MANGO:

11  Q.  Showing you what's in evidence, Government Exhibit 2.

12  I'll focus in on this top part.  Do you see this now on your

13  screen, Lieutenant?

14  A.  I do, but it's cut off on the bottom.

15  Q.  It's cut off on the bottom?

16  A.  Okay.

17  Q.  We can get down on the bottom by moving it here?

18  A.  Okay.

19  Q.  Do you see your name on this log?

20  A.  Yes, I do.

21  Q.  Okay.  What time is associated with your in and out on

22  this log?

23  A.  This log indicates that I was on the scene or in the

24  residence at 9:50, and that I exited at 12:54.

25  Q.  Okay.  And directing your attention as well to the

1    bottom, do you see the defendant's name on this log?

2    A.  Yes, I do.

3    Q.  What is his in and out time?

4    A.  He was there when we arrived, so 9:50 is his in time.

5    And his exit time is 12:13.

6    Q.  Okay.  So that's about a 40 minutes -- 41 minutes before

7    you; is that right?

8    A.  That's correct.

9    Q.  Right.  Now, we'll get back to that in a second.  There's

10   a name of (unintelligible) defendant's name.  Do you know who

11   she is?  Haley Keyser?

12   A.  She was somebody who arrived at the residence, and it's

13   my understanding that she was in a relationship with the

14   defendant.

15   Q.  Okay.  Like a girlfriend?

16   A.  Yes, an adult female.

17   Q.  And what time did she leave the premises?

18   A.  She departed and left the premises at 12:13.

19   Q.  Do you know if they left together?

20   A.  Yes, they did.

21   Q.  The defendant and this woman?

22   A.  Yes.

23   Q.  Now, at 12:13, at the time the defendant leaves the

24   premises, was the execution of the search warrant completed?

25   A.  It was not.  We were there for another 40 to 41 minutes,

1   approximately.

2   Q.  Okay.  So the defendant voluntarily left the premises

3   before the end of the warrant?

4   A.  Yes, he did.

5   Q.  And when the defendant left the residence, again, at

6   12:13 p.m. did he give you any instructions on what to do

7   when you were finished?

8   A.  Yes.  We discussed how to secure the house.  I don't

9   remember specifically what the instruction was, but it was

10  basically to lock the door when we left.

11  Q.  Let's just scroll down on this document.  Do you know who

12  created this document?

13  A.  The black marks were created by the lead investigator,

14  Investigator Peinkofer, and Conservation Officer Scott

15  Marshall filled it in.

16  Q.  Okay.  Now, do you know, Lieutenant, if any photographs

17  were taken during the search warrant?

18  A.  Yes, there were photographs taken.

19  Q.  Do you know who took those photographs?

20  A.  Investigator Piwko was the photographer.

21  Q.  Okay.  And he's an investigator who you supervised in

22  your unit?

23  A.  Yes, he is.

24  Q.  And you reviewed those photographs prior to testifying

25  here today?

1    A.  Yes.

2    Q.  Is there an accompanying photo log with those documents,

3    or with those photos?

4    A.  Yes.

5    Q.  And you have reviewed the photo log?

6    A.  I have.

7    Q.  Let me show you what's in evidence as Government

8    Exhibit 3.  Is this, again, a book -- it's chopped off, I'll

9    zoom in on the top half -- is this the photo log that was

10   used for the defendant's residence?

11   A.  Yes.

12   Q.  All right.  Is this standard procedure, as well, to

13   document -- to photograph what occurred in the residence?

14   A.  Yes, it is.

15   Q.  Let's move to a different photograph.  Government

16   Exhibit 3A.  Now, do you see Exhibit 3A in evidence,

17   Government Exhibit 3A on the screen?

18   A.  Yes, I do.

19   Q.  What is depicted in Government Exhibit 3A?

20   A.  It's a depiction of the residence at 41 Millbrook from

21   the street looking at the front of the residence.

22   Q.  Now, do you see a timestamp on this photograph?

23   A.  Yes, I do.

24   Q.  And a date?  Does it say July 5th, 2018?

25   A.  Yes.

1   Q.   Is that accurate?

2   A.   July 5th, 2018 is accurate.

3   Q.   Right.  That's the day of the search warrant.

4        Now it says 8:50; is that accurate?

5   A.   That's inaccurate.

6   Q.   Okay.  Is that off by a certain amount of time?

7   A.   That is off by one hour.

8   Q.   Okay.  Is -- would it -- is it -- why do you think it was

9   off by one hour?

10  A.   I believe it's off by an hour exactly because it didn't

11  reflect -- it wasn't changed when daylight savings time came

12  into effect.

13  Q.   Okay.  Has that happened previously in your law

14  enforcement career?

15  A.   It does happen.

16  Q.   Okay.  You've seen that.  Again, you weren't the

17  photographer here, right?

18  A.   I was not the photographer.

19  Q.   So this is the front of the residence, and it shows the

20  front door, and I'll show you a different photograph that has

21  the front door, but this is the door that you're talking

22  about?  Yeah, it does not have that in the highlight, but it

23  has a front door, and that's where you stood when you had

24  your conversation with the defendant?

25  A.   Yes.

1   Q. And you told him he was free to leave, he was not under

2   arrest, and you explained the warrant to him?

3   A. Yes.

4   Q. Now there's another -- let me show you 3B in evidence.

5   Government Exhibit 3B. It's dated the same date, but 8:51,

6   so would that really be 9:51?

7   A. Yes, it would be.

8   Q. Now, is there a -- the photograph you just saw, 3A and

9   now 3B, are these part of a certain set of photographs that

10   are taken at the beginning of the search warrant?

11   A. Yes, they're typically referred to as entry photographs.

12   Q. What's the purpose of taking entry photographs?

13   A. To document what the scene looked like upon our arrival.

14   Q. And that was done?

15   A. Yes, it was.

16   Q. And then are there photographs taken at the end of the

17   search warrant, as well?

18   A. Yes.

19   Q. What are those photographs called?

20   A. Those are called exit photographs. That's what we call

21   them.

22   Q. Okay. So this shows -- what does that show here?

23   A. This is the area of the home that appears to be what we

24   would call a living room, so it's inside the front door, if

25   you step inside the front door and look to the left, that

 1  would be the view that you would see.

 2  Q.  Okay.  And I'm kind of highlighting or moving my cursor

 3  over here, I want you to take note on the right-hand side of

 4  this photograph, I'm going to that area.

 5      Now we're on Government Exhibit 3C in evidence.  What

 6  does Government Exhibit 3C depict?

 7  A.  That's the dining area of the home.

 8  Q.  And the chair from 3B, is that the chair in the lower

 9  left-hand corner of 3C?

10  A.  Yes.

11  Q.  All right.  So the family room kind of flows into the

12  dining room then?

13  A.  Yes, it's more or less an L shape.

14  Q.  All right.  And we'll get to this sometime later in the

15  execution of the search warrant.  Did you sit at this dining

16  room table and attempt to interview the defendant?

17  A.  Yes.

18  Q.  Now that was, well, later in the warrant; is that right?

19  A.  That's correct, that was.

20  Q.  This is also -- would this be one of the entry

21  photographs taken?

22  A.  Based on the timestamp, yes.

23  Q.  So this was a -- it says 9:00, but it was really 10:00,

24  it was off by an hour?

25  A.  Yes.

1   Q.   Okay.  And so Exhibit 3D, what does Exhibit 3D show?

2   A.   That would be a room that would be referred to possibly

3   as a sun room or a back patio.  It's enclosed.  It's -- you

4   gain entry to that directly ahead or forward from the entry

5   door to the residence.  So it's in the back of the house, to

6   the -- to the right of the kitchen.

7   Q.   And were these animals depicted here important to your

8   investigation?

9   A.   Yes.

10  Q.   What were they?

11  A.   African cats, Servals and Caracals.  I don't know

12  specifically what those two are, but those were -- there were

13  Servals, Caracals, and a Savannah cat that were present at

14  the residence.

15  Q.   Okay.  And this would be considered the sun room?  That

16  was at the residence?

17  A.   That would be an accurate description.

18  Q.   I show you Government Exhibit 3E.  What does Government

19  Exhibit 3E show?

20  A.   Well, it shows the kitchen counter.  And on the kitchen

21  counter, it shows a copy of the search warrant that was

22  provided to the defendant.

23  Q.   And the timestamp associated with Government Exhibit 3E?

24  A.   That timestamp is 11:11.

25  Q.   And it if it was an hour behind, that would be 12:11; is

1    that right?

2    A.   Yes.

3    Q.   Okay.  And this, if you remember from the entry and exit

4    log, the defendant left at 12:13 p.m., so this would have

5    been just minutes before he left?

6    A.   That's right.

7    Q.   Jump ahead to Exhibit 3H.  Do you see the image on your

8    screen?

9    A.   Yes, I do.

10   Q.   Government Exhibit 3H.  What does 3H depict?

11   A.   Again, that image depicts the front door of the

12   residence.

13   Q.   All right.  And is this the location where you had your

14   conversation with the defendant upon the initial contact?

15   A.   Yes, it is.

16   Q.   And then, finally, 3I.  What does 3I show?

17   A.   That also shows the front of the residence on Millbrook.

18   A broader, more-distant view.

19   Q.   And the timestamp on this is 11:52, so that would be

20   12:52?

21   A.   Yes, it would be.

22   Q.   Would this be considered one of your exit photographs?

23   A.   Yes.

24   Q.   All right.  Thank you.

25        So, now, after having your initial conversation with the

1  defendant where you explained what you've already testified

2  to, explain -- then is it fair to say that the photographer

3  went in and started to do the entry photographs?

4  A.  Yes.

5  Q.  What happened after that?

6  A.  After that, the search began in earnest.  We were able to

7  secure several animals that were there with the help of

8  civilian rescue-type people.  Documents were seized.

9  Photographs were taken.

10 Q.  Now, at some point, I want to focus on a conversation

11 that you would have had, if you did have one, with the

12 defendant regarding -- not one of the exotic African cats,

13 but a different cat at the residence.

14     Did you have a conversation at some point during the

15 warrant with the defendant about a cat?

16 A.  Yes.

17 Q.  Can you tell the Court what that conversation was about

18 and how it came about?

19 A.  Yes.  There was a Savannah cat there.  And a Savannah

20 cat, depending on how close or remote from the wildness it

21 is, either requires a permit or doesn't.  And so there was a

22 Savannah cat there, and I asked the defendant if he knew the

23 generation of the Savannah cat.

24     He said it was an F1, which indicated that it would have

25 required a permit.

1    I knew that he did not have a permit, from our

2  investigation, and I informed him that, Mr. Casacci, that

3  animal would be seized as part of the warrant.

4  Q.  Okay.  So let's just back up.

5    Do you know what a Savannah cat is?  Is it a mix between

6  two cats?

7  A.  It's a hybrid of some kind.

8  Q.  Okay.  And so you told the defendant this cat was

9  illegal, and it needed to be seized?

10  A.  I told him that it would require a permit to have, and

11  that he didn't have a permit, And that it would be seized.

12  So, yes, it was illegal for him to possess.

13  Q.  What was your demeanor when you were having this

14  conversation with the defendant?

15  A.  The same as it was when I met him.  It was businesslike

16  and straightforward and direct.

17  Q.  And can you tell the Court what the defendant's demeanor

18  was like during this conversation, and whether that demeanor

19  changed at all?

20  A.  It did.  He became upset.  I think he gave a statement

21  that he viewed that as his pet, and he made some kind of

22  comment like, you're gonna take my pet?  As a question.

23    And I said, yes, it's illegal for you to have.

24    And he became upset at that point, agitated.

25  Q.  He became agitated?  Okay.  And at that point, did any

1   other investigators have a conversation with the defendant?

2   A.  Officer Marshall, who was shadowing the defendant,

3   deescalated the situation, and asked Mr. Casacci if he would

4   step outside.  And the two of them stepped outside.

5   Q.  Okay.  And how about Investigator Peinkofer?  Was he

6   there, and did he have any words with the defendant?

7   A.  I'm sure he did, but I can't really say I remember what

8   he said.

9   Q.  All right.  So, immediately after this conversation, is

10  it your testimony that the defendant went outside with

11  ECO Marshall?

12  A.  Yes.

13  Q.  And while the defendant was outside with ECO Marshall,

14  did you go outside at all?

15  A.  I did not.

16  Q.  And we're talking outside, is this the front of the

17  house?

18  A.  Yes, just in the front yard.  I don't know where, because

19  I wasn't outside, but it was just -- my understanding was

20  they were on the front porch or the driveway or the front

21  lawn, somewhere in the front of the house.

22  Q.  And that's depicted in Government Exhibit 3E that I

23  already showed you, the front of the house?

24  A.  Yes.

25  Q.  Okay.  So, if you didn't go outside, did you overhear at

1  all any of the conversations between the defendant and

2  ECO Marshall?

3  A.  No, I did not hear anything that was transpired between

4  them.

5  Q.  And then at some point after the defendant went outside

6  with ECO Marshall, did the defendant come back into the

7  residence?

8  A.  Yes, he did.

9  Q.  At some point during the execution of the search warrant,

10  did you attempt to interview the defendant yourself?

11  A.  Yes.

12  Q.  Okay.  And did that come before or after the conversation

13  the defendant had with ECO Marshall outside?

14  A.  It was quite a while after.

15  Q.  After?  All right.  So, please tell the Court how you

16  attempted to take an interview of the defendant, how did

17  that -- how did you attempt to do that.

18  A.  I asked Mr. Casacci if he would be willing to sit.  And I

19  think I invited him to sit at the dining room table, and that

20  I was interested in learning a little bit about his business

21  and how he conducted it, just kind of general.  I asked him

22  if I could interview him about what he was doing with the

23  cats.

24  Q.  Okay.  That conversation happened at the dining room that

25  we already saw in the photographs?

1   A.  Yes, it did.

2   Q.  And was there anybody else who assisted you in attempting

3   to interview the defendant?

4   A.  Yes.

5   Q.  Okay.  Who was that?

6   A.  It was Special Agent Lee Schneckenberger with the U.S.

7   Fish and Wildlife Service.

8   Q.  Was there anybody else who assisted you in attempting to

9   interview the defendant?

10  A.  Yes.

11  Q.  Okay.  Who was that?

12  A.  It was Special Agent Lee Schneckenberger with the U.S.

13  Fish and Wildlife Service.

14  Q.  And what did you tell the defendant during this

15  interview?

16  A.  I told him that I'd like to ask him some questions, but

17  that he was not under any obligation to answer any of the

18  questions.  I asked him if he would answer questions.

19  Q.  Did the defendant answer your questions?

20  A.  He politely declined.

21  Q.  And did he reference that he wanted an attorney present?

22  A.  He mentioned that he wanted to consult an attorney.

23  Q.  Okay.  Was that the first time the defendant mentioned an

24  attorney to you?

25  A.  That's the first time I heard him mention anything about

1  an attorney to me.

2  Q.  Okay.  Now, did you learn of the fact that there was a

3  recording of this interview?

4  A.  I did learn about the recording.

5  Q.  Did you know you were being recorded when you were

6  talking to the defendant?

7  A.  No, I did not know that.

8  Q.  Okay.  In fact, did you see Special Agent Schneckenberger

9  with a recording device in his hand?

10  A.  No.

11  Q.  Have you since listened to that recording?

12  A.  Yes, I have.

13        MR. MANGO:  Judge, I'd like to play Government

14  Exhibit 5A in evidence.

15        (Audio of interview played.)

16        BY MR. MANGO:

17  Q.  So that last part, it sounded like Special Agent

18  Schneckenberger stepped outside to record, I guess, the

19  conclusion; would that be right?

20  A.  That's what it sounded like to me, as well.

21  Q.  Did you go outside about with him at that point?

22  A.  No.

23  Q.  Again, did you not know that he had a recording device

24  with him at that point?

25  A.  That's correct, I did not know.

1    Q.   On the recording, did you hear the defendant say anything

2    about how he -- whether he had previously requested an

3    attorney?

4    A.   There was nothing on the recording that indicated that.

5    Q.   And, in fact, was your demeanor that you heard on the

6    recording consistent with your demeanor in how you spoke to

7    the defendant in the earlier execution of the search warrant?

8    A.   Yes, the demeanor was consistent throughout, at the door

9    upon arrival, throughout the course of the search warrant,

10   and what was recorded there.  All similar.

11   Q.   Okay.  So you testified already the defendant left the

12   residence at 12:13 p.m.; is that right?

13   A.   Yes.

14   Q.   And that he left with another civilian witness who showed

15   up?

16   A.   With another civilian person, I don't know if I would

17   call her a witness, but --

18   Q.   Okay, I didn't mean that.  Point taken.

19   A.   Just to be clear.

20   Q.   So is she -- and from the entry and exit log, it looks

21   like she was allowed to enter the residence; is that right?

22   A.   She was.

23   Q.   What was the reason for letting her come into the search

24   warrant scene?

25   A.   It's my understanding that the two of them were getting

1    ready to leave on a trip the next day, and she had requested

2    to come in and collect some personal belongings and leave.

3    And so I allowed that.

4    Q.  Okay.  So did you make the judgment call to allow that,

5    even though the defendant was previously told that if he

6    left, he couldn't come back in?

7    A.  Yes.

8    Q.  Okay.  So you made a reasonable accommodation to let her

9    come retrieve some clothing?

10   A.  Yes.

11   Q.  And is that what she took?

12   A.  I think so.

13   Q.  Now, during the execution of the search warrant, do you

14   know if the defendant was allowed to use his phone, his

15   cellular telephone?

16   A.  I learned later through the investigation that he did.

17   Q.  Okay.  Now, at any time during the execution of the

18   search warrant, in your interactions with the defendant at

19   the scene, the entire scene, did you ever handcuff the

20   defendant?

21   A.  No.

22   Q.  Did you ever see him handcuffed?

23   A.  No.

24   Q.  Did you ever raise your voice?

25   A.  No.

1  Q.  Did you ever tell the defendant he was not free to leave?

2  A.  No.  As a matter of fact, I told him he was free to

3  leave.

4  Q.  Okay.  In the beginning you told him that?

5  A.  Yes.

6  Q.  And then on the recording a couple hours later, we heard

7  you tell him that?

8  A.  Yes.

9  Q.  Did you use any tricks with the defendant?

10 A.  No.

11 Q.  Were you untruthful with him at all?

12 A.  No.

13 Q.  Did you ever make physical contact with the defendant?

14 A.  I don't recall any physical contact.  If it -- if there

15 was any, it was totally incidental.  It was tight quarters,

16 we might have brushed up against each other, but there was no

17 physical contact that I recall.

18 Q.  Okay.  And I think you already answered this, but did you

19 ever tell him that he could not leave the residence?

20 A.  No, I never told him that.  As a matter of fact, I told

21 him that he could.

22 Q.  Did you ever hear any other law enforcement officer tell

23 the defendant he could not leave the residence?

24 A.  No, I did not.

25 Q.  Did you physically block his ability to move throughout

1  the residence at all?

2  A.  No.

3  Q.  Did the defendant appear to be under the influence of

4  alcohol or drugs?

5  A.  There was no indication that he was under the influence

6  of alcohol or drugs.

7  Q.  Did he ever ask for any type of medication, or did it

8  look like he needed medication?

9  A.  No, on both accounts.

10  Q.  Did he appear to be suffering from any type of physical

11  or mental disability?

12  A.  Not that I can tell.

13  Q.  Now, as part of this evidentiary hearing, did you know

14  whether the defendant submitted a declaration to this Court

15  regarding the execution of the search warrant?

16  A.  I became aware that he did do that.

17  Q.  Have you reviewed that declaration?

18  A.  Yes, I have.

19  Q.  Now, in that declaration when the defendant says, quote,

20  I then stated I did not want to speak with them or answer any

21  questions without my lawyer, I also told them I was going to

22  get my car keys and leave.  I was told I could not leave and

23  go back inside the house.  Is that accurate?

24  A.  No, it's not accurate.

25  Q.  Then in the declaration when the defendant says, quote, I

 1  was initially told that I could not leave, and that there --

 2  they had some basic questions.  In fact, I was told that I

 3  was required to stay, and that if I attempted to leave my

 4  home I would be arrested.  Is that accurate?

 5  A.  Absolutely not.  On the contrary, I told him he could

 6  leave.

 7  Q.  Now, in the declaration when the defendant says, quote, I

 8  saw that one law enforcement officer was holding a recording

 9  for this round of questioning, and he introduced himself on

10  the recording as well, did you see Special Agent

11  Schneckenberger holding a recording device?

12  A.  No, I didn't know he had one.

13  Q.  If he was holding one, do you think you would have seen

14  it?

15  A.  Yes, it would have been obvious to me.

16          MR. MANGO:  Judge, may I have a moment?

17          MAGISTRATE JUDGE ROEMER:  Sure.

18          MR. MANGO:  Thank you, Judge.  No further questions

19  for the Lieutenant O'Connor.

20          MAGISTRATE JUDGE ROEMER:  We're going to take a break

21  so that Rosalie can wipe things down.

22          I would also offer, if at any time anyone feels more

23  comfortable staying where they're seated and asking questions,

24  I'm fine with that, too.

25          MR. GRABLE:  Thank you.

1      MAGISTRATE JUDGE ROEMER:  You might want to just let

2  it dry there for a second, Mr. Grable.

3      **CROSS-EXAMINATION BY MR. GRABLE:**

4  Q.  Good morning.

5  A.  Good morning.

6  Q.  We've met before, but in other cases, correct?

7  A.  I believe we have.

8  Q.  And I think the last time we spoke, you weren't yet

9  retired, correct?

10  A.  That would make sense.

11  Q.  Congratulations.

12  A.  Thank you.

13  Q.  You have had quite a bit of experience going into the

14  execution of this warrant and the discussions with

15  Mr. Casacci, correct?

16  A.  Yes.

17  Q.  I think you told us 30-some years?

18  A.  Just over 31 years with law enforcement.

19  Q.  And it sounded like you had more experience with warrants

20  in the latter part of your career than in the beginning,

21  correct?

22  A.  That's correct.

23  Q.  Okay.  Now, the lead investigator, however, was

24  Investigator Peinkofer, correct?

25  A.  Yes.

1  Q.  And he had considerably less experience than you, didn't

2  he?

3  A.  Yes.

4  Q.  In fact, he was just promoted to an ECI, and just to

5  refresh our memory, it sounded from your direct testimony

6  that there's three tiers that you went through in your

7  process of being employed at the DEC.  You were ECO, correct?

8  A.  Yes.

9  Q.  Then you were promoted to ECI?

10  A.  Yes.

11  Q.  And then eventually to a lieutenant?

12  A.  Yes, and that would be like an ECI-2, but yes.

13  Q.  And in that role, you would supervise other ECIs?

14  A.  Yes.

15  Q.  And Investigator Peinkofer was promoted to ECI in early

16  2018, correct?

17  A.  That makes sense.

18  Q.  And before that, he was an ECO, true?

19  A.  Yes.

20  Q.  And so this, do you know whether this was Mr. -- or,

21  Investigator Peinkofer's first warrant?

22  A.  I'm sure it wasn't, but I can't tell you how many he was

23  involved with.  He had a long career prior as an ECO.

24  Q.  Do you know whether this is the first one where he was in

25  charge?

1    A.   Well, I was in charge.

2    Q.   Well, were you in charge because he was new?  Or was it

3    standard procedure at the DEC for someone like Investigator

4    Peinkofer to be in charge, and then for you to also -- for

5    Investigator Peinkofer to be the lead, but for someone above

6    him to be in charge?

7    A.   Anytime there's a warrant executed, a lieutenant is

8    always in charge.  Like, the uniformed lieutenant might be an

9    investigative lieutenant, but I would supervise.  He was the

10   lead investigator, I was the supervisor.

11   Q.   And so this was -- this warrant, in its execution and

12   application, was consistent with the practice with respect to

13   any warrant that the DEC would try to execute at a premises

14   (unintelligible)?

15   A.   Yes.  Well, yes.

16   Q.   You hesitated.

17   A.   Well, just because it's a big agency, and I can't really

18   speak for every other office.

19   Q.   Speaking just from your experience?

20   A.   Yes.

21   Q.   Thank you.  Now, I understood from your direct testimony

22   that you were trained in the course of your career on taking

23   statements from suspects, correct?

24   A.   Yes.

25   Q.   And the DEC, do you call the person who you want to get a

1    statement from a suspect or a target?

2    A.   Both terms are used.  Sometimes witness, sometimes

3    suspect, sometimes target, sometimes defendant.

4    Q.   Is there a distinction made between a target or suspect,

5    and a witness or someone who's not a target or suspect?

6    A.   I think sometimes it's handled differently.

7    Q.   Sure.  When someone is a target or suspect, you really

8    want to try to get a statement from them, correct?

9           MR. MANGO:  Objection, Judge, I think we're a little

10   speculative here.

11          MAGISTRATE JUDGE ROEMER:  Overruled.

12          THE WITNESS:  Would you repeat that, please?

13          MR. GRABLE:  Sure.

14          BY MR. GRABLE:

15   Q.   If someone is a target or suspect, it can advance the

16   investigation if you're able to get a statement from them,

17   correct?

18   A.   That's correct.

19   Q.   And was there any difference in the training at the DEC

20   between trying to get a statement from a target or a suspect

21   versus someone who's not in that category?

22   A.   Not that I specifically, you know, recall.

23   Q.   How long before the warrant was executed on the 5th of

24   July, 2018 had you last received any training on warrants or

25   taking statements?

1  A.  I'm not sure.

2  Q.  More than a decade?

3  A.  No, it wouldn't be more than a decade.

4  Q.  Now, I take it that part of the training is that it's

5  important to try to preserve as accurately as possible

6  whatever the target or suspect says, correct?

7  A.  Yes.

8  Q.  And you want to preserve anything to the extent that you

9  can anything that a target or suspect says at the scene, as

10 much of it as possible and as accurately as possible; is that

11 fair to say?

12 A.  I would say that's accurate.

13 Q.  Anything that a target or suspect said at the execution

14 of a warrant might, at some point, be useful to the

15 prosecutor who prosecutes that person, correct?

16 A.  Yes.

17 Q.  So the idea is you want to try to get as much as you can

18 in terms of information that might come directly from the

19 target's mouth?

20 A.  Yes.

21 Q.  And there are several ways you can do that, correct?

22 A.  Yes.

23 Q.  One way is you can have the person write out a statement

24 and they can sign it?

25 A.  Are you -- is that a question?

1    Q.  Yes.

2    A.  Yes.

3    Q.  And that's certainly, in the training that you had to be

4    a DEC investigator, that's one of the tools at your disposal,

5    you can have somebody write out their own statement and sign?

6    A.  Taking a written statement is a tool, yes.

7    Q.  And another way is for the investigator or a law

8    enforcement officer to hear what the target has to say, write

9    it down, and then have the person sign it?  That's a

10   different way of doing what I described a moment ago,

11   correct?

12   A.  That's correct.

13   Q.  There's another way you can do it where the investigator

14   writes down what he hears the target or suspect say, and then

15   he doesn't have the target or suspect sign, correct?

16   A.  That would be another method.

17   Q.  And then there's even a way you can record, if you have

18   an audio or video recorder, you can record the precise words

19   that the person uses, correct?

20   A.  That's possible.

21   Q.  And these are all within the range of things that you're

22   trained on to become a DEC officer, the different ways and

23   tools at your disposal to try to get a statement from

24   someone, correct?

25   A.  Yes.

1  Q.  And it's not just ECIs who get this training, ECOs are

2  law enforcement officers, as well, correct?

3  A.  They are.  They're police officers, according to the

4  Criminal Procedure Law.

5  Q.  That's right.  So they get trained how to take statements

6  as well, correct?

7  A.  Yes.

8  Q.  And from your recollection from when you were an ECO, the

9  training that we've been talking about is the training that

10 you had available to you that night?

11 A.  I just wonder if you would say that again.  I'm a little

12 confused.

13 Q.  Yeah.  I'll try to be a little more precise.

14     The various ways you can get a statement from a suspect

15 or target, the training you got on that, I would imagine you

16 got training on that all the way through your career,

17 including when you were an ECO?

18 A.  That would be true.

19 Q.  Now, prior to testifying today, did you review any

20 documents?

21 A.  Yes.

22 Q.  What did you review?

23 A.  I reviewed the log that we looked at earlier.  I reviewed

24 the declaration of the defendant.  I reviewed photographs.  I

25 reviewed various other documents, I can't really think of

1  what they all are, but I looked through the file.

2  Q.  Did your review of the file include any prior testimony

3  given in this case?

4  A.  No.

5  Q.  And did you review any notes prior to coming in here?

6  A.  If they were part of the file, I did.  I mean, I didn't

7  take any notes.

8  Q.  Right.  Well, we know you didn't, but others at the scene

9  did, correct?

10 A.  I would assume there were some notes taken.

11 Q.  And in your preparation for today, you reviewed the file,

12 and that includes, to the extent that they're included within

13 the file, notes that might be within the file?

14 A.  I reviewed the file.  I didn't read every page of it, but

15 I reviewed the file.

16 Q.  And so then did there come a point in time when you met

17 with the prosecutors to prepare for your testimony?

18 A.  Yes.

19 Q.  When did that happen?

20 A.  Yesterday.

21 Q.  Any time before then?

22 A.  I'd met with the prosecutors over the course of the

23 investigation.  But that was the first and only time I met

24 with the prosecutor to prepare for this hearing.

25 Q.  And how long did that prep session go?

 1   A.   I'd say it lasted about an hour to an hour and 20

 2   minutes, something like that.

 3   Q.   And did the prosecution show you any documents in

 4   preparation?

 5   A.   Yes.

 6   Q.   And were they documents from the same file you've been

 7   describing?

 8   A.   Yes.

 9   Q.   And do you have that file with you?

10   A.   No.

11   Q.   Where is it?

12   A.   Where it currently is, I don't know.  I would assume it's

13   locked in the, you know, the offices of the DEC.

14   Q.   Well, when you reviewed it, where did you read it?

15   A.   I read it at my residence.

16   Q.   Okay.  And where would it normally be kept?

17   A.   It would be kept locked in the office at the DEC

18   headquarters, here in Buffalo.

19   Q.   Was it present when you -- did you meet with the

20   prosecution in preparation for today at the U.S. Attorney's

21   Office?

22   A.   I did.

23   Q.   Was the file present there?

24   A.   The U.S. Attorney's file is there, but I don't know if

25   the DEC file is there.

1    MR. GRABLE:  Okay.  Well, I'll just request a copy of

2  whatever the witness reviewed.  Maybe (unintelligible).

3    MR. MANGO:  Objection.  We've turned everything over

4  in this case, we turned the entire DEC file over.  I don't

5  know what this line of questioning is designed for, or what --

6    MAGISTRATE JUDGE ROEMER:  Okay.  Let's just proceed,

7  Mr. Grable.

8    MR. GRABLE:  I don't have any notes, that's why I'm

9  asking.

10    MR. MANGO:  He says he has not taken any notes, there

11  were other witnesses who will testify to that.

12    BY MR. GRABLE:

13  Q.  Do you know whether Investigator Schneckenberger was

14  taking notes at the scene?

15  A.  I don't know.

16  Q.  Now you told us during your direct testimony about some

17  statements that it's your understanding Mr. Casacci made to

18  Investigator Marshall, correct?

19  A.  Yes.

20  Q.  And if I understood your testimony correctly, it's your

21  testimony that you weren't present when Mr. Casacci made

22  those statements?

23  A.  That's correct.  I was not present when those statements

24  were made.

25  Q.  As far as you know, the only person who was present was

1  Investigator Marshall?

2  A.  As far as I know.

3  Q.  I'd like to ask you some questions in followup to your

4  direct testimony about the lead-up to the execution of a

5  warrant, okay?

6  A.  Yes.

7  Q.  I understood from -- there was some preparation that went

8  into executing this warrant, correct?

9  A.  That's correct.

10 Q.  And, in fact, the preparation included a preparation of a

11 DEC report that could be used to help the team prepare for

12 the search, correct?

13 A.  I'm not sure what you're referring to.

14 Q.  Yeah, let me try to help.

15       MR. GRABLE:  If we could pull up Defense Exhibit D1

16 in evidence.

17       BY MR. GRABLE:

18 Q.  I'm showing you at least the first page of a multi-page

19 report that's been received in evidence as Defendant's

20 Exhibit D1.  Do you recognize this document?

21 A.  Yes, I do.

22 Q.  This is a form that the DEC uses to prepare for the

23 execution of a search warrant, correct?

24 A.  Yes, it is.

25 Q.  And it's a very detailed form, isn't it?

1    A.  Yes, it is.

2    Q.  The idea is to spell out as clearly as possible the

3    various roles that different investigators will serve and

4    occupy during the execution of the warrant, and it is to try

5    to make things go as smoothly as possible, correct?

6    A.  Yes.  We call it an operation plan, or an ops plan.

7    Q.  Ops plan.  And is an ops plan prepared for every warrant

8    that's executed by the DEC?

9    A.  It is for every warrant that's executed by the Bureau of

10   Investigations.

11   Q.  Is the Bureau of Investigations the bureau that ECI is

12   on?

13   A.  Yes.

14   Q.  And are there some criminal investigations that are

15   conducted only by ECOs?

16   A.  Yes.

17   Q.  Now, we see in this Defense Exhibit D1 at page 48315,

18   which is a Bates number, the second page here, you should

19   have it on your screen.

20   A.  Yes.

21   Q.  At the bottom there, there's a case history notation,

22   correct?

23   A.  Yes.

24   Q.  And we've got that blown up on your screen.  Are you able

25   to read that?

1  A.  Yes.

2  Q.  Okay.  And that describes in the first sentence of this,

3  actually on page 2 of Defense Exhibit D1 in evidence that the

4  genesis of this investigation was Mr. Casacci applying for a

5  permit to the DEC, correct?

6  A.  That's what this indicates, yes.

7  Q.  Then, at this point prior to the search, Mr. Casacci was

8  the target, correct?

9  A.  I don't know if I'd use that term.  I understand your use

10  of it, though.

11  Q.  Well, target is a term of art, correct, in the DEC and in

12  law enforcement?

13  A.  Yes.

14  Q.  It is a term of art because when someone is a target,

15  that means, among several things, that again might be someone

16  who you would want to get a statement from, correct?

17  A.  In an investigation, there are a lot of different people

18  you would want to get a statement from.

19  Q.  And one of them would include a target, correct?

20  A.  Yes.

21  Q.  And if someone's a target, that would make someone

22  perhaps a even higher priority to try to get a statement?

23  A.  It might.

24  Q.  Okay.  And we go one page later to Defense Exhibit D1.

25      So we see the DEC prior search identified Mr. Casacci as

1   a target, right?

2   A.  Mr. Casacci is identified as a target in this document.

3   Q.  He's the only the target, isn't he?

4   A.  In the document?  Or in the investigation?

5   Q.  Do you need a copy of --

6   A.  No, I'm just asking if that's your question, in the whole

7   investigation or in this document?

8   Q.  I'm talking about at the time of the preparation of this

9   Exhibit D1, the ops plan, the only target on the preparation

10  of the ops plan and the execution of this form is

11  Mr. Casacci, correct?

12  A.  Yes.

13  Q.  And, in fact, he was a target to such an extent that

14  there was an application for a warrant made to Amherst Town

15  Judge Kara Buscaglia, correct?

16  A.  There was an application made to the town court, yes.

17  Q.  Now, you told us on direct examination that there was no

18  plan t arrest Mr. Casacci at the time of the execution of the

19  warrant, correct?

20  A.  That's correct.

21  Q.  There was, however, a fair understanding on the part of

22  you and all the officers who reviewed the ops plan that he

23  was the investigation's target?

24  A.  I would say that's correct.

25  Q.  We don't have to guess about that, it's in the report,

1    correct?

2    A.   He's identified as a target on the plan.

3    Q.   And the DEC protocols that are in place prior to the

4    execution of a search warrant, all the agents who are to be

5    on the search team are expected to review the ops plan,

6    correct?

7    A.   Yes, we go over it before we go, make sure everybody

8    reads it and signs that they read it.

9    Q.   And part of the function of doing that is so there's

10   sufficient coordination for a number of reasons, including,

11   for example, officer safety, correct?

12   A.   That's one of the reasons, yes.

13   Q.   And it's, frankly, the safety of everybody at the scene?

14   A.   Yes.

15   Q.   Now, I believe you told us in your direct testimony that

16   you were -- you told us that you were not the affiant on the

17   search warrant, but that Investigation Peinkofer was,

18   correct?

19   A.   Yes.

20   Q.   And you -- I think if I heard you correctly, you said you

21   reviewed it and maybe helped with the drafting, but you are

22   not the person who swore on the application?

23   A.   That's correct.

24   Q.   Did your help -- did the course of helping with the

25   drafting change anything in there?

1    A.  It was a work in progress, and we worked on it together,

2    and we edited it as we went along, and we did it together.

3    So -- things were changed.

4    Q.  Was this Investigator Peinkofer's first warrant

5    application, to your knowledge?

6    A.  I think it was a warrant application as an investigator,

7    I don't know about as a ECO.

8    Q.  You had done many, and you don't know how many he had

9    done?

10   A.  Yes.

11   Q.  Now, at the time that you and Investigator Peinkofer and

12   the DEC approached Judge Buscaglia, the determination had

13   been made that this was -- the investigation of Mr. Casacci

14   was a major case, correct?

15   A.  I don't know if I would call it a major case, I'm not

16   sure what you mean by that.

17           MR. GRABLE:  Okay.  Well, if we pull up Government

18   Exhibit 1 in evidence, please.  Second page.  Thank you.  Can

19   we go to the second page, please?

20           And could we blow up about the middle area here on

21   the second page?  That's good.  That's good.  Thank you.

22           BY MR. GRABLE:

23   Q.  Now there is -- I don't have a mouse here, but in this

24   paragraph that we've blown up on the second page, Government

25   Exhibit 1 in evidence, it's a description of Investigator

1    Peinkofer's background credentials, correct?

2    A.   Yes.

3    Q.   And it states that since his promotion in early 2018, he

4    been assigned at that point, he'd been assigned to

5    investigate major cases, correct?

6    A.   I see that, yes.

7    Q.   Okay.  And so this, because of the involvement of him and

8    all these other officers, especially officers of the ECI

9    level, this was a major case?

10   A.   That's typically a distinction we make between the

11   uniform and the investigative unit.  So typically the

12   investigative unit, I think, like I described in my direct

13   testimony, focuses on misdemeanors and felonies rather than

14   violations.  So, in that sense, because this could have

15   possibly ended up as a misdemeanor or a felony, it's called a

16   major case.

17   Q.   In other words, you wouldn't have an ECI who's assigned

18   to investigate major cases investigating the case unless it

19   was the view of the DEC that this might be a major case?

20   A.   Whenever we're -- we're looking at this as though it

21   would result in a possible charge of a misdemeanor or felony,

22   so therefore, it came under the purview of investigators.

23   Q.   Investigators only -- or, who, when they are promoted to

24   investigator, are assigned to investigate major cases?

25              MR. MANGO:  Judge, I'm going to object.  I don't know

1  what this line of questioning is.

2         MAGISTRATE JUDGE ROEMER:  I'm giving him some leeway.

3         Answer the question, sir.

4         THE WITNESS:  Would you repeat it again for me,

5  please?

6         BY MR. GRABLE:

7  Q.  Once you have an ECI assigned, the understanding of the

8  DEC is that there's a potential that this is a major case?

9  A.  I would say, to be clear, that all the cases that

10  investigators investigate are called major cases because

11  they're misdemeanor or felonies as opposed to violations.

12         MR. GRABLE:  Carly, can you please pull up D6 into

13  evidence?

14         MR. MANGO:  If that is Exhibit 1, just so you know,

15  Government Exhibit (unintelligible.)

16         MR. GRABLE:  Okay.  Thank you.  Could you turn to the

17  third page, please, Carly?

18         MR. MANGO:  And it's got the proper redaction on it.

19         MR. GRABLE:  Okay.  Are you concerned about this one

20  not having redaction?

21         MR. MANGO:  Well, it's got --

22         (Simultaneous talking.)

23         MR. GRABLE:  It's going to go to the judge.  I'm not

24  (unintelligible).

25         BY MR. GRABLE:

1   Q.  Investigator, we're showing you the third page of D6 in

2   evidence.  And this is the search warrant.  And do you see

3   that it was signed by Judge Buscaglia in the Amherst Town

4   Court on the 3rd of July at 10:30 a.m., correct?

5   A.  Yes.

6   Q.  And were you present when she signed it?

7   A.  Yes, I was.

8   Q.  Who attended the application process with you?

9   A.  Investigator Peinkofer.

10  Q.  So the two of you?

11  A.  Yes.

12  Q.  Is that typical in your experience with the DEC, that two

13  officers would have to do that?  Or when you did it, was

14  there only one of you who needed to do that?

15  A.  Most times, in my experience, the lead investigator would

16  go with his supervisor, the lieutenant.

17  Q.  And that was when you were -- when you were an ECI but

18  not yet a supervisor, if you made a warrant application,

19  you're telling us that you would normally have a supervisor

20  with you?

21  A.  Yes.

22          MR. GRABLE:  Can we please pull up Defense

23  Exhibit D10 in evidence.

24          BY MR. GRABLE:

25  Q.  Investigator O'Connor, are you familiar with Exhibit D10?

1  A.  I don't think I am.

2  Q.  Why don't we give you a moment to read it, since you're

3  not familiar with it.  It's in evidence.  And I -- before I

4  ask you some questions about it, if you can tell me you've

5  already had a chance to look at it.

6  A.  Sure.

7         MR. GRABLE:  Your Honor, may we hand up a hard copy?

8         MAGISTRATE JUDGE ROEMER:  Sure, please.

9         BY MR. GRABLE:

10 Q.  Have you had a chance to review Exhibit D10?

11 A.  Yes.

12 Q.  And having reviewed it, do you recall having seen it

13 before?

14 A.  I'm pretty sure that I have looked at it, but I don't

15 remember specifically looking at it.

16 Q.  And do you understand Exhibit D10 is an email chain that

17 was used by the DEC and the United States Department of Fish

18 and Wildlife Services, USFWS, to make sure that Mr. Casacci

19 would be home when the warrant was going to be executed,

20 correct?

21 A.  Yes.

22 Q.  In other words, you got the warrant at 10:30 in the

23 morning on the 3rd of July from Judge Buscaglia, and then at

24 2:32 p.m., so a few hours later, someone from the DEC working

25 undercover sends an email to Mr. Casacci, correct?

1  A.  Yes.

2  Q.  And that would have -- at least if the times are correct

3  on Exhibit D10, that would be about 2:32 p.m., if you look at

4  page 2.  Does that look right?

5  A.  And I see an entry here near the bottom of the second

6  page that indicates 2:32.

7  Q.  That's an entry from an email address that we don't --

8  there's no reason to have to put that email address into the

9  record, but you understand that the email address is one that

10  was in use by the DEC undercover officer, correct?

11  A.  Yes.

12  Q.  And whoever that person was or is, their name is not the

13  name in the email, correct?

14  A.  That's correct, that's not the name of the person that

15  wrote this email.

16  Q.  Okay.  And then you see that there's -- this email

17  exchange continues between Mr. Casacci and the undercover DEC

18  officer, correct?

19  A.  Yes.

20  Q.  And it's -- the DEC officer is trying to make sure

21  Mr. Casacci is going to be home at 10 a.m. on the 5th, And

22  Mr. Casacci is responding, correct?

23  A.  That's the point, yes.

24  Q.  And if you look at the bottom of page 1 of Exhibit D10,

25  Mr. Casacci tells this undercover officer that the officer

1   can visit at 10 a.m., but Mr. Casacci needs to hold onto the

2   male until he gets approval from the USDA, which should be at

3   11:45, you can come in late evening to pick him up, though.

4   Do you see that email entry?

5   A.  I do.

6   Q.  That's on the 4th of July at 4:30 p.m., correct?

7   A.  That's what this indicates, yes.

8   Q.  And, so, Mr. Casacci was writing to the undercover DEC

9   officer that he could come look at a male cat, but there was

10  some approval that had to happen first, correct?

11  A.  Yes.

12  Q.  And then the undercover officer answered, okay?

13          MAGISTRATE JUDGE ROEMER:  Mr. Grable, where are we

14  going with this?  The purpose of this hearing was whether he

15  made voluntary statements --

16          MR. GRABLE:  I'll get to that.

17          MAGISTRATE JUDGE ROEMER:  -- to the DEC.

18          Okay.  Well, we need to get there pretty quick,

19  because I've given you a lot of latitude here.  We've been now

20  a half an hour, and we haven't even gotten close to any of the

21  statements that were made.  Okay?

22          MR. GRABLE:  Sorry, Your Honor, I'll get to the

23  point.

24          BY MR. GRABLE:

25  Q.  Mr. Mango asked you on direct examination whether, when

1  you executed the warrant at Mr. Casacci's residence, if you

2  used any tricks, correct?

3  A.  Yes, he did.

4  Q.  There was some contact with Mr. Casacci before you showed

5  up to execute the warrant that tricked him into being home,

6  correct?

7  A.  I wouldn't use that term.

8  Q.  Okay.  But the point was, you wanted to make sure he'd be

9  there?

10  A.  Yes.

11  Q.  And lo and behold, he was there when you showed up at

12  10 a.m.?

13  A.  He was there.

14  Q.  His expectation would have been that a guy was coming to

15  look at a cat, correct?

16         MR. MANGO:  Objection, Judge.  Objection.  He's

17  asking the witness what the defendant's expectation would be.

18         MAGISTRATE JUDGE ROEMER:  Overruled.  Go ahead and

19  ask the question.

20         BY MR. GRABLE:

21  Q.  His expectation would have been that some guy was coming

22  to look at a cat, correct?

23  A.  It might have been.

24  Q.  Well, that would have been your expectation if you had

25  been on this email chain receiving it from the DEC undercover

1   officer, wouldn't it?

2   A.   Yes, I would have expected that.

3   Q.   But that's not what happened, is it?

4   A.   No, it's not.

5   Q.   Instead, there was a surprise waiting for him when he

6   opened the door, correct?

7   A.   I don't know if he was surprised or not, I think he was.

8   Q.   Ten armed officers, correct?

9   A.   I don't know the exact number without referring to it.

10  Q.   Why don't you look, if you would, at the DEC ops plan,

11  Defendant's Exhibit D1, we'll pull it up for you, at page 1.

12      There's ten law enforcement personnel who are preparing

13  to show up on Mr. Casacci's doorstep at 10 a.m. on the 5th of

14  July, correct?

15  A.   I'm just going to count them here.  There were a number,

16  for sure.  I don't know if there were exactly ten.  Some

17  names appear twice.  Would you like me to count them?

18  Q.   Please.

19  A.   Unless I'm miscounting, I'm counting nine, but there

20  might be ten.

21  Q.   And there's also civilians who are going to be there, as

22  well, in addition to the law enforcement officers?

23  A.   There were.

24  Q.   Several of them, correct?

25  A.   Yes.

1   Q.  So instead of one guy coming to look at a cat, there's a

2   whole crowd of people, many of them armed, on his doorstep at

3   10 a.m. on the 5th of July, 2018?

4   A.  That's true.

5   Q.  Some of them have, at least the law enforcement officers

6   all have bulletproof vests on, correct?

7   A.  Some visible, some not.

8   Q.  But they're all wearing them?

9   A.  Yes.

10  Q.  Many of them have handcuffs?

11  A.  Yes.

12  Q.  All of them have badges?

13  A.  The officers don't display their badges.

14  Q.  But they have them?

15  A.  They have them, yeah.

16  Q.  Now, among the roles, seeing the first page of Exhibit D1

17  in evidence, among the roles that were to be filled that day,

18  it was anticipated that there would be an effort to interview

19  Mr. Casacci, correct?

20  A.  Yes.

21  Q.  And we see from the first page of the ops plan that the

22  plan is to meet with Christopher Casacci.  Is that to be

23  conducted with Investigator Peinkofer who's directly across

24  that on that block?  Or is it to be conducted by someone

25  else?

1   A.   So the part that's blown up here is the initial meet and

2   entry assignments.

3   Q.   That's right.

4   A.   And then so on the left-hand side, it's the personnel

5   that were involved.  The right-hand side, across from that

6   list of -- one, two three, four -- nine officers, or

7   officers, investigators, and agents.  It says meet with

8   Christopher Casacci and advise of the warrant.

9   Q.   And there's going to be a safety search, pat and frisk of

10  Mr. Casacci upon arrival, correct?

11  A.   Yes.

12  Q.   Did that happen?

13  A.   Yes.

14  Q.   All right.  So I take it that when you arrived and

15  Mr. Casacci answered the door, the first thing that happened

16  before anybody did anything was to make sure that he was not

17  armed or pose any threat to the officers?

18  A.   No, I had a conversation with him, first.

19  Q.   Okay.  So first you introduced yourself, gave him the

20  warrant?

21  A.   Yes, I introduced myself, I gave him the warrant.  I told

22  him we had a warrant.  I told him he was free to leave, he

23  didn't need to stay.  If he did leave, he wouldn't be

24  entitled to come back onto the scene until after we had left.

25  If he stayed, he would be accompanied by one of our members.

1  Q.  Okay.  And then the pat-down happened?

2  A.  Yes.

3  Q.  Who did the pat-down?

4  A.  I believe that that was conducted by Environmental

5  Conversation Officer Machnica.

6  Q.  And not Officer Marshall who was in charge of the pat and

7  frisk, according to page 1 of Exhibit D1?

8  A.  It might have been Officer Marshall.  I -- my

9  recollection is that Officer Machnica did the pat-down or the

10  frisk, but it could have been Officer Marshall.

11  Q.  If I understand your answer correctly, I understand you

12  to be saying you don't remember, you remember that there was

13  a pat and frisk, you don't remember whether it was conducted

14  by Officer Marshall or Officer Machnica; am I saying that

15  correctly?

16  A.  Pretty close.

17  Q.  You don't remember which conducted it?

18  A.  I don't remember which.

19  Q.  Okay.  And so it's fair to say insofar as what happened

20  on the front porch on arrival, there's some things you do

21  remember, some things you don't remember perfectly?

22  A.  Yes.

23  Q.  And I take it when you execute a warrant, even when

24  you've done it 30 or 31 times, there's a little bit of

25  adrenaline when you first knock on the door and a person

1    answers?

2    A.   That would be fair.

3    Q.   In fact, you have prepared for potential major injuries,

4    correct?

5    A.   We do that in every warrant that we execute.

6    Q.   That's right.  You have a location selected for minor

7    injuries, and then a separate trauma hospital selected for

8    major injuries?

9    A.   Yes.

10   Q.   And, so, the folks who review the ops plan, including

11   yourself, from your own experience, it's your experience that

12   officers can sometimes be a little jacked up when you first

13   get there?

14        MR. MANGO:  Objection, Judge.

15        MAGISTRATE JUDGE ROEMER:  Overruled.

16        THE WITNESS:  I wouldn't say that that's a normal

17   occurrence, or that even anybody was jacked up at this

18   occurrence.

19        BY MR. GRABLE:

20   Q.   Well, you can only really speak for yourself on that

21   point.  And you're a pretty experienced guy, so maybe you

22   weren't as full of adrenaline as some of the other officers;

23   would that be fair to say?

24   A.   I don't know how much adrenaline was released on any

25   other officer there.

1  Q.  Fair enough.  If we could turn to page 48319 of D1 in

2  evidence, please.

3          BY MR. GRABLE:

4  Q.  And we see on page 48319 of D1 in evidence that there was

5  a plan worked out in the ops plan for how the approach would

6  happen to Mr. Casacci's home, correct?

7  A.  Yes.

8  Q.  The first part of the plan was that you, Agent Peinkofer,

9  and -- Investigator Peinkofer, and others would approach the

10  front door and greet Mr. Casacci, correct?

11  A.  Yes.

12  Q.  And then ECO Marshall, who was in charge of site security

13  and safety and that sort of thing, he was to be immediately

14  present behind the greeting team, correct?

15  A.  Yes.

16  Q.  Now, the fourth bullet point there references that --

17  after the reference to Lieutenant Beth Haag, that any weapons

18  would be secured in a locked, marked, DEC police vehicle for

19  the duration of the warrant?

20  A.  Yes, right below where it says Officer Machnica will

21  frisk the individual for weapons.

22  Q.  That's right.  And by the way, that entry that you just

23  read is -- seems a little different than what the plan was on

24  the first page, correct?

25  A.  Well, I'm not sure what you're referring to on the first

1    page.  It was my recollection that Machnica was the one that

2    was going do the search.

3    Q.  Marshall was to do the pat and frisk of the target, if

4    you look on the bottom part of the page there.

5    A.  Okay.  So can you direct me to where you're -- yes.

6        Yes, in one location it says that it would be Officer

7    Marshall, and another location it says it would be Officer

8    Machnica.  My recollection is that it was Machnica.

9    Q.  I think you told us you're not positive which it was?

10        MR. MANGO:  Well, Judge, my recollection was he said

11   my recollection is this, but --

12        MR. GRABLE:  The record will stand.  It can speak for

13   itself.

14        MR. MANGO:  And he just said it again, so --

15        BY MR. GRABLE:

16   Q.  This reference to weapons, is that agent weapons?  Or

17   weapons found on premises?

18   A.  The dangerous instruments or weapons found on the

19   premises.  We wouldn't lock up our own weapons.

20   Q.  No, you wear yours the entire time.

21   A.  Yes.

22   Q.  So the law enforcement officers who were present in

23   Mr. Casacci's home would keep their sidearm available to

24   them, or if they wear it somewhere else, it would be

25   available to them and, in many cases, visible for the

1  entirety of the search?

2  A.  Yes.

3  Q.  And anything -- this -- this plan that we're looking at,

4  page 48319 of D1, it contemplates a sweep, a protective sweep

5  of the entire home, correct?

6  A.  Yes.

7  Q.  Because you have to find out if there's anything

8  dangerous in the home?

9  A.  Yes.

10  Q.  Okay.  Turning to the next page, 48320 in evidence, there

11  is an interview team set up prior to the execution of the

12  warrant, correct?

13  A.  Yes.

14  Q.  When was the ops plan drafted?

15  A.  It's drafted over the course of time.  So I don't know

16  exactly, but it was completed prior to the execution of the

17  warrant.

18  Q.  Well, here we had a application that was made Judge

19  Buscaglia on the 3rd of July, then we had the holiday, then

20  we had the morning of the 5th of July when you're all going

21  to Mr. Casacci's house.  My question is:  Was the ops plan

22  prepared prior to the warrant being presented to Judge

23  Buscaglia?

24  A.  Probably not the finishing touches, but in anticipation

25  of giving approval to do a search, we started an ops plan.

1  Q.  In other words, you would have been working on a draft in

2  the event that Judge Buscaglia granted the warrant?

3  A.  Yes.

4  Q.  And the plan that was developing for the execution of the

5  warrant, it was contemplated that you and agent

6  Schneckenberger would interview Mr. Casacci, correct?

7  A.  If he was amenable to that, that was the plan.

8  Q.  But it was the plan and it was the hope, wasn't it?

9  A.  Yes.

10 Q.  I want to ask you some questions about the entry and exit

11 log, which is defense D2 in evidence, please.

12        MR. MANGO:  For the government?

13        MR. GRABLE:  I think it's easier to zoom in, same

14 exhibit.

15        BY MR. GRABLE:

16 Q.  Investigator O'Connor, just a few questions about this

17 document that Mr. Mango asked you some questions about on

18 direct examination.

19    This is a document that you didn't have any hand in

20 preparing, but you're familiar with it from your role in the

21 investigation, correct?

22 A.  Yes.

23 Q.  In the top left corner, we see next to Lieutenant Haag's

24 name, something that looks as though it says sum, S-U-M.

25 What does that mean?

1    A.  I don't know.

2    Q.  Have you been trained to prepare entry and exit logs in

3    connection with search warrants?

4    A.  Yes.

5    Q.  Have you ever used that phrase on an entry or exit log?

6    A.  No, I don't know what that is.

7    Q.  Now, in -- we see from the log that there are two people

8    who didn't enter the residence, ECO Dougherty and Theresa

9    Mucha.  Is that entry correct?  That those two people who

10   were in attendance did not enter the residence?

11   A.  Yes.

12   Q.  Who are they?

13   A.  ECO Dougherty is an Environmental Conservation Officer

14   assigned to Region 9 in Buffalo.  And Theresa Mucha is an

15   attorney with the DEC.

16   Q.  We also see at the bottom, and you were asked some

17   questions about this on your direct testimony, excuse me,

18   reference to someone named Haley Keyser, correct?

19   A.  Yes.

20   Q.  Now Haley Keyser was, in fact, present at the residence

21   that morning when you guys entered the house, wasn't she?

22   A.  I don't recall that.

23   Q.  In fact, she was cohabitating with Mr. Casacci, wasn't

24   she?

25   A.  I don't know.

1  Q.  She was living with him, because she'd moved in some

2  weeks earlier?  You don't know the answer to that question?

3          MR. MANGO:  Objection, asked and answered.

4          BY MR. GRABLE:

5  Q.  Am I correct in hearing you to say that you, at this

6  point, don't remember if she was there, left and came back,

7  or whether she just left at 12:03?

8  A.  That's correct.  I don't know whether she was there when

9  we arrived, and left and then came back, or whether she just

10 came back.  I don't remember.

11 Q.  Well, there had to be a protective sweep of the home to

12 make sure there were no dangers, correct?

13 A.  Correct.

14 Q.  Does a protective sweep, then, not give you any

15 indication whether Haley Keyser was present in her pajamas,

16 or whether she was not present?

17 A.  I didn't do the protective sweep, so I don't know.

18 Q.  There were a lot of people on the scene, correct?

19 A.  Yes.

20 Q.  Various people, each performing their respective roles,

21 correct?

22 A.  Yes.

23 Q.  And is it fair to say that because so many people were

24 performing so many roles, that you have roles that you're

25 expected to fill, as well, correct?

1   A.  Yes.

2   Q.  And it's a possibility in the execution of your

3   individual role that you might miss something that another

4   officer might pick up, correct?

5           MR. MANGO:  Objection, Judge.  I am not following the

6   line of questioning.  I don't know what it has to do,

7   especially with this person present or not.  It's already said

8   he doesn't know if she was there with him.

9           MR. GRABLE:  I'm challenging the accuracy of his

10  recollection with respect to everything that happened that

11  day.  Especially the taking of any statements, and especially

12  with respect to any statements that --

13          MAGISTRATE JUDGE ROEMER:  Well, how does she tie into

14  any statements that were made?

15          MR. GRABLE:  I'm going to tie it up --

16          MAGISTRATE JUDGE ROEMER:  Was she there?

17          MR. GRABLE:  She was there.

18          MAGISTRATE JUDGE ROEMER:  Okay.  Overruled.

19          BY MR. GRABLE:

20  Q.  So your role was such that you can't tell us whether she

21  was there in the morning when you folks arrived, or whether

22  she was --

23  A.  Well, I wouldn't say my role.  Just, I would say that I

24  don't recall whether she was there and left, or whether she

25  came back later -- or, not came back.  I don't know whether

1  she was there when we arrived, left, and came back, or

2  whether she just arrived later.

3  Q.  But Mr. Casacci was certainly there when you arrived,

4  correct?

5  A.  Yes, he was.

6  Q.  And he -- he is logged as being in at 9:50, the same as

7  the first agents, correct?

8  A.  That's what the log indicates.

9  Q.  And so even though he was residing at the residence,

10  Investigator Marshall or Officer Marshall logged him as

11  having an arrival time, correct?

12  A.  Yes.

13  Q.  You told us on direct that your demeanor was professional

14  and calm, correct?

15  A.  Yes.

16  Q.  And you said that Mr. Casacci was very quiet?

17  A.  Yes.

18  Q.  And -- and that was when you first met him out on the

19  porch after he had opened the door to see all these folks out

20  in front of his house, correct?

21  A.  Yes.

22  Q.  Now, at the time that he stepped out on the porch, you

23  stated you told him he was not under arrest and that he was

24  free to leave, correct?

25  A.  He didn't step out on to the porch, he stood in the

 1   threshold of the door.  So he was kind of in the house,

 2   standing at the open door.  So, he wasn't on the porch, but

 3   yes, that's when I told him that we had a search warrant, who

 4   I was, what we were there for, and that he was not required

 5   to stay.

 6   Q.  That's what you remember telling him?

 7   A.  Yes.

 8   Q.  Did you tell him anything else other than what you just

 9   said?

10   A.  I may have.

11   Q.  You don't remember?

12          MR. MANGO:  Objection, Judge.  I believe that

13   testimony was sort of a paraphrase.  He's already testified on

14   direct what he said.

15          MAGISTRATE JUDGE ROEMER:  And he did testify that he

16   told him other things, too, is my recollection.  Do you want

17   to just ask him what he said to him?  Okay.

18          MR. GRABLE:  I want to know from -- let me -- let me

19   ask you a preliminary question first.

20          BY MR. GRABLE:

21   Q.  When you met with Mr. Mango to prepare for your

22   testimony, did he go over with you what he would ask you

23   about what Mr. Casacci said to you when the initial entry

24   team greeted him at his doorstep?

25   A.  That was part of the preparation.

 1  Q.  And you may recall during your direct testimony that

 2  Mr. Mango asked you that question three or four times during

 3  your direct, correct?

 4  A.  Are you asking me about the witness preparation, or my

 5  direct testimony?

 6  Q.  Your testimony this morning.

 7  A.  Okay.  And what's the question?

 8  Q.  Mr. Mango came back to it a few times this morning,

 9  right, asking you what you said on the initial entry,

10  correct?

11  A.  Yes.

12  Q.  And he asked you a series of leading questions?

13      You know what leading questions are, correct?

14  A.  Yes.

15  Q.  And he asked you leading questions about that, correct?

16  A.  I don't know if I would phrase those questions as leading

17  questions.

18  Q.  Okay.  So the process of securing the scene at the

19  residence there took approximately a little less than an

20  hour, correct?

21  A.  I'm not sure what you're referring to about securing the

22  scene.

23  Q.  Let me try to clarify.

24      MR. GRABLE:  Can we pull back up Defendant's Exhibit

25  D2, please?

1          BY MR. GRABLE:

2    Q.  The ops plan for the execution of this warrant was that

3    civilians would remain outside until the home was safe and

4    secured, correct?

5    A.  Yes.

6    Q.  And the first civilians entered the residence at 10:33,

7    correct?

8    A.  Yes.

9    Q.  And so you arrived at 9:50 a.m. was when the first team

10   entered, correct?

11   A.  Yes.

12   Q.  So my time was off, but it's about 43 minutes it took for

13   the initial entry team to make sure the house was safe and

14   secure?

15   A.  I would not -- I would say that that's accurate.

16   Q.  And in terms of Mr. Casacci's freedom of movement, he

17   certainly was not free to walk past all of you to get to his

18   car, get the keys, drive away, until a pat and frisk had been

19   done, correct?

20   A.  No, that's not correct.  If he were to leave at that

21   time, we would not have frisked him.

22   Q.  This -- so, if he would have walked past you, got into

23   his car and left, he would have been unimpeded and not

24   stopped?

25   A.  Yes.

1  Q.  And if he had said, hey, you guys wait here on the front

2  step, I'll be back in a minute.  And he went into his house.

3  I'm assuming you would have had to stop him from returning

4  into his house?

5  A.  We wouldn't have allowed that.

6  Q.  And so, to some extent, upon initial entry, he should

7  have understood that his freedom of action was being

8  curtailed, correct?

9  A.  No.  I told him that he could move about, but that he

10  would be accompanied by an officer.  He just couldn't leave

11  and tell us to stay there and go somewhere like you

12  suggested.

13  Q.  Right.  And all the officers who were standing there,

14  would you, if you were in Mr. Casacci's position, understood

15  that you couldn't go into the house and roam about, and you

16  were obliged to stay within contact of the officer who was

17  escorting him around?

18      MR. MANGO:  Objection, Judge.  That's a --

19      MAGISTRATE JUDGE ROEMER:  Why don't you break it up.

20      MR. GRABLE:  I can rephrase it.

21      MAGISTRATE JUDGE ROEMER:  Rephrase it.

22      BY MR. GRABLE:

23  Q.  You had an officer assigned to escort Mr. Casacci during

24  the search to make sure he didn't do anything dangerous,

25  correct?

1    A.  Yes.

2    Q.  That was Investigator Marshall?

3    A.  Yes.

4    Q.  And he did, in fact, shadow and stay with Mr. Casacci

5    during the search?

6    A.  Yes.

7    Q.  And if prior to -- let me rephrase that question.

8        If Mr. Casacci had said, hey, stop shadowing me, I want

9    to be by myself, I'm going into my basement.  Leave me alone.

10       The search team would never permit that, correct?

11           MR. MANGO:  Objection, Judge.  We're engaging in

12   speculation here.  I'd like to stay with what actually

13   happened.

14           MAGISTRATE JUDGE ROEMER:  Overruled.

15           THE WITNESS:  I'm sorry, would you repeat that,

16   please?

17           MR. GRABLE:  Sure.

18           BY MR. GRABLE:

19   Q.  If, during the course of Investigator Marshall shadowing

20   Mr. Casacci, Mr. Casacci had said, hey, you know what?

21   You're a nice guy and everything, but I want to go in my

22   basement by myself.  I'll see you guys when you get down

23   there.  There's no way anybody would have let him do that,

24   correct?

25   A.  No, he might have said if you want to be by yourself, you

1  can leave.

2  Q.  But he didn't say that, correct?

3  A.  No, but Mr. Casacci didn't say what you said he might

4  have said, either.

5  Q.  You don't remember everything he said, do you?

6       MR. MANGO:  Objection, Judge.  Now we're engaging in

7  a question and answer --

8       MAGISTRATE JUDGE ROEMER:  Sustained.  Next question.

9       BY MR. GRABLE:

10 Q.  You were -- Investigator Marshall may have been with him

11 a lot of the time, but you weren't with him all the time,

12 were you?

13 A.  That's correct.

14 Q.  And so there may be some things that Mr. Casacci said

15 that day that you're not aware of?

16 A.  That's correct.

17 Q.  Now one of the reasons that you have investigator --

18 Officer Marshall trail Mr. Casacci and shadow him is to

19 prevent him from fleeing with evidence, I think you told us,

20 correct?

21 A.  Not necessarily fleeing with evidence, but interfering

22 with evidence, or for his safety and our safety.

23 Q.  Thank you.  So among the purposes of having Investigator

24 Marshall or Officer Marshall trail Mr. Casacci, is you want

25 to make sure that nothing happens with evidence when he's not

1  under supervision, correct?  Or observation?

2  A.  Yes.

3  Q.  You want to make sure he doesn't pose any threat to the

4  safety of any officer or himself while the search is being

5  executed?

6  A.  Yes.

7  Q.  And you want to make sure that he's not in a position to

8  destroy any evidence while not under observation, correct?

9  A.  Yes.

10  Q.  And those purposes that we just outlined, you never heard

11  anybody tell Mr. Casacci any of that, correct?

12  A.  I never heard anybody tell Mr. Casacci what?

13  Q.  The reason why Investigator or Officer Marshall was

14  following him around, no one ever told him that, correct?

15  A.  I don't think so.  I didn't tell him the reason.  I just

16  told him that he would be accompanied if he decided to stay.

17  Q.  Okay.  And now, in relation to when -- I think you told

18  me this, and forgive me, I don't mean to cover ground we

19  already have, I just don't remember your answer.

20      In terms of the sequence on the front porch, you greeted

21  him and told him what you say you told him, and then the

22  pat-down frisk happened?

23  A.  Yes.

24  Q.  And I think after the pat-down frisk, you didn't say to

25  him, hey, just to reinforce, you're still free to go?

1   A.  I don't recall saying it a second time.  I said it later

2   on, you know, when we sat at the table, but --

3   Q.  Yeah, we'll get there.

4       This was not a no-knock warrant, correct?

5   A.  That's correct.

6   Q.  What's the difference between a no-knock warrant and this

7   warrant?

8   A.  No-knock warrant authorized a court authorization to

9   enter whether the people present at the scene are there or

10  not, or without identifying who you are and what you're there

11  for.

12  Q.  This one, you needed to knock on the door and have

13  somebody, in this case, Mr. Casacci, open the door and hand

14  him the warrant?

15  A.  Yes.

16  Q.  Now, on the front -- in the front area where the initial

17  greeting took place, and there's a picture --

18          MR. GRABLE:  Can we pull up Government Exhibit 3A in

19  evidence, please?

20          MR. MANGO:  Yeah.

21          BY MR. GRABLE:

22  Q.  Okay.  And that's the front of the house which includes a

23  view of the front porch, correct?

24  A.  Yes.

25  Q.  And then if we looked at 3B, also.

1          MR. GRABLE:  Can you pull up 3B?

2          BY MR. GRABLE:

3    Q.  This is the entryway into the house once the entry team

4    proceeded in, correct?

5    A.  This is the view you would have inside the front door

6    looking to the left.

7    Q.  Okay.  And so jumping back just for a moment to 3A and

8    the front door there, thank you, the entry team would have

9    been assembled in the area in the middle of the picture where

10   the front door is, correct?

11   A.  The team that made the initial greeting was myself,

12   Investigator Piwko, Investigator Peinkofer, and Lieutenant

13   Haag.  There were several others that were just a few steps

14   back.

15   Q.  But certainly in this general area that we see in the

16   picture, I'm talking about the others?

17   A.  Yeah, there would have been, like, on the front lawn

18   there in front of the steps.

19   Q.  Okay.  And Investigator Peinkofer was next to you,

20   correct?

21   A.  We were all in close proximity.  We were on the porch,

22   and there's not much room there.  I don't know if he was on

23   my right or on my left or standing right behind me.  He was

24   right there.

25   Q.  He was part of the initial entry team that was a small

1  group that you were a part of?

2  A.  Yes.

3  Q.  And Mr. Casacci, in fact, had some communication with the

4  Investigator Peinkofer prior to you all going into the house

5  to begin the search, do you remember that?

6  A.  I remember Mr. Casacci and Investigator Peinkofer

7  interacting inside the house.  I don't recall any interaction

8  on the porch.  Investigator Peinkofer asked Mr. Casacci is

9  there anyone else in the house?

10 Q.  Do you remember him asking that?

11        MR. MANGO:  Objection, Judge, he just said he doesn't

12 recall.

13        MAGISTRATE JUDGE ROEMER:  Overruled.

14        THE WITNESS:  I don't recall if he said that or not.

15        BY MR. GRABLE:

16 Q.  And am I to understand that to mean that it possibly did,

17 it possibly didn't, you just don't remember?

18 A.  That's exactly right.

19 Q.  Okay.  Now Mr. Casacci, in fact, said some things to

20 Investigator Peinkofer in the front entryway that's shown in

21 3A, as well, correct?

22 A.  I thought that's what you just asked me.

23 Q.  I asked you what Mr. Pine -- Investigator Peinkofer said

24 to Mr. Casacci?

25 A.  Yeah.

1  Q.  Now I'm asking you Mr. Casacci spoke to Mr. --

2  Investigator Peinkofer, as well, correct?

3  A.  I don't recall.

4  Q.  Were you the first one in the house?

5  A.  I'm not sure.

6            MR. GRABLE:  Can we pull up 3D again?

7            BY MR. GRABLE:

8  Q.  If you look to the right on 3B, can you tell who it is on

9  the right edge of the picture there?

10  A.  I can't really tell who it is.  It looks like it's an

11  investigator.

12  Q.  And that would have been right at the point of entry,

13  correct?

14  A.  The picture was taken from the point of entry.

15  Q.  And you -- you don't recall where you were in terms of

16  the sequence of people entering the house?

17  A.  I don't.  I would assume --

18            MAGISTRATE JUDGE ROEMER:  Just to clarify,

19  Mr. Grable, you used the term point of entry.

20            I think maybe you were talking about in time terms,

21  and he was talking in terms of location terms of point of

22  entry, so just to clarify that.

23            MR. GRABLE:  Thank you, Your Honor.  Yeah, I

24  appreciate that.  Thank you.  Forgive me.

25            BY MR. GRABLE:

1  Q.  My question is, in terms of the sequence of who went in

2  when, so setting aside time for the moment, do you recall

3  whether you were in the first, the second, the first three,

4  whatever you were in terms of the entry team?  I'm talking

5  about across the threshold.

6  A.  I understand.  I don't recall.  My thought is, just from

7  based on experience, that the members that were going to be

8  doing the security sweep would go in first, and that I

9  wouldn't necessary go in first.  But I might have, I don't

10 know.

11 Q.  You don't remember one way or the other?

12 A.  That's correct.

13 Q.  And I take it that you also don't remember whether

14 Investigator Peinkofer went in before you or after you?

15 A.  I don't know.

16 Q.  And what about Mr. Casacci?  Is it fair to say that you

17 don't remember whether he was in the house when you went in?

18 Out of the house?  Do you recall what sequence he went in?

19 A.  I don't believe he ever came out of the house.  So he was

20 in the house, you know, he was in the threshold, and then he

21 stepped back into the house, so, you know, he was in there

22 already.

23 Q.  When the agents started coming into the house, did he

24 step back from the doorway and the agents went past him?  Or

25 did he walk into the house?

1   A.  I don't recall.

2   Q.  And so once you were in the house, the house presents in

3   such a way that when you walk into the front, there's a --

4   past the threshold, there's the area that we saw in 3B off to

5   the left, and then straight ahead there's, like, a

6   kitchenette, correct?

7   A.  Yes.

8   Q.  And the kitchenette has -- there's, like, an opening,

9   from the bar, some stools, three stools?

10  A.  Yes.

11  Q.  And we looked earlier in your testimony at a shot of the

12  kitchen, at least the kitchen counter, and that would be the

13  perspective if you're standing in the refrigerator area

14  looking towards the front door, correct?

15  A.  Could you put that picture up again so I can see that?  I

16  don't --

17          MR. GRABLE:  Yeah, I think it's 3E, thank you.

18          BY MR. GRABLE:

19  Q.  So this one's 3E that we looked at during your direct

20  testimony, that's from the kitchen area looking out towards

21  the front door.  And then off to the top-right corner, you

22  can see, like, the La-Z-Boy and the couch in the area where

23  the television is, correct?

24  A.  Yes, from that perspective, the full wall to the left of

25  the opening sort of blocks the front door.  So that's the way

1  we're looking, toward the front door.  It would be right

2  behind where those light switch -- it would be right behind

3  where those light switches are.

4  Q.  And behind -- if you're in the picture, let's take it

5  from this perspective, behind you would be a refrigerator,

6  and then the left would be, like, the hallway that goes back

7  to the bedroom, correct?

8  A.  I don't recall if the refrigerator was right behind or

9  behind on the right.  I know behind on the left was the

10  entrance to the sun room.  And then the hard left would be to

11  the garage.

12  Q.  Now, in the kitchen area, once every -- once the team was

13  inside, at least the initial entry team was inside, and in

14  this first area of the house, Mr. Casacci was present in the

15  kitchen area with you and Investigator Peinkofer, correct?

16  A.  Mr. Casacci was moving about the house, he was in the

17  kitchen sometimes, I was in the kitchen sometimes.

18  Q.  One of the times that you were in the kitchen, and he was

19  in the kitchen, and Investigator Peinkofer was in the

20  kitchen, you and Investigator Peinkofer asked him some

21  questions, correct?

22  A.  That makes sense.

23  Q.  You asked him if there were any weapons in the house?

24  A.  I think that would have been addressed prior to, you

25  know, just standing around that.  I think that would have

1  been asked earlier.

2  Q.  When you say that would have been, are you saying you

3  don't remember when it was done?

4  A.  Well, it was asked upon initial entry.  I don't know if

5  it was asked later on again.

6  Q.  Well, where were you when it was asked?

7  A.  We were all standing near the door.

8  Q.  In the house?

9  A.  I was on the porch, Mr. Casacci was standing in the

10  threshold.

11  Q.  So this is before you and the team went in?

12  A.  It's standard procedure to ask are there any weapons in

13  the house.

14  Q.  I understand.  At this point, I'm not asking standard

15  procedure, I'm asking what happened that day.

16      Did you ask him out on the porch whether he had any

17  weapons in the house?  Or did that happen in the house?

18  A.  I don't know.

19  Q.  You don't remember?

20  A.  I don't remember.

21  Q.  There was some discussion in this kitchen area about

22  whether there was anything in terms of records in the

23  basement, correct?

24  A.  All those questions were asked.  When they were asked,

25  and who asked them, I don't recall.

1    Q.  And so you don't remember where you were when someone

2    asked Mr. Casacci if there were records in the basement?

3              MR. MANGO:  Objection.  I'm not following, Judge.

4    There was a --

5              MAGISTRATE JUDGE ROEMER:  Well, I believe he

6    testified on direct at some point he did ask Mr. Casacci are

7    there -- matter of fact, my recollection is right after

8    Mr. Casacci said I want an attorney, he said okay, we'll stop

9    questioning you.  But can you tell me are there any records

10   anywhere else in the house.  That was my recollection of the

11   testimony.

12             MR. MANGO:  Yes, Judge.  Any additional records other

13   than the basement.  And he testified he was sitting at the

14   dining room table.

15             MAGISTRATE JUDGE ROEMER:  That's my -- Mr. Grable, I

16   guess, is asking him if he said it any other time.  But he did

17   say it at that, it was elicited on direct.  So I overrule the

18   objection and allow another question.

19             MR. GRABLE:  I'll try to clarify, Judge.  I don't

20   want there to be any confusion.

21             BY MR. GRABLE:

22   Q.  You heard the judge and Mr. Mango talking about reference

23   to your direct testimony when there was talk during the

24   gathering at the dining room table that was recorded about

25   whether -- that someone might be asking Mr. Casacci about

1  records.  Do you remember that?  I'm paraphrasing, of course.

2  A.  Yes.

3  Q.  Okay.  I'm asking now about -- that, by the way, was at

4  11:46 I think that morning, or --

5  A.  Something like that.  It was later in the warrant.

6  Q.  Yeah.  Much, much later than the 9:50 point of entry,

7  correct?

8  A.  Yes.

9  Q.  Okay.  I'm talking about now much closer to the 9:50

10 point of entry, there was some discussion about -- and some

11 questions put to Mr. Casacci about whether there were any

12 records in the basement; do you remember that?

13 A.  Not specifically, but that makes sense to me.  We would

14 have asked him that.

15 Q.  Yeah.  So your -- in your experience, it's something you

16 would have asked, but you don't remember in this case when it

17 was asked, correct?

18 A.  That's correct.

19 Q.  You don't remember where it was asked, correct?

20 A.  Correct.

21 Q.  You don't remember who asked, correct?

22 A.  Correct.

23 Q.  And you don't remember whether you were even present when

24 it was asked, correct?

25 A.  That's correct.

1  Q.  It could be that someone else, for example, Investigator

2  Peinkofer asked that question of Mr. Casacci, and you weren't

3  present to hear it, or you just don't remember today?

4  A.  That might be possible.  I don't remember.

5  Q.  Okay.  And because Mr. Casacci was roaming about the

6  house, as you said, with Investigator Marshall trailing

7  him --

8        MR. MANGO:  Objection, Judge.  I don't think he ever

9  used the term "roaming."

10       MR. GRABLE:  I forgot what word you used.  I think

11  you tried to tell him he was free to walk around.

12       MAGISTRATE JUDGE ROEMER:  I think he used the word he

13  was moving about the house.

14       MR. GRABLE:  Moving about the house.

15       BY MR. GRABLE:

16  Q.  When Mr. Casacci was moving about the house with

17  Investigator Marshall, there were times where he was in

18  contact with Investigator Peinkofer, and you weren't

19  necessarily there, correct?

20  A.  That's correct.

21  Q.  Okay.  Now you told us that Mr. Casacci, when you asked

22  him about his house cat, the cat that he keeps as a pet,

23  Savannah cat, I think you called it, that his demeanor

24  changed, correct?

25  A.  Yes.

1  Q.  He seemed to become upset?

2  A.  Yes.

3  Q.  He even seemed a little agitated at that time?

4  A.  Yes.

5  Q.  And, in fact, it was at the point in your presence that

6  Mr. Casacci said, am I free to go?  Didn't he?

7  A.  I don't recall him asking that.

8  Q.  Well, are you saying that it's possible that got said and

9  you don't recall it?

10  A.  That would be possible, because I wasn't with him the

11  entire time I was there.

12  Q.  Okay.  So now let's talk about what you were present for.

13      When he became upset and agitated, he in fact said in

14  your presence, am I detained, or free go?

15          MR. MANGO:  Objection, Judge.

16          MAGISTRATE JUDGE ROEMER:  Overruled.

17          BY MR. GRABLE:

18  Q.  Didn't he say that?

19  A.  I don't remember if he said that.  I don't think he did,

20  but I don't know.

21  Q.  You don't know one way or the other?

22  A.  I don't remember him saying that.

23  Q.  You weren't taking notes though, correct?

24  A.  I was not.

25  Q.  Do you recall that in this sequence, there came a point

1  in time where Investigator Peinkofer directed Mr. Casacci

2  that he was to sit in a chair?

3  A.  I don't recall that.

4  Q.  Do you recall at any point Investigator Peinkofer

5  restricting Mr. Casacci's movement in any way by asking him

6  or directing him to either sit in one of the bar stools or

7  sit in a recliner chair?

8  A.  I don't recall that.

9  Q.  Okay.  In terms of the duration of the time that

10  Mr. Casacci was in the presence of you and the investigators,

11  we can tell from the log that that was several hours,

12  correct?

13  A.  The log began at 9:50.  And I think Mr. Casacci left

14  before the rest of us did at -- well, it's documented there.

15  I don't recall the time.  At 12:13 maybe?  Is that a

16  correct --

17  Q.  And is that consistent with your recollection that he

18  left about 12:13?

19  A.  My recollection is that he left a considerable amount of

20  time before we were finished.

21  Q.  And a considerable amount of time after had entered?

22  A.  Yes.

23  Q.  The team was there for more than three hours, correct?

24  A.  We were there from 9:50, and I'd have to look at the log

25  again to see what time it was that we left.

1  Q.  12:54, sound right?

2  A.  It does.

3  Q.  At no point in time did you or anybody else give

4  Mr. Casacci Miranda warnings?

5  A.  I don't know about anybody else.  I did not.  I wasn't

6  required to.

7  Q.  You weren't required to because, in your view, he was not

8  in custody?

9  A.  He was free to leave and he wasn't in custody.  As a

10  matter of fact, he did leave.

11  Q.  We'll get there.  But your -- to your understanding, he

12  was not in custody at any point; that was your --

13  A.  It was my understanding, and I informed him of that.

14  Q.  His -- is there anything that -- anything in your

15  training or otherwise that prevents you from giving Miranda

16  warnings to somebody even if they're not technically in

17  custody?

18  A.  No.

19  Q.  But sometimes when you give somebody Miranda warnings,

20  they stop answering questions and they say I want a lawyer?

21  A.  Sometimes they do, sometimes they don't.

22  Q.  Do you ever, in your -- the course of your work, before

23  you were retired, of course, did you ever have anybody sign a

24  Miranda card when you gave them a Miranda warning?

25  A.  I may have, I don't specifically recall that.  Sometimes,

1  depending on when they're working with a different agency,

2  it's -- it's part of their form.  So, I've been present when

3  that's been done.  But I don't recall doing it myself.

4  Q.  Has it been your experience during your 30-some years at

5  the DEC that it's more likely than not --

6      Let me rephrase that.

7      That if you give someone Miranda warnings, it's more

8  likely they'll stop answering questions than if you don't?

9          MR. MANGO:  Objection, Judge.  I don't know the

10  relevance of this.

11          MAGISTRATE JUDGE ROEMER:  Overruled.

12          THE WITNESS:  I don't know if it's my experience or

13  not.  There are many times where I've Mirandized people and

14  they have talked, so I didn't keep track of the number of

15  times.

16          BY MR. GRABLE:

17  Q.  Okay.  We heard on your direct examination the tape that

18  was played that Mr. Schneckenberger recorded, correct?

19  A.  Yes.

20  Q.  And you told us on direct that you didn't know that you

21  were being recorded?

22  A.  That's correct, I did not know that.

23  Q.  And it's your testimony that Mr. Schneckenberger kept

24  that recording device from view of you and Mr. Casacci?

25  A.  I didn't see it.

1   Q.  Now, one of the questions that Mr. Mango asked you during

2   your direct examination when we talked about the recording

3   was whether we hear on the recording Mr. Mango -- or,

4   Mr. Casacci ever say or make reference to a prior request for

5   an attorney.  Do you remember him asking you that question?

6   A.  I do remember him asking that question.

7   Q.  And you, of the three people involved in that tape, the

8   three voices we hear, two of them are professional law

9   enforcement officers, and one of them started the day

10  thinking he was meeting with a guy who was coming to look at

11  a cat, correct?

12  A.  Yes.

13  Q.  And you don't, anywhere on that recording, say as I told

14  you before, you're free to go?

15  A.  That's not on the recording.

16  Q.  You don't say to him, hey, remember what I told you

17  before?  I'm going to repeat that.  You're not in custody.

18  A.  I didn't say that.

19  Q.  You didn't say to him, hey, you know when I told you

20  before?  You're not under arrest.  Let me repeat that:

21  You're not under arrest?

22  A.  No, I didn't say that.

23  Q.  In fact, what you said to him was you're not under

24  arrest, correct?

25  A.  If that's what's on the tape, that's what I said.

1  Q.  Do you remember?

2      MR. MANGO:  Judge, I think the tape speaks for itself

3  at this point.

4      MAGISTRATE JUDGE ROEMER:  If you want to play the

5  tape, you're free to play the tape again.

6      MR. GRABLE:  Okay.

7      BY MR. GRABLE:

8  Q.  In any event, as soon as you said the words on the tape

9  to Mr. Casacci, that he was not under arrest, that he was

10  free to leave at any time, that he didn't have to answer

11  anything and he was not in custody, he asked -- he invoked

12  his right to counsel, correct?

13  A.  Yes.

14  Q.  He also said -- he didn't say it, but then as soon as you

15  told him that, he left shortly thereafter?

16  A.  I'd have to look at what time the tape was and what time

17  he left.

18  Q.  Well, he left, I think you told us a few times, he left

19  long before the search was complete, correct?

20  A.  I think the log indicates he left at 12:13.  And the

21  timestamp is on the recording, so what time was that?  I

22  don't -- if you refresh my memory, I can tell you how long it

23  was from when we had that conversation to when he left.

24  Q.  Investigator Schneckenberger says outside it's

25  approximately 11:42, and the log shows Mr. Casacci leaving at

1   12:13?

2   A.  It's a little over a half an hour later.

3   Q.  And but that's certainly after you've told him he's free

4   to leave on the tape, right?

5   A.  I don't think I told him he's free to leave on the tape.

6   I think I told him he's not under arrest.  I don't -- I'd

7   have to listen to the tape again.

8          MR. GRABLE:  Let's just play that part of it one more

9   time, please.  (Unintelligible.)

10         (Audio was played.)

11         MR. MANGO:  Do you want me to jump ahead, Jim?

12         MR. GRABLE:  That would be helpful, thank you.

13         MR. MANGO:  You don't know where though, do you?  Do

14  you have a time?  I'll just throw it up here.

15         MR. GRABLE:  It's a little earlier than midway.

16         (Audio was played.)

17         BY MR. GRABLE:

18  Q.  On the tape, we're hearing you say that you're free to

19  leave at any time, correct?

20  A.  Yes.

21  Q.  We don't hear you say consistent with what I told you

22  before, you're free to leave any time?

23  A.  No, I didn't qualify it.

24         MR. GRABLE:  And if we can just play it a little bit

25  farther.

1          (Audio was played.)

2          BY MR. GRABLE:

3    Q.   And so it was at some point after you told Mr. Casacci on

4    this recording that he's free to leave at any time that he

5    did, in fact, leave, correct?

6    A.   Yeah, a little over a half hour later.

7    Q.   Before the search was complete?

8    A.   Yes.

9    Q.   Now, did you -- were you at any point during the search

10   aware that Mr. Schneckenberger had a recording device?

11   A.   I learned about it after the fact.

12   Q.   Did you have a recording device available to you?

13   A.   I had a cell phone, which I think can record, but I've

14   never used it to record.

15   Q.   Did you ever -- have you ever spoken to agent -- or,

16   Investigator Schneckenberger about why he didn't record

17   anything that Mr. Casacci said earlier in the day?

18   A.   No, I never asked him that.

19   Q.   To your knowledge, he had that recording device the

20   entire time the search warrant was being conducted?

21   A.   That makes sense.  He didn't leave and -- so, he probably

22   had it the whole time he was there.

23   Q.   Now, at some point, there was a truck.  We looked earlier

24   at a picture that showed there was an SUV in the driveway,

25   correct?

1    A.  Yes.

2    Q.  I'm talking about an SUV that was present when you showed

3    up for the search warrant?

4    A.  Yes.

5    Q.  And you understood that to be either Mr. Casacci's SUV or

6    a person who resided in the home, correct?

7    A.  I think that we were aware at the time of who it was

8    registered to.

9    Q.  Did you determine that it was registered to Mr. Casacci?

10   A.  I don't know whether it was registered to him or to a

11   leasing company or to another person at the residence.  It

12   just was -- I think I remember that it was something we were

13   confident that he was driving.

14   Q.  And at some point during the warrant execution process,

15   Mr. Casacci, that SUV was blocked into the driveway, correct?

16   A.  I don't recall whether it was or it wasn't.

17          MR. GRABLE:  Will you pull up Defense Exhibit D83,

18   please.

19          BY MR. GRABLE:

20   Q.  We're looking at Defense Exhibit D83, which has a date

21   and timestamp of July 5th, 2018 at 10:01, but we should

22   understand that time is actually 11:01 in the morning,

23   correct?

24   A.  If that's the same camera.

25   Q.  Yeah.  It's from the same series of pictures, so --

1   A.   Okay.

2   Q.   Would you then draw the conclusion that it was taken with

3   the same camera?

4   A.   I would.

5   Q.   And what we're looking at here is someone's pickup truck

6   backed into Mr. Casacci's driveway, correct?

7   A.   Yes.

8   Q.   And at some point, once the house had been cleared in

9   terms of the safety sweep, there were civilians who came in

10  and started tagging and bagging and boxing up the various

11  cats, correct?

12  A.   Yes.

13  Q.   And one of the teams that the DEC brought in to do that

14  was from Arkansas, correct?

15  A.   Yes.

16  Q.   So at some point, there was, in fact, you can see in the

17  reflection in the right-hand side of the tailgate of the

18  truck, that the SUV that you believe was registered or in

19  some capacity being used by Mr. Casacci is blocked in by the

20  pickup truck, correct?

21  A.   I see the pickup truck behind that SUV, yes.

22  Q.   Now, would this have been, in terms of the timing of it,

23  11:01 or so, in the sequence of what happened that morning,

24  would that have been before or after Mr. Casacci stepped

25  outside with Investigator Marshall?

1  A.  Just going by chronology, I would say this picture was

2  taken after the two stepped outside.

3  Q.  And is that because you have some understanding of when

4  Mr. Casacci made the statements that Investigator Marshall

5  put on the 710.30?

6  A.  No, it's because I recall that Investigator Marshall and

7  defendant Casacci went outside after the conversation about

8  the Savannah cat.

9      And I recall that the conversation about the Savannah cat

10 was pretty contemporaneous to the beginning of the warrant.

11 Q.  In other words, pretty early on in the process of

12 executing the search warrant was when, to your recollection,

13 Mr. Casacci and Investigator Marshall stepped out and when,

14 it's your belief, that Mr. Casacci made the statements are on

15 the 710.30?

16 A.  Yes.

17        MR. GRABLE:  May I have a moment, Your Honor?

18        MAGISTRATE JUDGE ROEMER:  Sure.

19        MR. GRABLE:  Thank you, sir.

20        MAGISTRATE JUDGE ROEMER:  Mr. Mango?

21        MR. MANGO:  Your Honor, I'll just do my redirect from

22 here if that's okay.

23        MAGISTRATE JUDGE ROEMER:  Sure, yep.

24        MR. MANGO:  Just in the event there's recross, and

25 then we can proceed.

 1          MAGISTRATE JUDGE ROEMER:  Okay.

 2          DEPUTY CLERK:  Excuse me, Aaron, can you move your

 3   microphone a little bit closer?

 4          MR. MANGO:  Yes, I'll get a little bit closer.

 5          **REDIRECT EXAMINATION BY MR. MANGO:**

 6   Q.  Good afternoon again, Lieutenant.

 7   A.  Good afternoon.

 8   Q.  Just to clarify, you were the lieutenant in Region 9 of

 9   DEC; is that correct?

10   A.  That's correct.

11   Q.  How many regions are there?

12   A.  Nine.

13   Q.  And you were shown during cross-examination some -- an

14   email chain on defense Exhibit D10; is that right?

15   A.  Yes.

16   Q.  And you identified that as a -- as an email between an

17   undercover DEC investigator and the defendant?

18   A.  Yes.

19   Q.  Is it important for you to -- or, was it important for

20   you to execute this warrant when the defendant was home?

21   A.  It was a no-knock warrant -- or, it was not a no-knock

22   warrant, so it was important to have somebody at the

23   residence.

24   Q.  Is it standard procedure to try to either get

25   intelligence by looking at someone's daily routine?  Or to

1  engage in some type of undercover activity to increase the

2  possibility that when you execute a warrant that that someone

3  will be there?

4  A.  That is standard procedure.

5  Q.  Now, there were civilians who did arrive on the scene,

6  you were shown Government Exhibit 2, I believe, which I'll

7  pull up if that's okay, who didn't arrive until, if you look

8  at the bottom, about 10:33.  Were these the individuals who

9  were from refuge and wildlife sanctuaries, one being from

10  Arkansas, to come and take the animals that were illegally

11  possessed by the defendant?

12  A.  Yes.

13  Q.  Were they staged somewhere else other than the

14  defendant's residence before they arrived?

15  A.  They were.

16  Q.  Where were they?

17  A.  They were in the parking lot of the Marriott Hotel on

18  Millersport Highway.

19  Q.  Okay.  So the fact that they came at 10:33, does that

20  indicate it took an hour, 40 minutes to secure the residence?

21  Or does -- or does that mean it just, they came 40 minutes

22  after the start of the warrant?

23  A.  They came 40 minutes after the start of the warrant.

24  That amount of time was not all used to secure the residence,

25  there were other activities that were taking place.  And so

1  when we became ready to seize the animals, that's when they

2  came, which also happened to be after the security sweep.

3  But there were other things that occurred during that time.

4  Q.  Okay.  So it would be fair to say the search was

5  underway, evidence was being seized, and the search warrant

6  execution was underway by the time they arrived?

7  A.  Yes.

8  Q.  Now, you were asked certain items -- certain questions

9  about do you remember if Peinkofer asked anything outside, or

10  Casacci asked anything outside of Peinkofer; do you remember

11  that?

12  A.  I remember being asked those questions.

13  Q.  On cross-examination?  And in your memory -- or, your

14  testimony was you didn't remember that; is that right?

15  A.  That's correct, I don't remember.

16  Q.  Okay.  And you also testified on cross-examination that

17  you don't have a perfect memory of everything that happened

18  that day; is that right?

19  A.  That's correct.  There were many things that happened

20  that were outside my presence.  There were some things that

21  happened in my presence that I don't have a direct recall of.

22  Q.  Okay.  But you did testify on direct that when you first

23  started talking with the defendant, you -- you told him you

24  had a warrant, he was free to leave; do you have a perfect

25  memory of that?

1          MR. GRABLE:  Object to the leading.

2          MAGISTRATE JUDGE ROEMER:  Overruled.

3          THE WITNESS:  I do have a perfect memory of that.

4          BY MR. MANGO:

5    Q.  That he was told he was free to leave?

6    A.  Yes.

7    Q.  And how about that he was told the other items you said.

8    That if he did not leave, he would be shadowed; do you have a

9    perfect memory on that?

10   A.  I do.  That's my standard operating procedure, so that

11   helped me recall that I said those things.

12   Q.  Now, you -- getting back to other questions you were

13   asked about what Peinkofer may have done, and you were asked

14   on cross-examination whether -- whether you heard Peinkofer

15   direct the defendant to sit in a chair; do you remember that

16   question?

17   A.  I remember I was asked that.

18   Q.  And you said you didn't hear that; is that right?  Or

19   what is your testimony?  Did you hear anything like that?

20   A.  I did not hear that.

21   Q.  Did you -- did you hear, during the execution of the

22   warrant, any law enforcement officer tell the defendant he

23   had to sit in a particular spot?

24   A.  No.  I don't have any recollection of any statement like

25   that by anybody there.

1  Q.  Now you were asked some questions about Special Agent Lee

2  Schneckenberger, the Fish and Wildlife agent?

3  A.  Yes.

4  Q.  And his recording device, and why he didn't record other

5  parts of the warrant execution, right?

6  A.  Yes.

7  Q.  Do you know if Special Agent Schneckenberger attempted to

8  interview the defendant at any other time other than when he

9  was with you?

10 A.  I don't think he did, but I don't know the answer to

11 that.

12 Q.  Okay.  You were shown a picture D83 with the Arkansas

13 truck in the driveway?

14 A.  Yes.

15 Q.  Do you know how long this truck stayed in the driveway

16 like this?

17 A.  I don't know how long exactly.  But it was just in order

18 to get the cats loaded into the truck, and then it left.

19 Q.  Now, looking at -- you were also shown some questions --

20 or, asked some questions or shown a document about the ops

21 plan, Defendant's Exhibit D1?

22 A.  Yes.

23 Q.  And looking on page 7, which it talked about who the

24 interviewing team was, and it was you and Special Agent

25 Schneckenberger; is that right?

1   A.   Yes.

2   Q.   Is that consistent with your recollection?

3   A.   Yes.

4           MR. MANGO:  Thank you, nothing further, Judge.

5           MAGISTRATE JUDGE ROEMER:  Mr. Grable?

6           MR. GRABLE:  Thank you, Your Honor.

7   **RECROSS-EXAMINATION BY MR. GRABLE:**

8   Q.   Lieutenant O'Connor, you spoke a moment ago in

9   response to one of --

10          MAGISTRATE JUDGE ROEMER:  Mr. Grable, if you're going

11  to do it from there, I'm fine with it.  You just need to sit

12  down and talk into the microphone.  Okay?

13          BY MR. GRABLE:

14  Q.   You answered a question a moment ago about your standard

15  operating procedure.  Do you remember giving that answer?

16  A.   I don't think I was asked about my standard operating

17  procedure.  I was asked if I recalled, and I said that

18  because it's my standard operating procedure, it helped me to

19  recall more perfectly.

20  Q.   And I think during my cross-examination, I asked you

21  about some records in the basement, and you made reference to

22  your SOPs, correct?

23          MR. MANGO:  Judge, I'm going to object.  I didn't ask

24  any questions about a basement on redirect.  This is exceeding

25  the scope of redirect.  I want to get into the statement here.

1    That's what the Court wants to do, and I'm prepared to do that

2    with the next witness.

3              MR. GRABLE:  I can clarify that, Judge.

4              MAGISTRATE JUDGE ROEMER:  Sure.

5              BY MR. GRABLE:

6    Q.  You're telling us on your redirect that you had some

7    recollection of saying what you said on the porch because it

8    was your standard operating procedure, correct?

9    A.  Not because it was, but that helped me to recall.

10   Q.  It helps you to recall because that's your SOP, correct?

11   A.  Yes.

12   Q.  It's also your SOP to ask about records that might be

13   onsite during the execution of the search warrant, correct?

14   A.  I would have, yeah, sure, yes.

15   Q.  And in this case, you don't remember whether you or

16   anybody else asked about records in the basement, you think

17   it happened because it's your SOP, but you don't remember?

18   A.  That's right, somebody else could have done that.  I

19   wasn't part of the search team, so I may not have been the

20   one that would be asking about records.  But I'm pretty

21   confident somebody else would have.

22   Q.  And your reference to the search team in that answer

23   references the point that there's a lot of people on the

24   premises at this point, correct?

25   A.  There were multiple people there.

1    Q.  Some things you can hear, some things you can't hear?

2    A.  That's true.

3          MR. GRABLE:  No additional questions, Judge, thank

4    you.

5          MAGISTRATE JUDGE ROEMER:  You may step down, sir.

6          THE WITNESS:  There's an exhibit here.

7          MAGISTRATE JUDGE ROEMER:  You can just leave it

8    there.

9          (Witness excused at 1:07 p.m.)

10          MR. MANGO:  Judge, we're ready to call our next

11    witness.

12          MAGISTRATE JUDGE ROEMER:  Okay.  For right now, I

13    just want the witness to step out and give Rosalie a chance to

14    clean up.

15          MR. MANGO:  Judge, I think the witness is done, if

16    you'd like him to stay.

17          MAGISTRATE JUDGE ROEMER:  No, I'd like him to leave

18    please.

19          MR. MANGO:  Yes, Your Honor.

20          MAGISTRATE JUDGE ROEMER:  Okay.  Just so I'm clear,

21    the statement we're worried about is this, their F1?  That's

22    the statement?

23          MR. MANGO:  No, Judge.  That's what led to the

24    statement that occurred outside with ECO Scott Marshall.

25    That's the statement.  We're going to get into that next.

1        MAGISTRATE JUDGE ROEMER:  Okay.  So when he allegedly

2   got upset, Marshall went outside with him, he made some kind

3   of statement to Marshall?

4        MR. MANGO:  Yes.

5        MAGISTRATE JUDGE ROEMER:  Okay.

6        MR. MANGO:  That's the statement that's in issue in

7   the government.  The recording that was attempted with this

8   witness and Special Agent Schneckenberger, which obviously the

9   defendant invoked his right to an attorney, we're not seeking

10  to introduce anything from that.

11       MAGISTRATE JUDGE ROEMER:  Okay.  What about the F1

12  comment?  He was asked, and he said it was F1?

13       MR. MANGO:  Yeah, that would be part of our case,

14  that -- I imagine if this case goes to trial.

15       MAGISTRATE JUDGE ROEMER:  But that's part of this

16  motion?

17       MR. MANGO:  I -- I don't think it was.  I think the

18  issue here was the statement outside with Scott Marshall.  Now

19  that F1 comes up in that statement, so I guess naturally --

20       MAGISTRATE JUDGE ROEMER:  Well, the F1 comes up

21  before he went outside with Marshall.  The F1 -- this witness

22  asked him what generation cat it is, and he said F1 --

23       MR. MANGO:  Yeah.

24       MAGISTRATE JUDGE ROEMER:  -- which I, if it was said,

25  I think it's incriminating, correct?  Or possibly

1  incriminating?

2         MR. GRABLE:  Judge, it was our understanding that the

3  710.30 listed the statements that the government intends to

4  use at trial.  To the extent that there are other statements,

5  our motion encompasses any that the government intends to use

6  at trial.

7         MAGISTRATE JUDGE ROEMER:  Do you intend to use the F1

8  statement?

9         MR. MANGO:  Yes, Judge.

10        MAGISTRATE JUDGE ROEMER:  Okay.  So that is an issue

11 here.

12        MR. MANGO:  It -- it seems like it, yes.

13        MAGISTRATE JUDGE ROEMER:  Okay.

14        MR. MANGO:  I mean, and it is in the 710.30.  The

15 second-to-last bullet point, that one is my house cat, it is

16 and -- that's a typo, it says and -- an F1 Savannah.  So --

17        MAGISTRATE JUDGE ROEMER:  Okay.

18        MR. MANGO:  Yeah.

19        MAGISTRATE JUDGE ROEMER:  And then the other set of

20 statements is going to be whatever statements he made to

21 Marshall when they went outside?

22        MR. MANGO:  Yes, that's included in that set of

23 statements to Marshall outside.

24        MAGISTRATE JUDGE ROEMER:  Okay.  All right.

25        MR. MANGO:  In addition to, you know, beforehand.

 1          MAGISTRATE JUDGE ROEMER:  Okay.  Rosalie, do you need

 2    a break?  Ten minutes or so?  Anybody else need a break?

 3          MR. MANGO:  We can proceed, Judge, if you'd like.

 4          MR. GRABLE:  Can I use the restroom, Your Honor?

 5          MAGISTRATE JUDGE ROEMER:  We'll come back at 20

 6    after.  Make sure you're in here at 20 after, I don't want to

 7    be waiting for you.

 8          MR. MANGO:  Yes, Your Honor.

 9          MAGISTRATE JUDGE ROEMER:  It's all right if you're

10    waiting for me.

11          (Off the record at 1:10 p.m.)

12          (Back on the record at 1:24 p.m.)

13          MAGISTRATE JUDGE ROEMER:  Mr. Mango, do you want to

14    call your next witness?

15          MR. MANGO:  Thank you, Judge.

16          Would it be now permissible to bring Lieutenant

17    O'Connor back in?  He'd like to watch.  There's no objection

18    from defense to let him watch the rest of the proceedings.

19          MR. GRABLE:  Whatever is your preference, Judge.

20    Once he's testified, I don't have an objection.

21          MAGISTRATE JUDGE ROEMER:  The witness who just

22    testified?

23          MR. MANGO:  Yes.

24          MAGISTRATE JUDGE ROEMER:  I'm sorry, I thought you

25    were talking about the guy who I asked to leave earlier.

1          MR. MANGO:  No.

2          MAGISTRATE JUDGE ROEMER:  Okay.

3          MR. MANGO:  He can come in?

4          MAGISTRATE JUDGE ROEMER:  Sure.

5          MR. MANGO:  Okay.

6          MAGISTRATE JUDGE ROEMER:  Yeah, I just -- when we had

7   our conversation, legal conversation, I didn't --

8          MR. MANGO:  That's --

9          MAGISTRATE JUDGE ROEMER: -- want him to be in here.

10          MR. MANGO:  -- that's what I figured, Judge.

11          We would next call ECO Scott Marshall to the stand.

12          MAGISTRATE JUDGE ROEMER:  Okay.

13          MR. MANGO:  It's a little out of order, Judge.  I

14   know our witness list said next would be Peinkofer, but at

15   this point, we're going to move to Marshall.

16          MAGISTRATE JUDGE ROEMER:  Okay.

17

18   **S C O T T   M A R S H A L L**, having been duly called and

19   sworn, testified as follows:

20          MR. MANGO:  May I proceed, Your Honor?

21          MAGISTRATE JUDGE ROEMER:  Sure.

22          **DIRECT EXAMINATION BY MR. MANGO:**

23   Q.  Good afternoon, Officer Marshall.

24   A.  Good afternoon.

25   Q.  Can you tell the Court if you're currently employed?

1    A.   I am.

2    Q.   How are you employed?

3    A.   I'm a police officer for the New York State Department of

4    Environmental Conservation.

5    Q.   And can we call that the DEC --

6    A.   You may.

7    Q.   -- from here on, you know, if I refer to the DEC.

8         Where is your office?

9    A.   We have a regional office at 270 Michigan Avenue in the

10   City of Buffalo.

11   Q.   And can you tell the judge, you said you're an ECO?

12   A.   Environmental Conservation Officer.

13   Q.   Can you tell the judge what your duties are as an ECO?

14   A.   We are state police officers whose primary function is

15   the enforcement of fish and wildlife and environmental

16   quality.

17   Q.   And how long have you been an ECO with the DEC?

18   A.   Since April 1st, 1996, just under 25 years.

19   Q.   And is -- have you ever sought a promotion to -- to

20   become, a --

21   A.   I have not.

22   Q.   -- an investigator?

23   A.   I have not.

24   Q.   You have not?  Why --

25   A.   I --

1    Q.   -- have you --

2    A.   -- have not.

3    Q.   -- not?

4    A.   I have never had any desire to do any other position than

5    the one that I applied for in 1996.

6    Q.   All right.  Did you receive training prior to becoming a

7    ECO, or -- or when you became an ECO with DEC, did you then

8    go through training?

9    A.   Yes, sir, it was a residential six month academy.

10   Q.   And since that time in 1996, when you started, have you

11   received any type of periodic trainings or trainings

12   throughout your working career?

13   A.   Yes.

14   Q.   And do those trainings and have those trainings involved

15   the taking of witness statements?

16   A.   Yes.

17   Q.   Are you familiar with Miranda warnings and a suspect's

18   constitutional rights?

19   A.   Yes.

20   Q.   Are you familiar or do you understand under what

21   circumstances you must provide Miranda warnings?

22   A.   Yes.

23   Q.   All right.  Let's move towards, are you familiar with an

24   investigation involving Christopher Casacci?

25   A.   Yes.

1  Q.  Can you tell the Court how you were involved in that

2  investigation?

3  A.  I was assigned by my captain at that time to perform site

4  security for that warrant.

5  Q.  And who was your captain at that time?

6  A.  Elizabeth Haag.

7  Q.  And she was present at the warrant, as well?

8  A.  She was.

9  Q.  All right.  Now, at some point during your site security

10  role at -- in this case, did you come to meet and talk to

11  Mr. Casacci?

12  A.  Yes.

13  Q.  Do you see him here in court?

14  A.  Yes.

15  Q.  Could you identify him by an article of clothing?

16  A.  Yes.  That is him in the dark jacket with the blue top.

17          MR. MANGO:  Judge, may the record reflect the

18  identification of the defendant by the witness.

19          MAGISTRATE JUDGE ROEMER:  The record should so

20  reflect.

21          BY MR. MANGO:

22  Q.  Did you have any type of role, Officer Marshall, in

23  drafting the search warrant documents in this matter?

24  A.  No.

25  Q.  Did you participate in the execution of the search

1   warrant at the defendant's residence on July 5th of 2018?

2   A.   Yes.

3   Q.   Again, what was your role during that search warrant?

4   A.   Site security.

5   Q.   And what were you wearing during the search warrant?

6   A.   Uniform clothing, issued uniform clothing.

7   Q.   Similar to what you're in now?

8   A.   This is a dress uniform.  I was in what is considered a

9   Class C uniform, which is more of the uniform that is for

10  daily field patrol.

11  Q.   Okay.  Did you have a weapon you, I imagine?

12  A.   Yes.

13  Q.   Now, prior to this search warrant, how many,

14  approximately, other search warrants had you participated in

15  during your law enforcement career?

16  A.   Dozens.

17  Q.   What's that?

18  A.   Dozens.

19  Q.   Dozens.  And have you -- did -- did you engage in the

20  role of site security in the past?

21  A.   Yes.

22  Q.   In fact, is that something that you often did?

23  A.   Yes.

24  Q.   Why did you seem to be the person who did site security?

25  A.   I have been a defensive tactics instructor since being

1  hired by this agency.  I have been a martial arts instructor

2  and student since I was a young child.  I have the ability to

3  command the respect of most individuals in most situations.

4  So they put me there so that I can interact and protect

5  everyone on site, the defendant or subject of the search

6  warrant, as well as all law enforcement, and civilian

7  personnel on site.

8  Q.  We'll get more into that role as site security, and, but

9  does that also involve shadowing around individuals who

10  decide to remain at the search warrant scene?

11  A.  That is my primary function.  They identify, based on

12  supervision, which individual or individuals I am supposed to

13  shadow or stay in close proximity to.  And then that is my

14  mission for the duration of that warrant.

15  Q.  And are you familiar with a document called an entry and

16  exit log?

17  A.  Yes.

18  Q.  And do you know if one was created for this Casacci

19  search warrant?

20  A.  Yes.

21  Q.  I'm going to pull up Government Exhibit (unintelligible)

22  and zoom in at the top.  Do you see this entry exit log.

23  A.  Yes.

24  Q.  And whose writing is in the Sharpie marker, the darker

25  bold, black?

1   A.  Investigator Peinkofer.

2   Q.  And then there's a lighter-colored black.  Whose writing

3   is that?

4   A.  That is mine.

5   Q.  Now, in the upper left corner, we see something crossed

6   out.

7   A.  Yes.

8   Q.  And there's something above it.  Are those your initials?

9   A.  They are.

10  Q.  And why did you cross that out?

11  A.  The time was written in the wrong location.

12  Q.  Okay.  You wanted to write it on the right in the column

13  that said in?

14  A.  That is correct.

15  Q.  What's the purpose of the entry/exit log?

16  A.  To keep strict control over all subjects or personnel who

17  enter or exit the site.

18  Q.  And if you can briefly see at the top, you see you start

19  the log at 9:50 for the first three witnesses or individuals,

20  and then it goes to 9:51 for Investigator Wojo -- is I think

21  what you probably call him, I'm not going try to pronounce

22  the name.  So what does 9:50 represent then?

23  A.  That is the time that that person entered the residence.

24  Q.  (Unintelligible) at the bottom of that exhibit, there's

25  individuals listed.  And you see Mr. Casacci's name listed at

1   9:50 as well.  How did it come that he -- he was put at the

2   end of this list, but also as a timestamp of 9:50?

3   A.  As a general rule, the subject of a warrant, they're

4   given the opportunity to leave if they would like.  Most

5   times they stay.  So if they stay, there's no reason to have

6   them as an in or an out because they don't leave, they stay

7   for the duration of the warrant.

8       In this instance, you can see that he left at 12:13.  So

9   he was put at the end because he actually left.

10  Q.  Okay.  So he was there when -- when the search warrant

11  was initially executed, just he chose to leave, that's why he

12  went down at the bottom of the list?

13  A.  That's correct.

14  Q.  Now, can you tell the Court when the warrant is about to

15  be executed and as you approach the front door, do you

16  remember that in this case?

17  A.  Yes.

18  Q.  Can you tell the Court what happened?  And were you part

19  of that approach team?

20  A.  I was not listed as part of the approach team.  My role

21  as site security, I stay slightly back from the approach

22  team.  There is usually one or two uniformed personnel, as

23  well as one or two investigators that actually approach the

24  residence, make contact with the individuals inside,

25  establish the purpose of the warrant, that the warrant is in

1   fact going to occur.

2      I am only there for the sole purpose of if something is

3   to go wrong at that juncture, I am close enough to respond.

4   But I'm not primarily involved in that initial approach.

5   Q.  Okay.  So there's some member of the team who initially

6   has communication with whoever answers the door?

7   A.  That's correct.

8   Q.  Who was that in this case?

9   A.  Lieutenant O'Connor.

10  Q.  Lieutenant O'Connor?  Okay.  And did you hear what

11  Lieutenant O'Connor said to the person who answered the door?

12  A.  Yes.

13  Q.  And was it the defendant who answered the door?

14  A.  Yes, the defendant was there.  And Lieutenant O'Connor

15  did what our standard operating procedure is.  Advised the

16  defendant of the totality of the situation, how the warrant

17  was -- what the warrant was, what the purpose of the warrant

18  was, how the warrant was going to be executed, the procedural

19  aspects of the warrant, then give the defendant the

20  opportunity to leave at that point or stay.

21  Q.  Okay.  So did you explicitly hear Lieutenant O'Connor

22  tell the defendant he was free to leave?

23  A.  Yes.

24  Q.  Did you hear the defendant -- or, I'm sorry, Lieutenant

25  O'Connor tell the defendant if he left, he wouldn't be

1  allowed back in?

2  A.  Yes.

3       MR. GRABLE:  Object to the leading.

4       MR. MANGO:  Yeah, I can rephrase, Judge, so I'm not

5  leading.

6       BY MR. MANGO:

7  Q.  Did you hear Lieutenant O'Connor say anything about what

8  would happen if the defendant stayed?

9  A.  Yes.

10 Q.  Tell the Court what you heard about that.

11 A.  Our standard operating procedure is that the person in

12 charge of the warrant and actually advising the subject of it

13 advises them that they are completely free to leave, they are

14 not under arrest, that they have the opportunity to leave

15 that residence.  But if they leave the residence, they may

16 not return to the residence.  And if they choose to stay,

17 they at no point may impede the actual execution of that

18 warrant.

19 Q.  Okay.  So everything you just said there, did Lieutenant

20 O'Connor say that to --

21 A.  Yes.

22 Q.  -- the defendant?

23 A.  That is what Lieutenant O'Connor said, yes.

24 Q.  Do you know how the defendant responded, or if he

25 verbally responded to those instructions?

1    A.   I did not hear if he responded.  But the warrant

2    commenced, and I was assigned to be his shadow.

3    Q.   All right.  And so the defendant stayed on site?

4    A.   The defendant did stay.

5    Q.   Did you have your own conversation with him at sort of

6    the start of the warrant in your -- as your role as shadow of

7    him?  Did you have your own discussions with him?

8    A.   Yes.

9    Q.   Tell the Court what your discussions with him were.

10   A.   My discussion was specifically related to his behavior.

11   My role there is to ensure site security and the safety of

12   all people there.  So that's any people that may be in the

13   residence that could be a target or involved in the warrant,

14   as well as civilian personnel and law enforcement personnel.

15       So I just wanted to have a conversation with him where I

16   described what it is that my function was going to be, so he

17   was not confused in any way, shape, or form, allow him to ask

18   any questions to explain what it is I was going to be doing,

19   and then ensure that we were on the same page that he was not

20   going to cause any problems.

21   Q.   Okay.  So tell the Court explicitly if you remember what

22   you told the defendant that day, what would you have advised

23   him?

24   A.   I -- I said that it was my role for site security and

25   precise security purposes.  I have to stay with him for the

1  entire duration that he is on site.  I have to be in close

2  physical proximity in case he chooses to do something that

3  would jeopardize the safety of anyone involved, including

4  himself.

5  Q.  Okay.  Did the defendant understand what you told him?

6  A.  Yes.

7         MR. GRABLE:  Object to that.

8         MAGISTRATE JUDGE ROEMER:  Rephrase your question.

9         BY MR. MANGO:

10  Q.  Did the defendant have any questions for you after you

11  told him your role?

12  A.  None, whatsoever.  He completely understood said I was

13  just doing my job.  I understand you're doing your job.

14  Q.  Okay.  What was your demeanor like when you were having

15  this conversation with the defendant?

16  A.  Firm, but fair.

17  Q.  Firm, but fair?

18  A.  Firm, but fair.

19  Q.  And what was the defendant's demeanor like with you?

20  A.  Receptive.  100 percent receptive.

21  Q.  Okay.  Now, looking -- looking ahead through the warrant,

22  and we're sort of getting ahead of ourselves, because it was

23  a three-hour warrant, and the defendant, you noted, left a

24  little bit before the search warrant was done.  But how

25  compliant was the defendant with you and those instructions

1  you gave him during the execution of the warrant?

2  A.   100 percent.

3  Q.   Meaning what?  Explain that for the judge.

4  A.   When I advised him that he either needed to leave or

5  comply with the search warrant, meaning you can't interfere

6  in any way, shape, or form, and you cannot do anything that

7  will be construed as aggressive or do something that could be

8  dangerous, he advised clearly he had no intent of doing that,

9  And he never did.  The entire time he was there, he was

10  pleasant, he was cordial, he was friendly.  He had never done

11  anything that would lead me to believe that he was a danger

12  in any way, shape, or form.

13  Q.   Okay.  And based on the defendant's demeanor with you and

14  conduct during the warrant, did that affect how you treated

15  him?

16  A.   Certainly.

17  Q.   Okay.  How so?

18  A.   Well, if the defendant is going to be aggressive or if

19  there is a threat that's posed, that forces me to relate the

20  way I deal with him both positionally as well with the use of

21  force that I use.  So, I did not even have to use the first

22  level of force, which is verbal communication above normal

23  conversation with him.  He was -- there was no part of him

24  that was confrontational whatsoever.

25       So, yes, I was able to treat him more cordially than I

1  have on some other instances.

2  Q.  Okay.  And if I get it wrong, but -- but -- let me know,

3  you mentioned the first level of force?

4  A.  Use of force continuum.

5  Q.  That's verbal commands.  And that's usually given in a

6  stern or loud voice?

7  A.  It can be, yes.

8  Q.  And you didn't have to do that?

9  A.  I didn't.  Not at all.

10  Q.  Now, in addition to you describing your role to the

11  defendant, this is early on in the warrant?

12  A.  Yes.

13  Q.  Is that right?  Did you also tell him whether he was --

14  that he was free leave?

15  A.  I did.

16  Q.  Okay.  Tell the Court exactly what you would have told

17  the defendant about whether he could leave or not.

18  A.  I advised him that -- I reiterated what Lieutenant

19  O'Connor stated, that he was not under arrest.  And at any

20  time he is free to leave.  But if he leaves, he cannot come

21  back.  Those are the rules of the warrant.  And he chose to

22  stay.

23  Q.  Okay.  Now, let's fast forward a little bit into the

24  warrant execution.  While it's being executed, do you recall

25  any conversation between -- or, were you present for any

1  conversation between Lieutenant O'Connor and the defendant

2  regarding a Savannah cat?

3  A.  Yes.

4  Q.  What do you remember occurring?

5  A.  Lieutenant O'Connor advised the defendant that that

6  particular animal was going to be seized as well as the

7  others that had -- he had already been advised were being

8  seized.

9      And at that point, he was -- it was the first time he had

10 shown any form of emotion that led me to be interested from a

11 site security standpoint.

12     He became agitated, that that particular animal was going

13 to be removed.

14 Q.  Okay.  Did he say anything that -- that -- say or do

15 anything that led you to believe he became agitated?

16 A.  Yes.  He exhibited all the telltale signs that humans do

17 when they become agitated.  His skin got flushed.  His voice

18 quickened in pace, it got louder.  You could tell that there

19 was a definite edge in it.

20     He was never threatening.  He was never to the point

21 where I felt I needed to take control of him physically.  But

22 he definitely had become far more agitated than he had been

23 at any point during the warrant.

24 Q.  Okay.  Did you do anything to deescalate the situation?

25 A.  Yes.  After he -- after he had asked Lieutenant O'Connor

1   the questions that he felt were pertinent regarding the

2   seizure and had resigned himself to the fact that it was

3   being seized, but was still visibly upset about it, I did

4   what I normally do, which is remove the threat from the

5   situation.  So, I suggested that we go outside, and get some

6   fresh air, and get away from the situation inside.

7   Q.  Did you order him outside?

8   A.  I did not.

9   Q.  Tell the judge how you went about --

10          MR. GRABLE:  I didn't hear that.

11          BY MR. MANGO:

12  Q.  Did you order him outside?

13  A.  I did not.

14  Q.  Okay.  Tell the judge how you suggested the two of you

15  move outside.

16  A.  He was very upset.  So I said, the warrant is going on,

17  we're not going to be able to change the outcome of the

18  warrant at this point.  Our job here is to do this, execute

19  this warrant.  Why don't you and I step outside, and we'll be

20  able to get away from it, get some fresh air, we don't have

21  to deal with what's happening right inside.  Would you like

22  to do that?  And he stepped outside.

23  Q.  So he went with you?

24  A.  He -- he went in front of me, yes.  He went out first.

25  Q.  So he went out first.  Did you have to put your hands on

1    him?

2    A.   I did not.  At no point in this warrant did I put my

3    hands on him.

4    Q.   What was the purpose of you asking him to step outside?

5    A.   To deescalate the situation.

6    Q.   Did you ask him to step outside because you wanted to

7    interview him?

8    A.   No.

9    Q.   So, the defendant walked outside.  Was this the front of

10   the residence?

11   A.   Yes.

12   Q.   And where did you go and where did the defendant go when

13   you went out to the front of the residence?

14   A.   The front stoop, front porch, front area on the front of

15   the house.

16   Q.   Okay.  I'll show you Government Exhibit 3A.  Is that the

17   picture of the front of the residence?

18   A.   Yes.

19   Q.   All right.  And it looks like the porch area is included

20   in this area, I'm highlighting this or circling this, and

21   then there's steps; is that right?

22   A.   Yes.

23   Q.   Okay.  So where is the defendant positioned and where are

24   you positioned once you went outside?

25   A.   He's sitting on the top step.  And I was standing to his

1  right.

2  Q.  All right.  So --

3  A.  On the landing.

4  Q.  Oh, on the landing.  You were standing in this area?

5  A.  Closer to him.  He would be toward the far right side of

6  that picture where your cursor is now.  That's where he was

7  sitting.  And I would be more towards the center of the

8  steps.  I always maintain touch distance.  If I need to act,

9  I'm close enough that I can act.

10  Q.  Okay.  You've got to be ready for anything?

11  A.  That is my function.  My function is site security.  My

12  only function is site security.  So I would have put him

13  somewhere, wherever he chose to stand, I would have

14  positioned myself in a position of advantage so that if he

15  did do something that was aggressive or dangerous, I would be

16  able to act against it.

17  Q.  Okay.  So he chose to sit then?

18  A.  He chose to sit.

19  Q.  You didn't tell him to sit?

20  A.  I did not.

21  Q.  And you then stood?

22  A.  I stood.

23  Q.  Back and to his right?

24  A.  Back and to his right.

25  Q.  And you decided not to stand in front of him; is that

1  right?

2  A.  I -- yes, I would never stand in front of him, because

3  I'm putting myself at a distinct disadvantage positionally.

4  I'm lower than he is.

5  Q.  While you go outside and he's sitting on the step there,

6  did he make any statements to you while you were outside?

7  A.  Yes.

8  Q.  First off, during this, so there was a conversation

9  between you and the defendant?

10  A.  Yes.

11  Q.  How -- how active were you in asking the defendant

12  questions during this conversation?

13  A.  I wasn't active at all.  I listened and showed interest.

14  Q.  Okay.  What -- what do you recall about this conversation

15  and how it began?

16  A.  It was borne out of his frustration.  Obviously, he

17  was -- had someone in his residence, several people in his

18  residence, which is frustrating.  They're all law enforcement

19  personnel.  It's an intimidating, overwhelming experience.

20  And he had just been told that his pet was one of the things

21  that was being taken away, so he was emotionally charged, he

22  was upset, he was frustrated.  So he vented, which is normal.

23  Q.  Okay.  So, and you listened?

24  A.  I did.

25  Q.  Were you interested in what he was saying?

1   A.  Yes, very much so.

2   Q.  Why?  Tell the Court that.

3   A.  He has an entrepreneurial spirit.  And the things that he

4   chooses to do were of interest to me because my mind does not

5   work that way.  I don't think the same way.  I don't have

6   that type of brain to be able to capitalize on business

7   opportunities, to be able to venture outside of my normal

8   comfort zone and try things that would be entrepreneurial.

9   And this venture was just that.  And I was interested, very

10  interested in how he started it, how he even came to think of

11  it, how it -- how it blossomed into what it was.

12  Q.  And when -- and we're talking about this venture

13  opportunity or this entrepreneurial spirit, are we talking

14  about the sale of these --

15  A.  Yes.

16  Q.  -- exotic --

17  A.  Yes.

18  Q.  -- African --

19  A.  Yes.

20  Q.  -- cats?

21  A.  Yes.  The sale of the African cats, yes.

22  Q.  That's what you were interested in?

23  A.  That's what I was interested in, 100 percent.

24  Q.  And were you interested from -- I'll try to ask this

25  without being leading -- from, like, a law enforcement

1   criminal aspect that you wanted him to incriminate himself?

2   Or were you interested because you just wanted to know how

3   this business worked?

4   A.  It had nothing do with my function or role for that

5   warrant or the fact that I was a police officer.  It was

6   directly related to the fact that he saw a thing he thought

7   to be a viable income stream, and how he started that income

8   stream, and how that income stream actually functioned.

9   Q.  And as the defendant is talking to you, how did -- how

10  did you respond to what he was telling you?

11  A.  With interest.

12  Q.  How so?  Like, give the judge an example.

13  A.  So, if he would tell me how he first found an individual

14  supplier in Africa and would explain how that was, my answer

15  would be, wow, that's incredible, that was very resourceful

16  to be able to figure out how to get in contact with that

17  individual.  That was resourceful.

18      Or, I -- however much money he would have made, or

19  however many cats he would have had, I would have responded

20  with things that showed interest because I was generally

21  interested.

22      Like, wow, I didn't realize that was an option.  Or I

23  never would have thought of that.  Or that's really

24  interesting.

25  Q.  Did you follow up with your own questions to him then?

1    A.   No.  I never -- I never had to ask any questions that

2    would be probative, because he was obviously just as

3    interested and excited about his venture.  He created it.  So

4    his sentences were -- he was describing what was happening.

5    He was telling me what was -- what he did.

6    Q.   Okay.  And did you take any notes during this

7    conversation?

8    A.   I did not.

9    Q.   Why not?

10   A.   That's not my function.  My function is for site

11   security.  My function is no form of information gathering or

12   procedural part of that warrant other than to protect those

13   involved, including himself.  So, no, I would not tie my

14   hands up with a pen and paper.

15   Q.   How about an audio recording?

16   A.   No.

17   Q.   One, did you have one?

18   A.   I do not even possess one.

19   Q.   And would you have used it even if you had access to one?

20   A.   I -- I would not.  That is any not my function.

21   Q.   Why?  Why would you not use it?

22   A.   That's not my function.  My function is to concentrate on

23   that subject and that subject alone and his actions.

24   Q.   How about body cameras, police body cameras?

25   A.   We do not have them.

1    Q.  You didn't have those at the time?

2    A.  We are not issued them.  Still have not been issued them.

3    Q.  How long did this conversation outside last, if you

4    recall?

5    A.  Half an hour, 20 minutes.  I don't really remember

6    exactly how long we were out there.

7    Q.  Okay.  During the entire conversation outside, did the

8    defendant ever ask to speak to an attorney?

9    A.  No.

10   Q.  Did he ever ask to leave?

11   A.  No.

12   Q.  Did he ever ask to stop talking to you?

13   A.  No.

14   Q.  Did the defendant seem resistant or hesitant in speaking

15   with you at all?

16   A.  No.

17   Q.  Now, following the execution of the warrant, did you

18   memorialize what the defendant told you outside?

19   A.  Yes.

20   Q.  How did you do that?

21   A.  A 710.30 statement.

22   Q.  What do you know is a 710.30 statement?  What's the

23   purpose of that?

24   A.  It's a statement that is used by police officers to

25   record spontaneous utterances by defendants.

1   Q.  And you wrote a 710.30 in this case?

2   A.  I did.

3   Q.  Where did you write it?

4   A.  At our office.

5   Q.  On what day?

6   A.  On that day.

7   Q.  All right.  How soon after the warrant, if you remember?

8   A.  We left the site, and went back to the office.

9   Q.  And then you drafted it --

10  A.  I did.

11  Q.  -- right then?

12  A.  I did.

13  Q.  Have you reviewed that 710.30 prior to today?

14  A.  I have seen it, yes.

15  Q.  I'm going to show you -- it's in evidence as Government

16  Exhibit 4.  Do you see that on your screen?

17  A.  I do.

18  Q.  Let's start at the top here, and then we'll go down.

19      Is this 710.30, the top of it, is this your handwriting?

20  A.  Yes.

21  Q.  And again, what was the purpose of writing this 710.30?

22  A.  To memorialize his statements for the prosecution.

23  Q.  Okay.  When did you realize that what he told you, or how

24  did you realize that what he told you had value, had

25  potential value in a prosecution?

1   A.  Upon returning to the office, there's always a debriefing

2   after every warrant.  We do that to determine if anything

3   went wrong and how to correct that in the future.  Determine

4   if anything was done that was beneficial that the other

5   members of the teams were not aware of.  And then we discuss

6   what happened.

7       So we discussed what happened and the conversation we

8   had, and then I was directed to do a 710.30.

9   Q.  Okay.  So you were debriefed.  And in the debriefing, you

10  mentioned, well, he made some statements to me outside?

11  A.  Yes.

12  Q.  And then you said you were directed to make a 710.30?

13  A.  Yes.

14  Q.  Who directed you to do that?

15  A.  Well, that came through Lieutenant O'Connor, through

16  Investigator Peinkofer.

17  Q.  Okay.  The two of them relayed that information to you?

18  A.  Yes.

19  Q.  So, I'd like to have you read this top part, if you can

20  read it into the record, please?

21  A.  The date is July 5th, 2018.  It's my name, Scott L.

22  Marshall, with a rank of Environmental Conservation Officer.

23  On July 5th, 2018, while participating in a search warrant,

24  executed at your residence you stated the following to me.

25      Continue?

1  Q.  Yep.

2  A.  I have been doing this business for three months and have

3  sold 14 cats to people all around the country.

4      I sell them for between $7,500 and $10,000 each.

5      I pay between $3,500 and $5,000 each.

6      I usually make about $2,000 profit per cat.

7  Q.  Keep going, please.

8  A.  I found my distributor online from a video.  I

9  freeze-framed the video, and zoomed in to get his telephone

10  number in Africa.

11      That one is my house cat.  It is an F1 Savannah.

12      Two cats die, and I sent them via Fed-Ex to Cornell

13  University for pathology and necropsy.

14  Q.  Okay.  And there's a -- what's underneath that?

15  A.  That's a termination line.  Police officers use that at

16  the end of a statement so that no statements can be added

17  subsequently.  And you sign it and date it.

18  Q.  That's your signature, and that's the date --

19  A.  That's correct.

20  Q.  -- that you -- that you made this?

21      Does this 710.30 accurately capture the statements that

22  the defendant made to you?

23  A.  Yes.

24  Q.  So after this conversation then with the defendant, where

25  did the defendant go, if you remember?

1   A.  At one point, toward the end of the warrant, he went back

2   inside.  And then he and a female left the residence.

3   Q.  All right.  So, first off, do you know -- well, go back

4   to Exhibit 2.  Is that female listed on the entry and exit

5   log?

6   A.  Yes.

7   Q.  And what's her name?

8   A.  Haley Keyser.

9   Q.  Okay.  And do you know if that individual was present

10  during the entire warrant, or had shown up?

11  A.  No, she arrived at 12:03.

12  Q.  Okay.  And then was there what appears for ten minutes?

13  A.  That's correct.

14  Q.  And then left with the defendant?

15  A.  That's correct.

16  Q.  All right.  So, he went back into the residence at some

17  point, the defendant did?

18  A.  He did.

19  Q.  After your conversation with him?

20  A.  He did.

21  Q.  And was -- during the whole warrant, was the defendant

22  allowed to move throughout the residence?

23  A.  Yes.

24  Q.  Did you ever direct him not to go to a particular

25  location?

1   A.  I did not.

2   Q.  During the execution of the warrant, was the defendant

3   allowed to use his phone?

4   A.  Yes.

5   Q.  His cell phone?

6   A.  Yes.

7   Q.  Did you see him using a cell phone?

8   A.  Yes.

9   Q.  Now, you mentioned, and you testified here and it's

10  recorded that the defendant left at 12:13 p.m.  If I

11  highlight out, it looks like the warrant essentially

12  concluded at 12:54 p.m.; is that right?

13  A.  That's correct.

14  Q.  So he left about 41 minutes before you and the entire

15  team finished?

16  A.  That's correct.

17  Q.  Did he say why he was leaving?

18  A.  To the best of my recollection, they were going on a

19  vacation or a trip, and she had arrived to get personal

20  effects of some sort.  And she had gathered whatever it is

21  that she had come for, they left together.

22  Q.  Okay.  Did he say anything about, to you, before he

23  departed, any type of statement, you know, that he's had

24  enough or anything?

25  A.  I said goodbye.  He shook my hand, I shook his hand.  I

1    thanked him for being compliant.  And he said yeah, he's had

2    enough, and he left.

3    Q.  Okay.  So he did say he had enough, but you shook hands

4    with him?

5    A.  I did.

6    Q.  He thanked you?

7    A.  Yeah, he thanked me for being pleasant and compliant.

8    And I thanked him for being compliant.  We had an extremely

9    cordial time together.

10   Q.  Do you recall any instructions he would have given you

11   about how to leave the residence, what to lock, how to lock

12   it up?

13   A.  There was a conversation not directed at me, but there

14   was a conversation regarding the fact that he was leaving it,

15   and Lieutenant O'Connor, you know, made sure that he advised

16   that he would handle that procedure, and asked him the

17   particulars about how it -- he wanted it to be accomplished.

18   Q.  Okay.  Now, after your discussion with the defendant

19   outside, which you memorialized in the 710.30, all right, do

20   you know if Lieutenant O'Connor and Special Agent

21   Schneckenberger attempted to interview the defendant?

22   A.  They did.

23   Q.  Okay.  Were you there for that?

24   A.  I was shadowing him, so I was close, but I was not part

25   of the interview process.  But I was close enough that if I

1   needed to act, I could.

2   Q.  Okay.  And that happened after your interview of him?

3   A.  Yes.

4   Q.  Or your -- I don't even want to call it an interview.

5   A.  I didn't interview him.

6   Q.  Did you call it an interview?

7   A.  No, I did not interview him in any way, shape, or form.

8   Q.  Now, at the time you -- at any time during the execution

9   of the search warrant, and at any time during your

10  interactions with the defendant, did you ever put him in

11  handcuffs?

12  A.  No.

13  Q.  Did you ever see him in handcuffs?

14  A.  No.

15  Q.  Did you ever raise your voice?

16  A.  No.

17  Q.  Did you tell the defendant he was -- did you ever tell

18  the defendant he was not free to leave?

19  A.  No.

20  Q.  Did you use any tricks on the defendant or --

21  A.  No.

22  Q.  -- with the defendant?

23  A.  No.

24  Q.  Were you untruthful with him at all?

25  A.  No.

1  Q.  Did you make physical contact with the defendant at all?

2  A.  No.

3  Q.  Did you ever tell him he could not leave the residence,

4  and that he had to stay?

5  A.  No.

6  Q.  Did you ever hear any other law enforcement officer tell

7  the defendant he could not leave the residence?

8  A.  No.

9  Q.  Did you physically block his ability to move throughout

10  the residence at all?

11  A.  No.

12  Q.  And then finally, did he appear under the influence of

13  any type of alcohol or drugs?

14  A.  No.

15  Q.  Did he look like he needed medication?

16  A.  No.

17  Q.  Did he look like he was suffering from any physical or

18  mental disability?

19  A.  No.

20          MR. MANGO:  Judge, can I just have a moment?

21          MAGISTRATE JUDGE ROEMER:  Sure.

22          MR. MANGO:  Nothing further, Your Honor.  Thank you.

23          MAGISTRATE JUDGE ROEMER:  We'll take a little break

24  so Rosalie can wipe down the --

25          MR. GRABLE:  Judge, if it's okay with you, I can

1   start here and then go up so we don't --

2           MAGISTRATE JUDGE ROEMER:  Sure.

3           MR. GRABLE:  While we're waiting for things to dry.

4           MAGISTRATE JUDGE ROEMER:  Sure.

5           MR. GRABLE:  Thank you.

6           **CROSS-EXAMINATION BY MR. GRABLE:**

7   Q.  Good afternoon, sir.

8   A.  Good afternoon.

9   Q.  Can you see me over here?

10  A.  I can.

11  Q.  Okay.  You mentioned during your direct examination that

12  you were trained to take statements, correct?

13  A.  Yes.

14  Q.  That training includes the various ways that you can take

15  a statement from a suspect, correct?

16  A.  Yes.

17  Q.  One of the ways is to record it on some sort of a device

18  that generates an audio recording, true?

19  A.  True.

20  Q.  You can also ask the person to write out their own

21  statement and sign it and swear to it, correct?

22  A.  Correct.

23  Q.  Another way to get a statement from somebody is to, as

24  they say it, you write it out.  And then you give it to them

25  and say, hey, is this accurate?  And they can sign it.  True?

1  A.  Yes, true.

2  Q.  Another way is for them to tell you the statement, you go

3  and type it out somewhere, bring it to them and say, hey, I

4  typed this out, can you read it and make sure it's accurate,

5  and then we'll talk about whether or not you can sign it.

6  That's another way, correct?

7  A.  When you mean go somewhere, what do you mean?

8  Q.  Well, I know that here you were at Mr. Casacci's home.

9  But I'm just talking generally now about your experience as a

10  DEC law enforcement officer, that there can be an occasion

11  where -- there can be an occasion where you go, for example,

12  to your office or someplace, type it up, and then bring it to

13  the person and say, hey, does this look like an accurate

14  description of what we talked about?

15  A.  I have never done that.

16  Q.  Never?

17  A.  I -- no.  All statements that I have ever taken have been

18  in person.

19  Q.  Okay.  And some of the ones that you've taken in person,

20  I take it, you had the person write it out?

21  A.  I have.  Rarely, but I have.

22  Q.  And some of the time, you've written it out and asked

23  them to sign it?

24  A.  Yes.

25  Q.  And some of the time you've recorded it?

1   A.   No, I do not possess a recorder.

2   Q.   Can you borrow a recorder from somebody?

3   A.   Maybe.  Our agency does not generally possess those

4   recorders.  In my career, I have not recorded anything.

5   Q.   How many statements have you taken in your career?

6   A.   Oh, high hundreds.

7   Q.   And of those high hundreds, can you approximate how many

8   you've taken by having the person sign something after it's

9   been presented to them?

10  A.   Every statement has to be signed.

11  Q.   And how many -- so when you say high hundreds, you're

12  talking about statements where the person has ratified what

13  is in the statement as something that they said?

14  A.   Or something to be true, or a factual event to have

15  happened.

16  Q.   Okay.  And how many, then, have you done where you

17  prepared a 710.30, but the person never sees it?

18  A.   I would not be able to tell you a number.  But I've done

19  a fair number of 710.30s in 25 years.

20  Q.   Can you approximate for us?

21  A.   Oh, I would say low hundreds.  But I would -- that would

22  be an estimation.

23  Q.   Okay.  And you recognize, because you've been trained on

24  it, that it's important to try to be as accurate as you can

25  in preserving what someone has said if you're going to

1  prepare a 710.30, correct?

2  A.  Correct.

3  Q.  That's because the nature of the 710.30 is such that, and

4  you know this from your training, that it might be given to

5  somebody against whom a criminal prosecution is commenced,

6  and then it will become an important document in the

7  prosecution of that case, correct?

8  A.  Correct.

9  Q.  And, so, in the ideal situation, you would want to write

10 it out right as a person is saying it?

11 A.  Law enforcement is rarely ideal.  That's the term that

12 you're using, it's subjective.  You react to the situation

13 that you have at the time.  So you would write it down, or

14 you might not write it down immediately.  It depends on the

15 situation that you're in.

16 Q.  I think you mean by that that sometimes the exigencies of

17 the circumstances you find yourself in make it impractical

18 for you to write something out right as the person is saying

19 it?

20 A.  That's correct.

21 Q.  Now here, those exigencies didn't exist, did they?

22 A.  It was -- they certainly did exist, it's just not the

23 same level of urgency that you're alluding to.

24    My function was one function, and one function only.  And

25 the reason I am repeatedly given that function is because I

1  take that function with the utmost importance.  So I am not

2  going to divert from what I am intended to do.

3  Q.  I -- if I'm hearing you correctly, you have laser focus

4  on the issue of completing your role and performing your role

5  as site safety -- what was the phrase you used?

6  A.  I am site safety officer.

7  Q.  Site safety officer.  You seem like the kind of person

8  who, throughout, however long it takes for a warrant to be

9  executed, you would be laser focused on executing that

10  responsibility the best you could?

11  A.  Your term is laser.  That -- that -- that's your

12  terminology, not mine.

13      My function is to ensure the safety.  So I don't have to

14  only focus on one thing, because by that very nature I would

15  be taking my focus off of everything else, which could pose a

16  threat.  The defendant's not the only threat.

17  Q.  Fair enough.  Now let's talk again about the exigencies

18  or lack of exigencies of the circumstances that found you

19  outside Mr. Casacci's home with him.

20      There were certainly people on site that day who had pen

21  and paper, correct?

22  A.  Sure.

23  Q.  Lots of people?

24  A.  Sure.

25  Q.  In fact, there was someone who was writing down every

1  picture that was taken, you see that person in some of the

2  reflections of the pictures, correct?

3  A.  Photo log.

4  Q.  And you've -- now you, what did you review prior to

5  testifying?

6  A.  The two statements that I have there.  The in and out

7  log, and my 710.30.

8  Q.  Did you review any notes?

9  A.  I don't have any notes.

10  Q.  Did you review anybody else's?

11  A.  I did not.

12  Q.  Did you meet with the prosecutors to prepare for your

13  testimony?

14  A.  Yes.

15  Q.  With whom did you meet?

16  A.  He's sitting behind you.

17  Q.  Mr. Mango?

18  A.  Yes.

19  Q.  Anybody else?

20  A.  Officer -- or Investigator Peinkofer was present this

21  morning, as was Lieutenant O'Connor, retired Lieutenant

22  O'Connor.

23  Q.  And were you prepped together or apart from one another?

24  A.  Separate.

25  Q.  Okay.  And have you spoken with anybody since coming up

1   to the stand, but in the time when the hearing first began

2   this morning, 10:30, till the time you took the stand, did

3   you speak with anyone about your testimony?

4   A.  I was sequestered.  We were in the attorney's room next

5   door.

6   Q.  And did you talk to anybody about your testimony?

7   A.  I had a conversation with the prosecutor before we came

8   on the way up the stairs to here.

9   Q.  Okay.  So, back to the exigencies or lack of exigencies.

10  There was nothing, you had made the assessment by the time

11  you were talking to Mr. Casacci that at least from your best

12  estimation, he did not pose a security threat at that point?

13  A.  No, for the duration of the execution of the warrant, he

14  did not pose a threat.

15      But the function of that officer that is in charge of

16  security is to monitor that individual at all times because

17  at any given moment, his demeanor could change and the threat

18  level could increase.

19  Q.  Right.  It could change in an instant, correct?

20  A.  It can.

21  Q.  And that's part of the reason why you have to be so

22  focused on what he's doing and what's happening around you,

23  correct?

24  A.  I pay attention to the totality of the situation.  You

25  can't get tunnel vision.  So I cannot focus solely on him or

1  his hands or his body language.  I focus on the totality of

2  the situation.

3          MR. GRABLE:  If we can please pull up Defense

4  Exhibit D1 in evidence.

5          BY MR. GRABLE:

6  Q.  Sir, I'm showing you what's been received in evidence for

7  this hearing as Defense Exhibit D-1.  Do you recognize that

8  document?

9  A.  It's one of our forms referenced to the search warrant.

10  Q.  This is the ops plan that the DEC uses, correct?

11  A.  It is.

12  Q.  And the ops plan is a document that's prepared prior to

13  the execution of a warrant to spell out the roles, it has

14  several functions, but one of the functions is to spell out

15  the roles that various persons will carry out during the

16  warrant execution, correct?

17  A.  Correct.

18  Q.  And part of the process of preparing for the execution of

19  a search warrant is that the ops plan gets prepared and

20  reviewed by the members of the search team, correct?

21  A.  The search team, meaning all the people that are on the

22  warrant to be executed, there will be a briefing prior to the

23  search warrant execution, if that's what you're asking me.

24  Q.  Yeah, and as part of that briefing, this form gets

25  reviewed with the people who are going to be on the lead and

1 entry assignments and who will be entering the home, correct?

2 A. The supervisor in charge of the execution of the warrant

3 will go over the roles assigned to each individual that's

4 there.

5 Q. And here, that was Investigator Peinkofer? Or O'Connor?

6 Or both?

7 A. Lieutenant O'Connor is the one that started the briefing,

8 and Investigator Peinkofer interjected. There were things

9 that he felt that needed to be covered.

10 Q. And you understood from the briefing included your role

11 included conducting an officer safety search pat-frisk of the

12 target, correct?

13 A. I did not do that.

14 Q. That's not my question. My question was that, at least

15 in terms of the ops plan, we see on page 1 of D1 that the

16 plan going in was for you to conduct an officer safety

17 search, pat and frisk of the target, correct?

18 A. That's what it says.

19 Q. And that target was Mr. Casacci?

20 A. It was.

21 Q. And now ultimately, it wasn't you who performed the pat

22 and frisk, it was somebody else, correct?

23 A. That's correct.

24 Q. It was ECO -- forgive me if I say his name wrong,

25 Machnica?

1   A.  Tim Machnica.

2   Q.  Machnica, okay.  And how did it come to be that he did it

3   and you didn't?

4   A.  You're asking me a question beyond my pay grade.  I

5   follow orders.  I'm in a rank and file, and I'm on the bottom

6   of the rank and file.  I do what I'm told.

7   Q.  In your role and in the role -- some of the roles that

8   are spelled out in D1, the first priority upon entering and

9   conducting the execution of the search warrant is to make

10  sure that the site is secure and safe for both the persons

11  conducting the search and for people present at the search,

12  including, for example, Mr. Casacci?

13  A.  Correct.

14  Q.  And so that process includes some activity that can be a

15  bit bustling about, correct?

16  A.  Sure.

17  Q.  And the people who are doing that part of the search are

18  law enforcement officers who are armed and making sure that

19  the premises is safe, correct?

20  A.  Correct.

21  Q.  Here, that's ten people, correct?

22  A.  The initial response is not ten people.  There were, may

23  have been ten people if that's what the form says that were

24  there.  That initial search is not ten people, you'd never --

25  you'd fall all over each other.  It would be dangerous.

1    So they -- the officer in charge picks select individuals

2    to go and do that building search.

3    Q.  So who -- who did that here?

4    A.  It was not me.  So, I believe by my recollection it was

5    Officer Machnica and Lieutenant Haag, but I'm not 100 percent

6    sure on that.  It wasn't me.  It was not my role.

7    Q.  At least page 1 of D1 advised that the initial meet and

8    entry assignment will include all of the people listed under

9    personnel, correct?

10   A.  If that's what it says, I'll clarify right at the

11   beginning.  I didn't draft this document, this document had

12   nothing to do with my initial response.  When we get briefed,

13   this is prepared and it is a living document.  Upon arrival

14   at the site, changes may have to be made.

15       So if you saw something in here and that's not the way it

16   occurred exactly on site, that happens.  And I cannot take,

17   you know, say that's out of line, in line.  It's a line

18   organization, and it's fluid.

19   Q.  Let me try to focus more on the reality on the ground of

20   what happened when you arrived.

21            MR. GRABLE:  Can we pull up Defense Exhibit D2,

22   please.

23            BY MR. GRABLE:

24   Q.  This is the log of the people that you prepared, these

25   were the folks who were in and out of the house at various

1  points in time, correct?

2  A.  Correct.

3  Q.  And we see from your log that there were ten people who

4  were on the entry team from 9:50 to 10 a.m., correct?

5  A.  If you counted, yes.  I didn't count, but yes, if that's

6  what it says.

7  Q.  I want to make sure I'm right.  But it sounds like ten

8  people were in the house as part of the initial entry team.

9  A.  Yeah.  I think where you're being confused is initial

10  entry team versus search warrant execution team.

11     Initial entry team is the team that has gone in ahead of

12  the warrant personnel to assure that the site is secure and

13  safe to execute a warrant.

14     So, like I said a few minutes ago, if you have all these

15  people attempt to get through a door, you'd have a bottleneck

16  and it would be dangerous.  That's why SWAT teams have two

17  and three members for entry teams.  Because there's too many

18  people to get in the door.  It's gonna bottle jam, and

19  someone's gonna get killed.

20  Q.  And where is Mr. Casacci between 9:50 and 10:00 a.m. when

21  all these people are going into his home?  I take it there's

22  at least the initial entry team, however many those were,

23  were streaming past him, correct?

24  A.  Streaming?  It's -- you're equating this with a no-knock

25  warrant.

1      This is not a no-knock warrant.  We were not streaming

2   past.  We were not busting through doors.  We were not

3   pushing the subject out of the way.  He was not taken into

4   custody.  This was a compliant search warrant.

5   Q.  Understood.

6   A.  So he was spoken to by Lieutenant O'Connor and

7   Investigator Peinkofer at the beginning.  They gained access.

8   Upon them gaining access and the initial entry team

9   determining the number of occupants inside the residence, if

10  any occupants were there, what their locations were, what

11  their status or their relation were to the defendant, and

12  then I would come in to actually shadow Mr. Casacci.

13  Q.  Where was Mr. Casacci when --

14  A.  As soon as it was deemed --

15  Q.  Let me finish.  I didn't finish my question, I'm sorry.

16      If you look at the log, D2 in evidence, Haag, O'Connor,

17  Peinkofer -- Mr. Mango called him Wojo, and DeAngelo went in

18  between 9:50 and 9:52.  Correct?

19  A.  Correct.

20  Q.  Where was Mr. Casacci?

21  A.  In the residence.

22  Q.  Where?

23  A.  I was not in the residence.  You're asking me to testify

24  to something I don't know.  I had not -- until the site is

25  clear, I don't gain access.  That is the responsibility of

1   the entry team, to determine security.  So I have no idea

2   what happened in advance.

3       I know these individuals went in.  That was my job to

4   record the time that they went in.

5       What happened until I was advised, assume my role of site

6   security and shadow Mr. Casacci, did -- do I know who went

7   where?  Who spoke to who?  I can't testify to that.

8   Q.  I understood that your role was keep eyes on Mr. Casacci.

9   A.  That is my role, once, like I've explained in the past,

10  this is a line organization.  I'm on the bottom of the line.

11      When you work in a line organization that is para

12  military, you follow the last standing order.  So my order

13  from my lieutenant on site is we are going to make access,

14  these are the individuals that are going to be going in,

15  making access, securing the site.

16      Then I will be called in to shadow Mr. Casacci.

17  Q.  Well, when did you start the shadowing?

18  A.  I don't have an exact recollection of the minute that

19  I -- that's not something that we record on a form somewhere.

20  That's not something I would have even taken note of, the

21  exact minute that I was called in to shadow him.

22  Q.  You don't remember?

23  A.  I have no idea.

24  Q.  And if you look at D2, which is still on the screen, D2

25  in evidence, does it help to jog your memory at all as to

1    when you might have taken on the responsibility of --

2    A.  It appears that 9:55, I would have entered the residence.

3    Q.  So from 9:50 to 9:55, Mr. Casacci was not within your

4    eyes, within your range of sight?

5    A.  That's correct.

6    Q.  And I take it from your response that you were outside

7    the residence, so he was someplace who knows where inside the

8    residence, and you don't know the answer, correct?

9    A.  Correct.

10   Q.  And you don't know anything, for example, that

11   Investigator Peinkofer may have said to Mr. Casacci, or that

12   Mr. Casacci may have said to Mr. Peinkofer prior to you

13   putting eyes back on him at 9:55?

14   A.  Correct.

15   Q.  Five minutes or so where you can't tell us where, if

16   anything, Mr. Peinkofer and Mr. Casacci were?

17   A.  Correct.

18   Q.  Just a few more questions about the log, Defendant's

19   Exhibit D2.

20        MR. MANGO:  (Unintelligible).

21        BY MR. GRABLE:

22   Q.  There is -- we looked when defendant -- or, Mr. O'Connor

23   testified, we looked at some photographs.  You've seen those

24   photographs, correct?

25   A.  Yes.

1   Q.  But you don't know anything about the timestamps?

2           MAGISTRATE JUDGE ROEMER:  Just let the record reflect

3   that the witness shook his head no.  He didn't say no, but he

4   shook his head no.

5           THE WITNESS:  I'm sorry, no.

6           MR. GRABLE:  Thank you.  Can we pull up defense

7   Exhibit D14 in evidence.

8           BY MR. GRABLE:

9   Q.  Now, who was in charge of photographs?

10  A.  I have no idea.  You'd have to look on that operational

11  plan.  I don't have it committed to memory.

12  Q.  If I were to tell you that it was Investigator Piwko,

13  would that make sense?

14  A.  Sure, he's an investigator.

15  Q.  And if you look -- we can jump back to it if you want to

16  see it, but I'll represent to you that Defense Exhibit D1

17  contains 48319, which says Investigator Piwko will photograph

18  the interior with ECO Machnica describing the details of each

19  photo on a photo looking.  Does that comport with your

20  recollection of that day?

21  A.  I have no recollection.  My function -- I stuck to my

22  function.  I stayed in my lane.  So asking me questions about

23  what someone else was supposed to do or what someone else was

24  tasked to do, I can't testify to that.

25  Q.  What we see in D14 is when you first walk into the house,

 1  that's what's in front of you, correct?

 2  A.  That's the recollection I have of the house.

 3  Q.  Kitchenette area and some stools, and then there's like a

 4  living room area to the left that's out of view in the

 5  picture, correct?

 6  A.  Correct.

 7  Q.  And there's a clock on the wall that seems to show the

 8  time of 9:56 or so, correct?

 9  A.  That looks like what that clock says.

10  Q.  And where were you getting the times that you were

11  putting on the in and out log for the entry minutes?

12  A.  Cell phone.

13  Q.  Your cell phone?

14  A.  Yes.

15  Q.  And the first -- were you preparing the log at the scene?

16  In other words, did you have a sheet of paper and you were

17  writing down --

18  A.  The log was at the entryway, at the door.

19  Q.  Clipboard or something?

20  A.  It was a clipboard.

21  Q.  And was it in your possession at all times?

22  A.  It was next to me.  It was never in my possession, I

23  would never hold onto it.  So if I had to make an entry,

24  someone else would keep eyes on the subject, I would make an

25  entry, then someone else -- I would take my eyes back, take

1  my role back over.

2  Q.  You talked in direct about writing on the top, going back

3  to D2 just briefly, in the top left corner, you put your

4  initials up there.  But initially, you had written a time of

5  9:51?  Do you remember giving that testimony?

6  A.  Yes.

7  Q.  Okay.  And why did you put the time up there initially

8  when -- just nerves?

9  A.  I don't know if it was a typographical error.  As you can

10  see, that entry log is hand generated.  So it may have been

11  difference in -- from the previous entry log that I did.  So,

12  I may have had the time in or out on the left side

13  previously, a name on the right side, I can't tell you why I

14  did it.  I just made an error, realized that I had the time

15  in the wrong spot, crossed it out.

16  Q.  You wrote 9:51, though, with what you called a typo.  Was

17  that after you wrote all the 9:50 entries?

18  A.  I have no recollection as to when I wrote that.  This was

19  two years ago.

20  Q.  Is it fair to say that going in for a search such as

21  this, especially given your role in connection with security,

22  that there can be some nerves and adrenaline?

23  A.  I've been doing this for a long time.  Nerves and

24  adrenaline are not something that I generally, subject to

25  that's going to make me make a mistake, especially not a

1  typographical one.  And especially at this point, I had

2  already had my conversation with the defendant, and he had

3  become clear that he was planning to be compliant.  So I --

4  at this point would I say I was keyed up or high on

5  adrenaline?  No.

6  Q.  That conversation you just mentioned wasn't the one

7  outside --

8  A.  No.

9  Q.  -- that you talked about in relation to the 710.30?

10  A.  No.

11  Q.  You're talking about the conversation when you were

12  headed into the residence when you were asking him questions

13  aimed at making sure he didn't pose a threat?

14  A.  Yes, just a general this is how this is going to go

15  conversation.

16  Q.  When did that happen in relation to what Investigator

17  O'Connor said happened?

18  A.  You mean, his initial -- you mean O'Connor's?

19          MAGISTRATE JUDGE ROEMER:  Rephrase your question.

20          BY MR. GRABLE:

21  Q.  You asked him questions that you wanted to have him

22  answer to ascertain whether he posed a security threat,

23  correct?

24  A.  No.  I think, you're misconstruing what I'm saying.

25          When I have my initial briefing, I'm not asking the

1   subject or the defendant questions.  I'm advising that

2   individual of who's driving the bus and how it's going to go

3   if they choose to step outside the parameters.

4   Q.  When you were advising him who is driving the bus, did

5   that happen before or after Mr. O'Connor had spoken to

6   Mr. Casacci?

7   A.  When you mean speaking to him, you mean his initial

8   entry?

9   Q.  Correct.

10  A.  It would be after.

11  Q.  And do you remember where you had that conversation with

12  him, where you conveyed to him, in sum and substance, that

13  you were driving the bus?

14  A.  His -- the left side of the house in between, I believe,

15  would be the dining room.  There was a table there, and then

16  the couch.  That was where he chose to stage at the did

17  beginning.

18  Q.  So that would have been after Investigator O'Connor spoke

19  to him from outside the house, and after that five-minute

20  window where you had not yet come in?

21  A.  Yes.

22  Q.  And then you gave him -- you had communication with him,

23  to use your phrase, to let him know you were driving the bus,

24  correct?

25  A.  Correct.

1  Q.  You had a gun on, correct?

2  A.  I was in uniform, correct, so yes, that is part of the

3  uniform, yes.

4  Q.  And the uniform also includes handcuffs, correct?

5  A.  It does.

6  Q.  What else?  Everything that's on your belt?

7  A.  Everything that's on your belt.

8  Q.  What else in terms of measures that you could use in

9  order to protect yourself is included on that belt?

10 A.  Well, oleoresin capsicum spray, handcuffs, expandable

11 baton.

12 Q.  That's pepper spray, correct?

13 A.  Correct.

14 Q.  And a baton that when you flick it, it expands, correct?

15 A.  Correct.

16 Q.  And you can use that to strike a suspect to disable them,

17 or hit them in the thigh and then they'd fall down?

18 A.  It is a control device, yes.

19 Q.  And those were all -- none of those were out of view,

20 they're all visible on your belt?

21 A.  That's correct.

22 Q.  And they were visible when you were conveying to

23 Mr. Casacci that you were driving the bus?

24 A.  Correct.

25 Q.  And, incidentally, that conversation where you conveying

1  to him that you were driving the bus, was that before or

2  after he was patted and frisked?

3  A.  After.

4  Q.  So the sequence, if I understand it, when Agent O'Connor

5  speaks to him and gives him the warrant, someone pats and

6  frisks him outside the residence, then he and others proceed

7  into the residence, and then five minutes later you're inside

8  to communicate with him?

9  A.  Yes, that sounds reasonable.

10 Q.  There's some, if you look at D2 in evidence, there's

11 reference to someone you talked about on direct examination,

12 Haley Keyser, do you see that there?

13 A.  I do.

14 Q.  Haley Keyser is Mr. Casacci's girlfriend, correct?

15 A.  That was my understanding.  I don't know that to be true.

16 Q.  In fact, she was living with him at the time, correct?

17 A.  I do not know.

18 Q.  She was, in fact, present that morning, left, and then

19 came back at 12:03, correct?

20 A.  She did come back at 12:03, yes.

21 Q.  But only after she had been present after she left,

22 correct?

23 A.  I do not have a recollection, I'm sorry, I don't

24 remember.  I'd have to refer to the log, that's all -- I

25 can't remember if she was there earlier or if she wasn't.  I

1  remember she came back, and my sum and substance of that

2  recollection is that they were going on a vacation, going on

3  a trip, going somewhere, and they were getting personal

4  effects.

5  Q.  Does that recollection, meaning what you just said, come

6  from communication from what Haley had with you, or

7  Mr. Casacci had with you?

8  A.  Casacci, I believe.

9  Q.  Where did that happen?

10  A.  When we were sitting at the dining room table for a

11  portion of the warrant, we were sitting -- he was sitting at

12  that table.

13  Q.  Is that before or after you went outside and the 710.30

14  statements that you --

15  A.  Before.  Before.

16  Q.  Okay.  And so was there a time when you were away from

17  the front door and the clipboard or the log that was at the

18  front door?

19  A.  I was within sight of the door.  As you can tell by the

20  photo, the house isn't big.  So my standing in that dining

21  room, I was in sight of the door at all times.

22  Q.  But you don't know one way or the other whether Haley was

23  there, left, and came back?

24  A.  I do not recall.  I do not recall.

25  Q.  Now, in terms of Mr. Casacci's freedom of action, and

1  whether he was, during this execution of the warrant, whether

2  he had full freedom of action or whether there was some

3  curtailment of his freedom of action, there were at least

4  some moments during this search where he was not completely

5  free to move as he wished, correct?

6  A.  Not correct.

7  Q.  Well, prior to the pat and frisk, no one on the search,

8  especially you, would have permitted him, for example, when

9  the initial team arrived to say, hey, guys, you know what?

10  I'm just going to close this door, I'm going down to the

11  basement, I'll be up in a few minutes.

12  A.  I am going to follow direction.  If I was advised to stop

13  someone from doing that, that's what I would have done.  Did

14  I do that?  No.  Did he do that?  No.

15  Q.  But you're an experienced officer who's had this role of

16  being the site safety person many, many times.  You know from

17  your experience that if when you arrive the target says, hey,

18  guys, I'm going back in the house, and I'll be back in a

19  minute.  That's not allowed?

20       MR. MANGO:  Objection.  I don't know why we're

21  talking in hypotheticals.

22       MAGISTRATE JUDGE ROEMER:  Overruled.

23       THE WITNESS:  I would not.  I stay in my lane.  It is

24  a line organization.  Something I may know or believe to be

25  true, if I am not directed to act, I stay in my lane.  That

 1    was my function, that's what I did.  Whether it would be

 2    normal or abnormal is a moot point.  It's not my role.

 3            BY MR. GRABLE:

 4    Q.  Well, now, for example, Mr. Casacci had said to you, hey,

 5    listen, Officer Marshall, you're a nice guy and everything,

 6    and we're getting along great, but I don't like you shadowing

 7    me around, so, beat it.  You wouldn't have done that?

 8    A.  I would have stayed near him.

 9    Q.  Because you --

10    A.  I would not have impeded his movement, unless that

11    movement was going to interfere with the execution of the

12    warrant or someone else's safety.  Then I would have

13    intervened.

14        But as far as him saying, I don't want you to shadow

15    me -- we had a conversation at the beginning that that is, in

16    fact, what my job is.  And he stated, you're just doing your

17    job.

18        So, he was compliant, he understood, and we didn't have

19    to cross that bridge.

20    Q.  That conversation you're talking about, that's the

21    driving-the-bus conversation, correct?

22    A.  Yes.

23    Q.  And you're conveying to him, you're not saying to him, do

24    you mind if I follow you around for the next three hours?

25    You're saying to him, since you've decided to stay, and my

1  role is I'm going to shadow you for the next three hours, I

2  want you to understand it, do you understand it?

3  A.  Yes.

4  Q.  And there's no -- there's no freedom on his part to say,

5  you know what?  I want to be able to move about as I please?

6  A.  He did move about as he pleased.

7  Q.  Without you?

8  A.  No, he cannot move without me.

9  Q.  Okay.  And so it's, to some extent or another, you are

10  responsible for keeping eyes on him and making sure that he

11  is within your reach, correct?

12  A.  Correct.

13  Q.  In fact, I think you told us on direct testimony that you

14  never let him get far enough away from you that he was more

15  than an arm's length?

16  A.  That's correct.

17  Q.  And if you were him, you would have understood that to

18  mean this guy's not letting me get more than an arm away, I

19  must --

20          MAGISTRATE JUDGE ROEMER:  Sustained.  Next question.

21          BY MR. GRABLE:

22  Q.  On the front step -- or, I should say the front porch,

23  prior to everybody starting to go into the house,

24  Investigator Peinkofer said at one point to Mr. Casacci, is

25  there anyone else in the house?

1      Do you remember him saying that?

2      You have to answer out loud.

3   A.  Yes, I'm sorry.

4   Q.  That's okay.  And so that was a question that was put to

5   Mr. Casacci right at the beginning, correct?

6   A.  Yes.  That's standard operating procedure, to know how

7   many people are in the house and what their relation is to

8   the individual that the warrant we're serving is.

9   Q.  And when in the sequence of what we've been talking about

10  did that happen?  And by that I mean did it happen before

11  Agent O'Connor talked to him, or after?

12  A.  That's semantics.  They were both up there talking, and I

13  can't tell you who said what first.

14     It's the -- the sum of what is always said.  It's the

15  standard operating procedure is what they --

16  Q.  In other words, it's sort of a -- it's a conversation,

17  people are all kind of talking, and there's a flow to it?

18  A.  No one talks over anyone else.  There is a flow, just

19  like there's a conversation between you and I right now, no

20  one else is talking.

21  Q.  There came a point in time --

22          MR. GRABLE:  We should pull the photograph that we

23  looked at previously of the kitchen.  The number escapes me,

24  but I suspect, D14.  Thank you.  Okay.

25          BY MR. GRABLE:

1   Q.  We're looking again at D14.  At some point after you

2   communicated with Mr. Casacci about who was driving the bus,

3   but before you went back outside with him.  Mr. Casacci,

4   Investigator Peinkofer, and Investigator O'Connor were in

5   this area we see in the picture, correct?

6   A.  Yes.

7   Q.  And you were over in the dining room area at that time,

8   correct?

9   A.  I have no recollection of being at all away from

10  Mr. Casacci.  I have no recollection of that, whatsoever.

11      Mr. Casacci was in this kitchenette area, I was in this

12  kitchenette area.  If he was in the kitchen, I would be in

13  the kitchen.  That is my role.  I have no recollection of it

14  being any different.

15  Q.  In other words, you're positive that you were within an

16  arm's length of him throughout the duration of this --

17  A.  I was within actionable distance.

18  Q.  By that you mean, you know, able to act if he becomes a

19  physical threat, able to act if needed?

20  A.  That is my role.

21  Q.  And so that would have had you, for any communication

22  involving Mr. Casacci, Mr. O'Connor, and Mr. Peinkofer, you

23  would have been in the kitchen at that same time, as well?

24  A.  I would have been in actionable distance.  So if -- it

25  doesn't necessarily have to be in the exact same -- that

1  little tiny kitchen.  I could have been on the back side

2  coming out of the dining room.

3      I would maintain the ability to act if Mr. Casacci was to

4  choose to do something dangerous or threatening.

5  Q.  Do you remember there came a point in time where, in this

6  kitchen area, Mr. Peinkofer asked Mr. Casacci a series of

7  questions?

8  A.  I'm sure he did.  I don't -- I can't tell you that I

9  remember an exact series of questions, no.

10 Q.  Well, if in fact -- the topics that are covered in 710.30

11 you drafted were discussed in the kitchen based on questions

12 from Mr. Peinkofer, correct?

13 A.  They may very well have been.

14 Q.  And those questions, we'll talk about the 710.30 in a

15 minute, but those questions -- let me rephrase that.

16      You certainly have some recollection of this kitchen area

17 shown in D14 that agent or Investigator Peinkofer did ask

18 questions to Mr. Casacci?

19          MR. MANGO:  Objection, Judge.  That was not his

20 testimony.

21          MAGISTRATE JUDGE ROEMER:  Well, let him answer this

22 question, and he'll clarify.

23          THE WITNESS:  I do not.  If this -- if you're asking

24 me if I remember every conversation that was had by every

25 individual over the course of a three- or four-hour search

1    warrant, the answer is no.

2            BY MR. GRABLE:

3    Q.  And in fairness, if I understand what you're saying

4    correctly, you mean there are other things that are being

5    discussed, not everything that was said by everybody there is

6    going to end up in a 710.30?

7            MR. MANGO:  I'm going to object to this.  He answered

8    the question.  Now we're starting to qualify.

9            MAGISTRATE JUDGE ROEMER:  I don't know if he clearly

10   answered the question.  The question is, do you recall a

11   conversation between Agent Peinkofer and Mr. Casacci in the

12   kitchen?

13           THE WITNESS:  The answer is no.

14           BY MR. GRABLE:

15   Q.  And just to clarify that does that mean that you have a

16   recollection that it didn't happen, or that it may have

17   happened and you just don't recall?

18   A.  I have a recollection, I did not hear -- I don't recall

19   that conversation.  If it occurred, I do not recall it.

20   Q.  Okay.  Now there came a point in time prior to going

21   outside with Mr. Casacci but after you had had the

22   conversation with him about who's driving the bus, when

23   Mr. Casacci said about Haley, is she free to go?  Do you

24   remember that discussion?

25   A.  I do not.

1  Q.  Does that mean you don't -- that you recall it didn't

2  happen?  Or that it may have happened, and you just don't

3  recall one way or the other?

4  A.  The second.  I do not recall the conversation.

5  Q.  Well, you were always within hearing distance of anything

6  Mr. Casacci said, correct?

7          MR. MANGO:  Objection, Your Honor, he answered the

8  question.  It's just a continued attempt to chip away at an

9  answer.

10         MAGISTRATE JUDGE ROEMER:  Well, that's what happens

11 on cross-examination.  Overruled.

12         THE WITNESS:  I do not recall a conversation.

13         BY MR. GRABLE:

14 Q.  But -- but my question was, you were always within

15 hearing range of Mr. Casacci?

16 A.  That's correct.

17 Q.  So anything he said, you were close enough that you

18 should have heard it, unless he whispered?

19 A.  The answer would be yes, I could have heard it.  Do I

20 recall it?  No.

21 Q.  Am I understanding your answer correctly to be that he

22 may have said that, you don't remember that one way or the

23 other?

24         MR. MANGO:  Objection.  His answer was clear before.

25         MR. GRABLE:  I don't know --

1          MAGISTRATE JUDGE ROEMER:  Overruled.

2          THE WITNESS:  That's correct.

3          BY MR. GRABLE:

4    Q.  There is also a point in time around that same point

5    where Mr. Casacci said, am I free to go?

6          Do you remember him asking Mr. Peinkofer that?

7    A.  I do not recall.

8    Q.  And does that same answer, you don't remember if it did

9    or didn't get said?

10   A.  That's correct.

11   Q.  There's a later point in time where Mr. Casacci said

12   again, am I detained or free to go?

13         Do you remember him asking Mr. Peinkofer that?

14   A.  I -- if I remember it, I will tell you I remembered it.

15   I do not recall those conversations you are specifically

16   addressing.

17   Q.  And the same answer, meaning it's possible he said it,

18   it's also possible he didn't say it.  You don't remember one

19   way or the other?

20   A.  That's correct.

21   Q.  At some point, Mr. Peinkofer told him you can't leave.

22   Do you remember Mr. Peinkofer saying that?

23   A.  No.

24   Q.  And same answer, it may have been said, you don't

25   remember?

1   A.  No, I have no recollection of him saying that.

2   Q.  Okay.

3   A.  That's what I'm telling you.  I have no recollection of

4   him saying that.

5   Q.  Do you remember Investigator Peinkofer telling

6   Mr. Casacci you're to sit in that chair?

7   A.  No.

8   Q.  And at no point do you remember him saying that?

9   A.  No.

10  Q.  Do you remember a point in time where Mr. Casacci was

11  sitting in a La-Z-Boy recliner, and Lieutenant Haag was

12  standing with her hands on her hips watching him?

13  A.  No, but that could have happened.

14  Q.  And Lieutenant Haag was armed, as well, correct?

15  A.  That's correct.

16  Q.  There came a point in time where Mr. Casacci said to

17  Mr. Peinkofer, I'm not answering any more questions; do you

18  remember that?

19  A.  No.

20  Q.  When Agent Peinkofer and the agents informed Mr. Casacci

21  that he was not going to -- that his F1 Savannah cat, his

22  pet, was going to be seized, at that point, Mr. Casacci said,

23  in that case, I'm not answering any questions.

24      Do you remember him saying that?

25  A.  No.

1  Q.  And by that, you mean you have an affirmative

2  recollection that he didn't say that?

3  A.  Yes, that was when he was becoming agitated.

4  Q.  He was become being agitated.  Did he say anything when

5  he was becoming agitated?

6  A.  He was displeased, so he expressed his displeasure.

7  Q.  And part of his expression of his displeasure was to say

8  I'm not answering any questions?

9  A.  No.

10      MR. MANGO:  Objection, Your Honor, asked and

11  answered.

12      MAGISTRATE JUDGE ROEMER:  Overruled.

13      BY MR. GRABLE:

14  Q.  And so I take it then you don't have any recollection, or

15  can't say whether Investigator Peinkofer said, well, then,

16  we're taking him -- meaning the cat, in response to I'm not

17  answering any more questions?

18  A.  No, he did not say it.  I did not hear it.

19  Q.  Does that mean you have a recollection that it wasn't

20  said --

21  A.  That's correct.

22  Q.  -- or --

23      Do you remember in the kitchen area or in this front area

24  of D14, Mr. Peinkofer saying, where do you keep your cat

25  records?, to Mr. Casacci?

1  A.  No, I have no recollection of it.

2  Q.  And does that mean it might have been said, but you don't

3  remember?

4  A.  That's correct.

5  Q.  You've talked about the demeanor of various people who

6  were present at the scene.  I think you told us Mr. Casacci's

7  demeanor was essentially cooperative, correct?

8  A.  Yes.

9  Q.  And that your -- in your assessment, he didn't seem to

10 pose an immediate threat?

11 A.  Correct.

12 Q.  And you reached some level of satisfaction that while you

13 were still going to keep watching him, he was being

14 cooperative and compliant?

15 A.  Correct.

16 Q.  And you talked about your own demeanor during your

17 testimony, as well, correct?

18 A.  Correct.

19 Q.  Now, Mr. Peinkofer, his demeanor, would it be fair to

20 say, can be a little stern?

21 A.  Demeanors are like view.  It's in the eye of the

22 beholder.  I -- some people may say stern, some people may

23 say he's a pussy cat.  That's going to be how that individual

24 reads them.  Some people can say I'm stern, as well.

25 Q.  Do you remember Investigator Peinkofer saying to

1  Mr. Casacci, if you get out of that chair, I'll put you in

2  handcuffs?

3  A.  No.

4  Q.  Does that mean that you remember that wasn't said?

5  A.  That's correct.

6  Q.  Normally, your experience as an officer whose assignment

7  often includes making sure that a site where a search warrant

8  is being executed is safely maintained so that nobody gets

9  hurt, agents or anybody in attendance.  But normally the

10 home, in your experience, is a place where, in some

11 circumstances, people can be a little more open and more

12 relaxed and less of a threat, correct?

13 A.  No.

14 Q.  That's not your experience?

15 A.  No.  No.

16 Q.  In your experience, sometimes people, when a search team

17 comes into their home, they're on edge?

18 A.  Sure.

19 Q.  And was that a concern that you had about Mr. Casacci

20 when you were beginning the process of keeping the site safe

21 and secure?

22 A.  Initially, that is the -- that's the impression you

23 always go under.

24 Q.  And when Mr. Casacci first came to the door and noticed

25 the people who were assembled there, and was -- received the

1  initial communication from Mr. O'Connor, would you agree with

2  the notion that his demeanor at that point was very quiet?

3  A.  Yes.

4  Q.  And you later found him to be not so quiet, correct?

5  A.  Yes.

6  Q.  And so you would -- would you agree with me that his

7  demeanor, when you initially arrived with the team, was that

8  he seemed to be shocked?

9  A.  Shocked, yes.

10 Q.  And -- and the point in time where his demeanor changed

11 from seeming to be shocked to something that caused you to

12 make a determination that he wasn't as much of a threat, that

13 would have had to have been sometime after 9:55 a.m.,

14 correct?

15 A.  Correct.

16 Q.  Because do you recall when that moment came?

17 A.  No.

18 Q.  Can you approximate how long after --

19 A.  No.  No.  He was never a problem for me.  From the time I

20 got in, we had a conversation which you keep referring to as

21 the driving-the-bus conversation.  It's not authoritative

22 where it's oppressive.  We have a conversation, and that

23 conversation is directly proportional to the response that I

24 get from the defendant or the subject.  And Mr. Casacci was

25 compliant at all times.  So our conversation was cordial the

1   entire time.

2   Q.  So I guess what I'm getting at is when you had that

3   conversation with him, and that's your phrase, the

4   driving-the-bus conversation, in fairness to me, right?

5   A.  Well, you keep referring to it as that.  That was just

6   part of the my statement.  That's the way you've chosen to

7   coin it.

8   Q.  I'll call it whatever you want.  Tell me --

9   A.  That's fine.

10  Q.  Okay.  That conversation, was it at that point when you

11  sensed a change in his demeanor?

12  A.  I -- I -- I don't know if I can tell you the exact

13  moment.  His demeanor, to me, was always the same.  I don't

14  know that I can tell you that he had a different demeanor

15  with me than he did an hour and a half later.  It was pretty

16  much the same.  He was cordial and polite the entire time.

17  Q.  Nobody ever game him Miranda warnings, correct?

18  A.  No.

19  Q.  Were you at the dining room table when Investigator

20  O'Connor -- Investigators O'Connor and Schneckenberger tried

21  interviewing him?

22  A.  I was in the area, yes.

23  Q.  You were how far away from him?

24  A.  Within reach.  Actionable distance.

25  Q.  So within an arm's length?

1  A.  Within an actionable distance.  I'm not going to tell

2  you -- my arm is 28 inches long and I was 27 inches away.  I

3  was in actionable distance.

4  Q.  Close enough to hear what was said?

5  A.  Close enough to hear what was said.

6  Q.  And did you -- so you would have heard Mr. Casacci say

7  that he wanted a lawyer?

8  A.  I would have heard that had he said that, but he did not.

9  Q.  He never said that?

10  A.  He did not.

11  Q.  To your recollection, throughout the time that you were

12  at the premises, he never said I want a lawyer?

13  A.  When he -- at the end when they attempted to record his

14  interview or have an actual formal statement given, that is

15  the only point that he invoked counsel.

16  Q.  Forgive me.  My earlier questions might have been

17  unclear.

18      That's the time I'm talking about.  When I say gathered

19  around the dining room, that conversation you're talking

20  about happened around the dining room table?

21  A.  That's right.

22  Q.  And that conversation, that's the one where Investigator

23  Schneckenberger and O'Connor and you're within striking

24  distance?

25  A.  That's correct, I was within actionable distance.

1  Q.  Actionable distance, thank you.

2      And you heard Mr. Casacci say I'd like a lawyer, I'm not

3  going to answer anything related to that?

4  A.  He's done talking, yes.

5  Q.  And did you at that point say to Mr. Casacci or anybody

6  else, dude, why don't you just tell him what you told me when

7  we were outside?

8  A.  No.

9  Q.  What did you say?

10 A.  It's not my function.  You -- you repeatedly try to put

11 me in a role that's not my role.  I have a function, I stay

12 in the function.

13     They were talking to him.  That's their job.  They talk

14 to him, they handle that interview.  That's not my job.

15 Q.  You're the interview team -- I'm sorry, they're the

16 interview team, and you're not?

17 A.  That's correct.

18 Q.  Is that, in part, the reason why you didn't prepare a

19 710.30 right at the house?

20 A.  No.  But it's when we have a standard operating

21 procedure, we follow the standard operating procedure.

22 Standard operating procedure is you return to the office, you

23 have a debriefing.  Anything that's identified as needing to

24 be done, any questions that need to be answered, that's when

25 you do it.

1  Q.  And when Mr. Casacci was around the dining room table

2  when he said he wanted a lawyer and wasn't going to answer

3  anything related to that, the -- Investigator O'Connor told

4  him at that point that he was free to leave at any time,

5  correct?

6  A.  He had been told that multiple times.

7  Q.  My question is:  When you saw them all seated around the

8  dining room table and Mr. Casacci said I'm not going to

9  answer anything related to that and I would like a lawyer, it

10  was in that same conversation that Mr. O'Connor told him that

11  you are free to leave at any time, correct?

12  A.  I have no recollection if it was exactly in that

13  conversation.  I heard that several times during the day.

14  Q.  But did you hear Mr. O'Connor say it then?

15  A.  I cannot recall.

16          MR. GRABLE:  Can we just play that portion of the

17  tape, please?

18          MR. MANGO:  Judge, I guess for the record, I object.

19  He answered the question.  He doesn't remember it.

20          MAGISTRATE JUDGE ROEMER:  Let's just see if it

21  refreshes his recollection.

22          MR. GRABLE:  Which exhibit is it?

23          MR. MANGO:  This is 5A, for the record.

24          MR. GRABLE:  Government Exhibit 5A in evidence.

25          MR. MANGO:  Is this okay, Jim?

1        MR. GRABLE:  Let's give it a try.

2        (Audio was played.)

3        BY MR. GRABLE:

4    Q.  So did you know that Mr. Schneckenberger had a recording

5    device?

6    A.  No.

7    Q.  Okay.  But do you have some recollection of hearing this

8    conversation?

9    A.  No.  They were sitting at the table.  The sum and

10   substance of those conversations are germane to you, they

11   were not at the time to me.

12       So things that were germane to me stick in my memory.

13       Things that are standard operating procedure, they're

14   going to interview him, and it doesn't directly impact me or

15   something that's going to stick in my brain, I don't remember

16   that conversation.  I had no idea he was recording.

17   Q.  So can you just help me understand?  What was your

18   understanding from 9:55 until this point about what would be

19   germane to you and what was not germane to you?

20   A.  I have answered that question multiple times.

21       My job on that site is for site security.  So I am

22   listening for anything that is going to affect that

23   particular role, the safety, or something that is going to

24   directly impact how this event is going to come off.

25        MR. GRABLE:  Can we resume?

1        MR. MANGO:  Yes.

2        MR. GRABLE:  Playing 5A.

3        (Audio was played.)

4        BY MR. GRABLE:

5   Q.  Do you remember that discussion?

6   A.  I'm hearing it, but I have no recollection of the

7   discussion, no.  The content of it, no.  What Lieutenant

8   O'Connor said, I have no recollection of it.

9   Q.  It doesn't refresh your memory?  So -- you have to

10  answer.

11  A.  I said no.  I shook my head and said no, I'm sorry.  I

12  was too quiet.

13  Q.  My hearing is not so great, especially in here with a

14  barrier in front of us.

15      These -- so even hearing the tape doesn't help you

16  remember, and even hearing the precise words on the tape

17  doesn't help you remember the words or the general sense of

18  the conversation that happened at that dining room table?

19  A.  The general content of the conversation, I testified to a

20  few minutes ago.  They generally attempted to get a statement

21  out of him, and he said no.

22  Q.  And he also said he wanted a lawyer, that was an

23  important part of the conversation, even in your role as site

24  safety supervisor, correct?  Site safety person?

25  A.  His invoking right to counsel doesn't affect what my role

1  is.  I still have to shadow him until all civilian and law

2  enforcement personnel are out of the house.

3  Q.  Did you become concerned at any point that day, including

4  at the debriefing meeting afterwards, about whether

5  Mr. Casacci had invoked either his right to counsel or his

6  right to silence prior to the conversation that you say took

7  place out on the front of the house outside?

8  A.  No.

9  Q.  You never asked anybody?

10  A.  I'm sorry, you're going to have to clarify.  Asked anyone

11  what?

12  Q.  Whether he ever invoked his right to silence, or right

13  to -- or right to an attorney prior to this time we're

14  hearing on the tape?

15  A.  He never invoked that right while he was with me.

16      And Lieutenant O'Connor or Investigator Peinkofer, it's

17  standard operating procedure, if someone invokes the right to

18  counsel, all members of the team are advised.  And that never

19  occurred.

20  Q.  At the scene?

21  A.  At the scene.  And that never occurred.

22  Q.  Now do you recall that at some point after that

23  conversation, around the dining room table, the one that's

24  recorded, and we were just listening to that, Mr. Casacci

25  decided, you know what?  I'm leaving.

 1  A.  He left.

 2  Q.  Yeah.  And that was after Mr. O'Connor told him you're

 3  free to leave at any time during that conversation around the

 4  dining room table, correct?

 5  A.  According to the tape, that's exactly what he said.

 6  Q.  Were you surprised to hear him say he was going to leave,

 7  given -- and wondering to yourself, gee, why didn't he say he

 8  wanted to leave earlier?

 9  A.  No.

10  Q.  Let's talk about the 710.30.

11      When Mr. Casacci and you stepped outside, he was agitated

12  about the discussion about his cat, his pet cat, correct?

13  A.  Yes.

14  Q.  And did he tell you that cat was named Tigger?

15  A.  I don't recall if he told me the name.

16  Q.  But, okay.  But in any event, you had no question in your

17  mind, you had no question in your mind but that he was -- his

18  demeanor had changed.  He was agitated at that point, and

19  wasn't of the same demeanor he had been prior to that cat

20  being brought up?

21  A.  With them, not with me.

22  Q.  Right.  In other words, by that you mean they brought it

23  up with him, his demeanor changed, and then you said I'm

24  going to --

25              MAGISTRATE JUDGE ROEMER:  No, let's just make it

1  when -- let's say who "they" are, so it's clear for the

2  record.

3          MR. GRABLE:  Thank you.

4          MAGISTRATE JUDGE ROEMER:  Okay?

5          THE WITNESS:  Other members of the team.

6          BY MR. GRABLE:

7  Q.  Other members of the team, specifically Peinkofer and

8  O'Connor?

9  A.  The individuals who informed him that they were seizing

10  the animal, yes, that would be Lieutenant O'Connor and

11  Investigator Peinkofer.

12  Q.  And then you -- you took him outside right?

13  A.  I --

14  Q.  Or you went outside with him?

15  A.  Yes, I went outside with him.  I accompanied him outside.

16  Q.  Okay.  There was some discussion out on the porch about

17  the reasons why you had to maintain a security presence over

18  Mr. Casacci; do you remember that discussion?

19  A.  We definitely had discussions regarding what my function

20  on the site was.

21  Q.  And you told him, for example, well, if you had a weapon

22  in your car, we can't let you just, like, leave and not be

23  under anyone's observation?

24  A.  I advised him that at any point, should he choose to

25  leave the site, he is not allowed back.  If he is on the

1  site, then I have to shadow him.

2  Q.  And did you talk to him about the fact that one of the

3  reasons he couldn't leave and come back is because he might

4  have a weapon in his car?

5  A.  Certainly.  If someone that leaves and comes back, they

6  could do that for that purpose, go to get a weapon and come

7  back.

8  Q.  Now, just, I'm asking whether you talked to him about

9  that.

10  A.  I have no specific recollection if I addressed a weapon

11  in his car or I did not.  But it is a conversation that would

12  make sense, the substance of the conversation would make

13  sense.

14  Q.  You told him that someone who leaves could come back and

15  be a threat, correct?

16  A.  It sounds reasonable.  It would be something I could see

17  myself saying.

18  Q.  In other words, you're telling us that it's possible you

19  said that and it sounds plausible that you would have said

20  that, but you don't have a specific recollection as you

21  testified to?

22  A.  Right.  What I'm testifying to is that I would have

23  advised him if he leaves the site, he cannot come back.  If

24  he is on the site, then I will be shadowing him for the

25  duration of that search warrant.  That is what I'm testifying

1  to, yes.

2  Q.  You eventually said to him outside that you felt like he

3  was being levelheaded and not aggressive, right?

4  A.  He was being levelheaded and not aggressive.

5  Q.  Again, I don't mean to split hairs, but my question is:

6  Did you say to him, you are being levelheaded and not

7  aggressive?

8  A.  Yes, I said he was not being aggressive.  Yes, he was not

9  being aggressive.

10 Q.  And you told him that you appreciated that he was being

11 polite?

12 A.  Yes, I told him that.  And he did the same to me.

13 Q.  And -- and he told you, during the conversation outside,

14 that he was kind of in shock; do you remember him saying

15 that?

16 A.  No, but it would make sense.  That most people are

17 somewhat shocked when a search warrant is executed on their

18 residence.

19 Q.  So when you wouldn't disagree with the notion that he

20 would have said to you outside at some point I'm kind of in

21 shock from all this?

22 A.  He would have said he was shocked by it, yes.

23           MAGISTRATE JUDGE ROEMER:  Let's clarify the record.

24 Did he say he was shocked?  Or did he not say he was shocked?

25           THE WITNESS:  He said he was shocked.

1          MR. MANGO:  Okay.

2          BY MR. GRABLE:

3   Q.  And he also -- you were reassuring him when he said he

4   was shocked, correct?

5   A.  I don't know what that means.  Well, what was I

6   reassuring?

7   Q.  Yeah, let me try to be more specific.

8       You were -- you were telling him that from your

9   assessment, he was cooperative and he wasn't behaving like a

10  threat?

11  A.  Correct.

12  Q.  And you were showing him, for lack of a better way of

13  saying it, you were kind of showing him some kindness and

14  compassion and reassuring him because he was in a bit of a

15  shock?

16  A.  I was kind and compassionate, just as he was to me, yes.

17          MR. GRABLE:  And now the 710.30 itself, can we please

18  pull that up?  That's Government Exhibit 4 or Defense D.  Is

19  that the government one?  If you don't mind, let's pull up the

20  defense one.  Thank you.

21          BY MR. GRABLE:

22  Q.  Defense D3 in evidence.  This is the 710.30 you prepared,

23  correct?

24  A.  Correct.

25  Q.  And we don't know what time you prepared it, but we know

1  you prepared it sometime after you left the site and after

2  debriefing took place, correct?

3  A.  Correct.

4  Q.  How long was the debriefing?

5  A.  They're generally half an hour.

6  Q.  In this particular search, there was the seizure of a

7  number of cats, correct?

8  A.  Correct.

9  Q.  There's civilians who were staying offsite in the hotel

10  parking lot from out of state who were going to come and

11  collect the cats in cages and take them out of state?

12  A.  Outside my pay grade.  I don't know that.

13  Q.  Well, part of the process, we looked at the log earlier,

14  we don't have to go back to it unless you need to or want to,

15  but part of the process after the search team finished at the

16  residence was that these cats had to be moved to wherever

17  they were going to go, correct?

18  A.  Correct.

19  Q.  And that was going to be done by the civilians who were

20  in from out of state.  Was there any law enforcement

21  assistance with that?

22  A.  We had an ECO assigned to that group.  I don't know what

23  ECO Dougherty's function was.  That was outside my burden.

24  Q.  Was ECO Dougherty present at the debriefing?

25  A.  Yes, I would say, everybody was present.  So yes, I would

1    say yes.

2    Q.  When you say everybody, you mean all the law --

3    A.  Yes.

4    Q.  -- enforcement people --

5    A.  Yes.

6    Q.  -- but not the civilians?

7    A.  No.

8    Q.  I think we're unclear on the record there.

9         There is law enforcement people in one group, and

10   out-of-state civilians in another group, correct?

11   A.  Correct.

12   Q.  And the debriefing was law enforcement personnel, not the

13   out-of-state --

14   A.  Correct.

15   Q.  -- people who were collecting the cats?

16   A.  Correct.

17   Q.  And so ECO Dougherty did whatever he had to do with the

18   out-of-state civilians who were collecting the cats, and then

19   he came to the debriefing?

20   A.  That's my understanding, yes.  That's my recollection.

21   That's generally, if we have to liaise, and the officer

22   that's in charge of liaising with civilians, they do that

23   portion and then return when they're free.  Or sometimes they

24   don't attend the debriefing, and they're debriefed at a

25   different time if their function requires them to escort them

1    to the state line or their individual duties may vary.

2    Q.  So is it your recollection that ECO Dougherty was

3    escorting the civilians to the state line?

4    A.  I don't have a recollection.  That's why I said I would

5    assume she was there, because that's the general procedure,

6    but I don't have a recollection if she was at that debriefing

7    meeting.

8    Q.  So, you don't recall whether that particular officer,

9    ECO Dougherty, was present at the debriefing?

10   A.  I do not.

11   Q.  And you don't recall what time the debriefing was?

12   A.  I do not.

13   Q.  And you don't recall how long after the search warrant

14   execution ended that that debriefing occurred?

15   A.  It -- we went directly from the site to the office.  So,

16   if you were to Google that, I don't know what it is,

17   15 minutes?

18   Q.  Did the debriefing take place right when you got back?

19   A.  Yeah.

20   Q.  Oh, okay.  So the only time between from completion of

21   the execution of the search warrant and the debriefing was

22   the travel time from the residence to however long it took to

23   drive to the office, and then everybody comes in and gathers

24   in a room somewhere, and you start the debriefing?

25   A.  That's correct.

1   Q.  But that didn't happen that way if ECO Dougherty had

2   other plans?

3   A.  Well, she would come late.  If she had another task, she

4   would come late, or she wouldn't come.

5   Q.  In other words, the debriefing would start in her

6   absence, and then -- how long does the debriefing take?

7   A.  Like I said, they're usually 20 minutes to a half hour.

8   Q.  When you say usually, do you have a specific --

9   A.  I do not.

10  Q.  Sorry?

11  A.  I do not.

12  Q.  You don't have a specific recollection how long this was?

13  A.  I do not.

14  Q.  And the conversation that the 710.30 purports to

15  memorialize, what time do you think that happened?

16  A.  While we were outside.

17  Q.  All right.  Now that, I think you told us during your

18  testimony, happened pretty early on in the process, correct?

19  A.  I don't -- I didn't keep a running log of what time we

20  went outside, what time we came inside, I don't have a

21  running log of that.

22  Q.  But am I correct in understanding that the -- the

23  communication about the F1 cat happened before the civilians

24  were in the residence?  Meaning Peinkofer and O'Connor were

25  talking to Casacci about the F1 Savannah cat before the

1  civilians got there?

2  A.  I don't know.  You'd have to refer to the log as to what

3  time they logged in the civilians.  I don't know what time

4  that was, I'm sorry.

5  Q.  That's okay.  But, okay.  So you don't know what time you

6  were outside, approximately?

7  A.  I don't.  I know was hot.  I remember that, it was hot.

8  Q.  It was hot?

9  A.  Yeah.

10  Q.  July 5th?

11  A.  Yeah.  It was hot, I remember that.  I don't remember

12  exactly what time it was.

13  Q.  And you -- and you at some point asked Mr. Casacci about

14  the heat, wether you guys could go back in the air

15  conditioning, correct?

16  A.  I never asked him permission for anything.

17  Q.  Well, it wasn't so much permission as, do you mind if we

18  go back inside because there's air conditioning in the house?

19  A.  It was hot.  So, it definitely -- I don't remember

20  specifically asking him if he wanted to go back inside, but

21  it was hot.  So, I would not be out of the realm of

22  possibility, but I have no recollection of that whatsoever.

23  Q.  How long were you outside with him before he made the

24  statements on the 710.30?

25  A.  I don't know.

1    Q.  Well, you went outside with him.  You said there was this

2    conversation that sounded kind of organic about him talking

3    about things that tickled your entrepreneurial spirit; am I

4    understanding that correctly?

5    A.  That's correct.

6    Q.  And how long -- that whole conversation, as I understand

7    it from your testimony, took about 20 to 30 minutes?

8    A.  That's what it seemed like.  It was -- it wasn't over in

9    8 seconds like you'd see somebody in a hallway, and it didn't

10   last like a geology class.

11   Q.  But these statements in the 710.30, and the time it takes

12   to speak them, it would be less than three minutes, correct?

13   A.  If he said every one of those statements directly and in

14   order and succession, it probably took me less than three

15   minutes to read them, yes.

16   Q.  Are you telling us that you don't know whether he said

17   them in succession?  Or --

18   A.  What I'm saying is the entire sum and substance of the

19   conversation is not written in a 710.30.  So in the time that

20   it takes to have an entire conversation, the germane points,

21   the utterances, were put in in the statement.

22       I can't tell you if he had 47 sentences in between

23   utterance 1 and utterance 3.  I don't know that.

24   Q.  That's what I was getting at.  You didn't write down

25   everything he said, correct?

1   A.   No.

2   Q.   You only wrote down a few of the things he said?

3   A.   That's correct.

4   Q.   And you don't -- how did you make the decision what to

5   write down in the 710.30 and what not to write down?

6   A.   You write down what's germane to prosecution.

7   Q.   How did you determine what was germane?

8   A.   By the statement itself.

9   Q.   Well, did you -- you told us that you consulted with the

10  chain of command on the debriefing.  And that it came back to

11  you that O'Connor said to Peinkofer, and Peinkofer said to

12  you, prepare a 710.30?

13  A.   It's standard operating procedure.  So when I described

14  to you what the chain of command said, that's how chain of

15  command works.  You do what you're directed to do.

16  Q.   Understood.

17  A.   So that's why I memorialized it based on them directing

18  me to do it.  It's -- we would do a 710.30 on this anyways.

19  Q.   I apologize.  Maybe my question wasn't clear.

20       I wasn't asking about SOP, I was asking about what

21  happened here in this case.

22       You're at the debriefing, and you get word after the

23  debriefing that O'Connor said to Peinkofer, then Peinkofer

24  said to you.

25  A.   We were all in the same room.

1   Q.  Okay.

2   A.  We're all in the same room.  So during the debriefing, my

3   filling out a 710.30 form was discussed.  And then I was,

4   this is what we will do.  That is how a chain of command

5   works.  You are given a directive.

6   Q.  So am I correct in understanding that what was happening

7   was everyone's talking about what happened during the search.

8   People are all describing what happened when performing their

9   various roles.  You get to the point where you're describing

10  what you recall to be a conversation with Mr. Casacci.  And

11  then O'Connor and Peinkofer say, you have to do a 710.30?

12  A.  Yes.  I said my plan is to do a 710.30.  Here is the

13  information I'm planning on including in the 710.30.

14  Investigator -- or, Lieutenant O'Connor said yes, we need to

15  make sure we get that memorialized today.  Let's do that

16  today.  Let's do that right now.

17      Officer Peinkofer provided the form.  Yeah, we need do

18  that.  We did it.

19      It was a living, breathing conversation.

20  Q.  And so that was something you had decided yourself

21  without them telling you that you needed to do a 710.30?

22  A.  I brought it up in the conversation, this is my thought,

23  these are the spontaneous utterances.  After being a

24  policeman for 27 years with two agencies, this is standard

25  operating procedure.

1        But you bring it up to your chain of command if they

2   don't want something done they're going to advise you that

3   even if you think it's something that you should do, they're

4   going to advise you yea or nay.

5   Q.  So they have a part in deciding what would or wouldn't be

6   included in the 710.30?

7   A.  No.

8            MAGISTRATE JUDGE ROEMER:  Mr. Grable, you're getting

9   a lot now into, you know, why did you put some statements in,

10  why didn't you put -- that goes to the weight of this evidence

11  if it's admitted, but it doesn't have anything to do with the

12  admissibility of this evidence, okay.

13           MR. GRABLE:  Yeah.  I'll try to get to the point,

14  Judge, thank you.

15           BY MR. GRABLE:

16  Q.  One of the things that's on the 710.30, which is in front

17  of you, it's D3 in evidence, is referenced down at one of the

18  lower bullet points to the house cat, correct?

19  A.  And are you referring to the second-to-last one?

20  Q.  Yes.

21  A.  Okay.

22  Q.  And that's -- we've now blown it up, D3 in evidence,

23  that's in reference to the cat that Mr. Casacci was talking

24  about that was the one when mention of it, you said it made

25  him agitated, correct?

1  A.  Correct.

2        MR. GRABLE:  And if we could pull up D67, please.

3  I'm going to go back to the 710.30 first though.

4        BY MR. GRABLE:

5  Q.  D67, do you recognize that to be the cat that Mr. Casacci

6  was talking about?

7  A.  I do not.

8  Q.  Do we see on D67 that there's a timestamp of 9:37, which

9  would have been 10:37 a.m., correct?

10  A.  I have no idea how that works, I've never done it.

11  Q.  Okay.  Fair enough.

12    You know from your presence at the scene that the cats

13  were never permitted outside because the warrant called for

14  their seizure, correct?

15  A.  Correct.

16  Q.  The cats remained inside until the civilians could come

17  in and secure them in cages?

18  A.  Correct.

19  Q.  And at any point did any of the cats, included this one

20  in D67, come outside?

21  A.  Not to my recollection, no.

22  Q.  And the 710.30, if we can pull that back up, that's D3.

23  The second-last point says:  That one is my house cat.  It is

24  and F1 Savannah.  And was a typo?

25  A.  Correct.

1  Q.  How did that -- you were writing fast, I take it?

2  A.  I would imagine it's not outside my realm to, you know,

3  transpose a letter here or there.

4  Q.  We all make mistakes.

5  A.  We all make mistakes.

6  Q.  Here you were preserving your belief or assertion that

7  Mr. Casacci said while you were outside, that one is my house

8  cat, it is an F1 Savannah?

9  A.  Correct.

10  Q.  But that one was inside the house, wasn't it?

11  A.  Yes.

12  Q.  And did you record these statements on the 710.30 from

13  your recollection, the order in which they were given to you,

14  or did you mix up the order?

15  A.  I have no recollection of which order I put them in.

16  Q.  So they may have been spoken in a different order than

17  what's on there?

18  A.  That is entirely possible.

19  Q.  In fact, Officer, the statements that are in the 710.30

20  were elicited by Investigator Peinkofer inside the house,

21  weren't they?

22  A.  I have no recollection of that.  I never heard him ask

23  those questions, interview in that regard.  So the answer is

24  no.

25  Q.  Well, these answers on the 710.30 when you read them,

1  when you read them, don't you agree, they don't sound like

2  something someone would spontaneously say?  They sound like

3  something that someone would answer in response to a leading

4  question?

5  A.  I disagree wholeheartedly.  When I have a conversation

6  with you -- oops, excuse me.  And you're legitimately

7  interested in what I'm going to say, that conversation is

8  going to flow.  In that conversation, people are going to

9  talk about things that they are genuinely interested in and

10  excited about.

11      And that's exactly the conversation that myself and

12  Mr. Casacci had.  I was interested, genuinely interested in

13  that enterprise.  And he was just as interested in talking

14  about it.

15  Q.  So your interest was personal, not professional?

16  A.  That is correct.

17  Q.  So you weren't thinking this as he was saying it, you

18  would -- I better put this in a 710.30 right away?

19  A.  No.  When I had that conversation, I was interested in

20  what it is that he was saying, because he was excited about

21  talking about it.

22  Q.  And it excited something in you, but not something

23  professional related to your work as a DEC officer, rather,

24  something that's of personal interest?

25  A.  That's the beauty of police work, your interpersonal

1   communications, they weave between professional and personal

2   all the time.  And you find yourself talking to people that

3   you never would dream you would talk to about things you

4   would never dream about talking about.

5           MR. GRABLE:  May I have a moment, Your Honor?

6           MAGISTRATE JUDGE ROEMER:  Sure.

7           MR. GRABLE:  Could we please pull up D23 in evidence?

8           BY MR. GRABLE:

9   Q.  You told us during your direct testimony that it was your

10  understanding that Haley and Mr. Casacci and Mr. Casacci's

11  child or children were headed on a trip at some point after

12  the warrant was to be done, correct?

13          MAGISTRATE JUDGE ROEMER:  I don't remember any

14  testimony about children or -- unless I missed something, I

15  don't remember anything about children.

16          MR. GRABLE:  It was about the trip, Judge, so forgive

17  me.  I may have misspoken.

18          MAGISTRATE JUDGE ROEMER:  Okay.

19          BY MR. GRABLE:

20  Q.  This photograph, Mr. Casacci at one point entered a room

21  that included this closet, correct?

22  A.  I don't recall seeing the inside of that closet.  But it

23  might have.

24  Q.  These, in fact, were the -- this -- these -- this was the

25  closet, and this was the clothing of Haley Keyser who was

 1  living at the house at the time and was present in the

 2  morning when all of you arrived, right?

 3          MR. MANGO:  Objection.

 4          MAGISTRATE JUDGE ROEMER:  Sustained.

 5          MR. GRABLE:  I don't have any other questions.

 6  Thank you.

 7          MAGISTRATE JUDGE ROEMER:  Okay.

 8          MR. MANGO:  Judge, I will stay right here.  I have

 9  two questions.

10          MAGISTRATE JUDGE ROEMER:  Okay.

11          **REDIRECT EXAMINATION BY MR. MANGO:**

12  Q.  Sir, good afternoon again.

13  A.  Good afternoon.

14          DEPUTY CLERK:  Excuse me, Aaron, please --

15          MR. MANGO:  Oh, yeah.

16          DEPUTY CLERK:  Thank you.

17          BY MR. MANGO:

18  Q.  Good afternoon again, Officer.  All right.  Did you have

19  a 710.30 statement with you on July 5th, 2018?

20  A.  No.

21  Q.  You mentioned you worked at two law enforcement agencies.

22  Just so the record's clear, what did you do before you become

23  a ECO with the DEC?

24  A.  I was a patrolman for the Town of Westfield.

25  Q.  How long did you serve in that position?

1    A.   Just shy of two years.

2              MR. MANGO:  Judge, if I can just have a minute?

3              Nothing else, Judge.  Thank you.

4              MR. GRABLE:  I'm sorry, Your Honor, just briefly.  I

5    have a few questions off that redirect.

6              MAGISTRATE JUDGE ROEMER:  Sure.

7              MR. GRABLE:  Thank you.

8              **RECROSS-EXAMINATION BY MR. GRABLE:**

9    Q.   Mr. Mango just asked you whether or not you had the

10   710.30 form with you.  Do you remember him asking you that a

11   moment ago?

12   A.   Yes, sir.

13   Q.   There's nothing preventing you from creating a document

14   that you can then turn into the 710.30 while you're on the

15   scene, correct?

16   A.   Correct.

17             MR. GRABLE:  Thank you.  No more questions.

18             MAGISTRATE JUDGE ROEMER:  Okay.  You can step down,

19   Officer.  Thank you.

20             THE WITNESS:  Thank you.

21             (Witness excused at 3:19 p.m.)

22             MR. MANGO:  Judge, the government rests.

23             MAGISTRATE JUDGE ROEMER:  Okay.  Nothing further?

24             MR. MANGO:  Nothing further.

25             MAGISTRATE JUDGE ROEMER:  Mr. Grable?

1        MR. GRABLE:  Your Honor, may we have a few moments in

2   recess to confer?

3        MAGISTRATE JUDGE ROEMER:  We'll take a 15-minute

4   break.  We'll come back at 3:35, okay?  Does that give you

5   enough time to --

6        MR. GRABLE:  That's plenty of time.

7        MAGISTRATE JUDGE ROEMER:  Okay.  15 minutes.

8        MR. MANGO:  Thank you, Your Honor.

9        MAGISTRATE JUDGE ROEMER:  Okay.

10       (Off the record at 3:19 p.m.)

11       (Back on the record at 3:39 p.m.)

12       MR. DUGGAN:  Patrick Duggan.

13       DEPUTY CLERK:  This is Rosalie calling from the

14   courtroom, I'm going to put you on mute.

15       MR. MANGO:  Thank you, Rosalie.

16       MR. ROMANO:  The defense will call Chris Casacci to

17   the stand.

18

19   **C H R I S T O P H E R   D E A N   C A S A C C I**, having been

20   duly called and sworn, testified as follows:

21       MR. ROMANO:  May I proceed, Your Honor?

22       MAGISTRATE JUDGE ROEMER:  Yes.

23       **DIRECT EXAMINATION BY MR. ROMANO:**

24   Q.  Now, Chris, you've been in this courtroom today to hear

25   all the testimony; is that right?

1    A.  Yes, correct.

2    Q.  You were here for Officer Marshall's testimony?

3    A.  Correct.

4    Q.  You were also here for Retired Lieutenant O'Connor's

5    testimony; is that right?

6    A.  Yes.

7    Q.  I'd like to turn your attention to the early-morning

8    hours of July 5th, 2018; do you remember that time?

9    A.  I do, yes.

10   Q.  And at some point, law enforcement officers knocked on

11   your front door?

12   A.  Correct.

13   Q.  What do you recall from the initial interaction with law

14   enforcement?

15   A.  When the -- I heard my doorbell ring.  And I went to my

16   front door.  When I opened the door, I saw several officers

17   on my front porch.

18       I opened -- I have, like, a little glass door that's kind

19   of an inbetween, between the outside and my inner wood door.

20   And I pushed the glass door open, pulled the wood door behind

21   me, stood out on the porch, and asked what it was all about

22   and what was going on.

23       And Officer O'Connor -- excuse me, Lieutenant O'Connor,

24   stated that he had a search warrant for my residence.  And he

25   was polite and cordial as he had stated.

1    And I said I wasn't letting him in without a search

2  warrant.

3    And he said, I have it here.  And he handed it to me.

4    He showed me the search warrant, and gave me some time to

5  read it.  So I did read through the warrant.

6    And then I stated to him at the end that, you know, I was

7  kind of in shock because just kind of reading through the

8  whole thing, it just absolutely blew me away.

9    And I said, I'm gonna grab my keys and leave.  I want my

10  lawyer.

11    And at that point, Officer Peinkofer interjected, and he

12  said, you need to go inside, we've got some questions for

13  you.

14  Q.  Let me cut you off right there, Chris.

15    You said a moment ago that you told Investigator

16  Peinkofer and Lieutenant O'Connor that you wanted your

17  lawyer.  Did you mention anything about answering any

18  questions?

19  A.  At that time, I said I don't want to answer any

20  questions.  Because they had asked -- they was -- it was

21  actually kind of -- after I said that, they said, we need you

22  to go inside and answer some questions for us.

23    And I said, I'm not answering any questions.

24    And Officer Peinkofer said, you need to go inside.

25    At that point, they had patted me down briefly.

1     And I said, I'm just wearing shorts and a T-shirt, I

2  don't have any weapons on me.  They asked me if I did, and

3  then I walked back inside the house.

4     And I believe it was Officer -- or, excuse me, Lieutenant

5  O'Connor and Peinkofer that followed immediately after me

6  into the house where we proceeded towards the kitchen as

7  those two gentlemen were leading the way.

8  Q.  After you entered the kitchen with Lieutenant O'Connor

9  and Investigator Peinkofer, what happened?

10  A.  Mr. Peinkofer -- or, excuse me, Officer Peinkofer

11  immediately said, you've garbages outside.  Are there dead

12  cats in your garbage?  Do we need to go through your garbage?

13     And I was kind of shocked, like, kind of taken off guard.

14  Like, there's no dead cats in the garbage.

15     And he said, well, do we need to search it?  Are there

16  any dead cats in the garbage?  I he said it think twice.

17     And I said, no.

18     And he said, where are the dead cats?  Where are the dead

19  cats?

20     And I said, well, there was two that have passed, but

21  they went to Cornell for an autopsy and a necropsy.

22     And then he started asking me --

23  Q.  When you're saying he, not to cut you off, Chris, but you

24  mean Investigator Peinkofer?

25  A.  Excuse me, yes.  Investigator Peinkofer.

1    He was the lead person questioning me in the kitchen at

2  that point.

3    And then he continued to ask questions pertaining to me

4  selling the cats, how much did you sell them for, just

5  general questions about it.

6  Q.  Now, Chris, you testified a few moments ago that you told

7  law enforcement that you did not want to answer any

8  questions?

9  A.  Correct.

10  Q.  You did not want to answer any questions without your

11  lawyer.  Why were you answering these questions in the

12  kitchen?

13  A.  I was terrified.  I was scared and shocked.  And I felt

14  there's a bunch of guys coming into my house with guns and

15  badges, and I kind of didn't know what was going on.  They

16  clearly had a warrant, and I was just afraid.  I was afraid

17  and in shock.

18    And then when he started asking the leading question

19  about the garbage, I just wanted to explain away, like, this

20  is -- I'm not this terrible person.  I did not -- there's not

21  dead cats in my garbage.

22    And so I started to just, you know, give verbal diarrhea,

23  and I just started talking to him about it.

24  Q.  You began answering the questions?

25  A.  Yes.  That he was -- I was answering as he was asking me

1  questions pertaining to me having the cats.

2  Q.  Chris, did you believe that you had a choice not to

3  answer the questions?

4  A.  No, I thought I had to.  I, on the porch, had said, I

5  want to grab my keys and go.

6     And they said, no, you're gonna go inside and answer some

7  questions.

8     So I didn't think I had a choice.

9  Q.  So this was not a voluntary discussion?

10 A.  No.

11       MAGISTRATE JUDGE ROEMER:  Can we clarify?  He uses

12 terms like "they" and "he."  He just said they said he

13 couldn't go.  Can we clarify who that was?

14       THE WITNESS:  Officer Peinkofer.

15       Officer O'Connor was silent after his initial polite

16 meet and greet where he showed me the warrant and gave me a

17 chance to read it.

18       And then it immediately switched gears to Officer

19 Peinkofer being quite a bit more stern and aggressive and

20 taking a more interrogatory stance.

21       BY MR. ROMANO:

22 Q.  Now, Chris, you testified that these statements were

23 involuntary, you didn't feel like you had a choice.  Were

24 they spontaneous at all?

25       MR. MANGO:  Objection, Judge.  Leading.

1          BY MR. ROMANO:

2     Q.  Were they spontaneous?

3          MAGISTRATE JUDGE ROEMER:  What was your question

4     originally?

5          MR. ROMANO:  It was, Your Honor, what I asked was in

6     addition to them being involuntary, that he didn't have a

7     choice, were they spontaneous statements.

8          MAGISTRATE JUDGE ROEMER:  In this context it has a

9     legal connotation to it.

10         MR. ROMANO:  I can rephrase, Your Honor.

11         MAGISTRATE JUDGE ROEMER:  Yeah, why don't you

12    rephrase the question?

13         BY MR. ROMANO:

14    Q.  Chris, you were answering questions?

15    A.  Correct.

16    Q.  This wasn't a narrative from you, or -- or describing --

17         MAGISTRATE JUDGE ROEMER:  You weren't -- you weren't

18    volunteering the information?  You were only responding to

19    questions?

20         THE WITNESS:  Yeah.  I was responding to questions.

21    I wasn't just, you know, explaining all these things randomly.

22    He was asking me about them.

23         BY MR. ROMANO:

24    Q.  And there were questions that you felt at that time that

25    you were required to answer?

1  A.  Yes.  I was scared, in shock, and I had these guys in my

2  house with guns.

3  Q.  Chris, were you ever read your Miranda warnings at any

4  time on July 5th, 2018?

5  A.  No.

6  Q.  Were you ever advised that you had a right to an

7  attorney?

8  A.  I was at the very end.  So at the very end when Bob --

9  Lieutenant O'Connor sat me down at the dining room table,

10  that's when he said, you have a right to an attorney, and you

11  are free to go.

12     At that point.  At the very end.  So that was when the

13  gears shifted dramatically.

14  Q.  Were you advised of that right before the questions in

15  the kitchen from Investigator Peinkofer?

16  A.  No.  No, I was not that.  It was at the end.

17  Q.  Were you ever advised of your right to remain silent?

18  A.  I'm sorry?

19  Q.  Were you ever advised of your right to remain silent?

20  A.  No.

21  Q.  Were you ever advised that if you could not afford a

22  lawyer, that one would be appointed for you?

23  A.  No.

24  Q.  Were you ever advised that anything you said could and

25  would be used against you in a court of law?

1   A.   No.

2   Q.   Chris, did Investigator Peinkofer also ask you about the

3   cost of the cats?

4   A.   Yes.

5   Q.   How about the price of the cats that you purchased?

6   A.   Yes.  He asked me where I got them from, what the price

7   was.  He asked me just general questions about the business.

8   Q.   Did he ask you any questions about your house cat?

9   A.   Yes, he did.  My house cat, Tigger, walked into the

10  kitchen at one point while we were having the conversation,

11  rubbed up against my leg.

12       And he said, which cat is that?  Is that a Serval?

13       And I said, no, it's my house cat, Tigger.  He's a

14  Savannah cat.

15       And Mr. Peinkofer -- or, Officer Peinkofer said, what

16  generation is he?

17       And I said, he's an F1.  I admitted that he's an F1.

18       And then Bob O'Connor, again, Lieutenant O'Connor said,

19  are you sure he's an F1?

20       And I said, yeah, he's an F1.

21       So, I did state that also in front of both of them.

22  Q.   In addition to Investigator Peinkofer and Lieutenant

23  O'Connor, was any other law enforcement officer in your field

24  of vision?

25  A.   I was so focused on responding to Peinkofer, because it

1  was kind of a -- kind of an overbearing focus on me, that I

2  really wasn't focused on the rest of the agents around me.  I

3  do remember Officer Marshall shadowing me as he had mentioned

4  throughout the visit.

5      At times, it was the female officer who had stood over me

6  while I was sitting on the couch at a later date for a while.

7      But I don't remember specifically every officer and

8  their, you know, approximation to me during the time.

9  Q.  Chris, when Investigator Peinkofer was asking you

10  questions in the kitchen, did he take any notes regarding

11  your answers?

12  A.  I didn't see him take any notes, if he did.

13  Q.  Did he record on any recording device your answers, or --

14  and/or his questions?

15  A.  Nothing that I saw.

16  Q.  At some point, did the questioning stop?

17  A.  Yes.

18  Q.  How did the questioning stop?

19  A.  I started to kind of get my wits about me a little

20  better, and realize oh, my God, he's interrogating me.  Like,

21  he's asking me questions.  This could be a problem.

22      And I said, I'm not answering any questions without my

23  lawyer again.

24      And at that point, he stopped asking me that line of

25  questioning, and he just stopped asking questions, he just

1   chilled out and, you know, it shifted gears in the house.

2   Q.  Did you ask him whether you were able to leave?

3   A.  Yes, I did.  Again, at the front door.  And then at one

4   point -- well, Haley was in the house when they first came,

5   because as I went to the front door, she said, where are you

6   going?

7       And I'm like, well, the doorbell rang, and I thought it

8   was maybe someone to potentially buy a cat or whatever.

9       But it ended up not being.  So, I walked outside the

10  door.  When I walked back in, she said, who's this?  What's

11  going on?

12      And I said, they have a search warrant.

13      And I asked, is she allowed to leave?  To Officer

14  Peinkofer.

15      And he said, she can go, but you can't.

16      And at that point I said, Haley, grab your keys, and go

17  right now.

18      And I picked her keys up off the -- I can't remember

19  where it was, around my bar store, kitchen counter, and I

20  handed them to her, and I said, get out of the house.

21      And then she took a few minutes, kind of fussing around.

22  And I remember thinking, please, get out of the house faster.

23  And after a few minutes she left.

24      And I believe they had to move some vehicles to let her

25  actually leave, but I can't recall precisely.

1  Q.  And at that time, you wanted to leave, but you were told

2  you're not allowed to leave?

3  A.  Correct.

4  Q.  I want to turn your attention back to the --

5          MAGISTRATE JUDGE ROEMER:  Mr. Romano, before you go

6  on, you know, we had a lot of questions about Haley.  Okay?

7  We don't -- there's no evidence of who Haley is, why she was

8  there, or anything like that.  Okay?  So do you want to round

9  that part out before we go on?

10          BY MR. ROMANO:

11  Q.  Chris, who is Haley Keyser?

12  A.  My ex-girlfriend.

13  Q.  And on July 5th, 2018, was she your girlfriend?

14  A.  She was at that time, yes.

15  Q.  Did she live with you?

16  A.  She did.  She had been living there for a couple weeks.

17  Q.  And was Haley at the house at the time of the execution

18  of the search warrant?

19  A.  Yes.

20  Q.  Was she there at the beginning when the law enforcement

21  officers first got there at about 9:50 a.m.?

22  A.  Yes.  When she -- when they first got there yes, right

23  before she had left, after for a bit.

24  Q.  And then do you ever recall -- do you recall what time

25  she left?  Was it immediately upon their arrival?

1    A.   I think it was within the first five minutes.  Five to

2    ten minutes, I would estimate.  I don't have an exact moment.

3         But I just remember trying to get her out the door as

4    quick as I could.  And her taking a few minutes to kind of

5    get out of the door.  So I would say under ten minutes.

6    Q.   At some point, did Haley come back to the house?

7    A.   Yes, she came back around noonish.

8    Q.   And then she left again?

9    A.   Yes.  And then -- yeah, we both left around the same

10   time.  Shortly thereafter, yeah.  Like, within ten,

11   15 minutes of her coming back.

12   Q.   Are you still dating Haley?

13   A.   No.  No.

14   Q.   Did you break up at some point?

15   A.   Yes, we did.

16   Q.   About roughly what time period did you break up?

17   A.   It was about a week after -- after the search warrant,

18   not even.  It was a short period of time after.

19   Q.   Thank you.  Chris, I just want to go back.

20        So at the end of the questioning in the kitchen, or what

21   prompted the ending of the questioning, did you say anything

22   to Investigator Peinkofer about wanting to leave at that

23   time?

24   A.   At that specific time, I don't recall asking to leave

25   again.  After, again, I was just told that Haley could leave

1  and I couldn't.  So, it was inferred when I asked if she

2  could leave and he said she can leave, but you can't, that

3  even then within, you know, five minutes, saying once again,

4  can I now leave.  But it was inferred after my -- after his

5  response regarding Haley being able to leave.

6  Q.  Do you recall asking Investigator Peinkofer in the

7  kitchen whether you were detained or not?

8  A.  Not in the kitchen specifically, I was nearby it.  But I

9  had asked several times if I was detained or free go.

10  Q.  And what was the response?

11  A.  He didn't respond initially.  He just kind of ignored it

12  as if I wasn't saying it.

13      And then at a later point, I had asked it three times in

14  a row, and he said, sit in that chair.  And he pointed at my

15  reclining chair.  And he said, sit there.  And he said, if

16  you get out of that chair, I will arrest you if you give me a

17  reason to.

18      And he pointed at the chair aggressively.  And I just sat

19  in the chair.

20          MR. ROMANO:  Carly, will you pull up Defendant's

21  Exhibit 3, D3?

22          BY MR. ROMANO:

23  Q.  Chris, I'm showing you Defendant's Exhibit D3.  Do you

24  recognize this document?

25  A.  Yes.

1  Q.  And how do you recognize it?

2  A.  Well, we reviewed it after the fact.

3  Q.  But you were here in court during Officer Marshall's

4  testimony?

5  A.  Yes.

6  Q.  Is it your understanding that this is Officer Marshall's

7  recollection of statements that you gave during the execution

8  of the search warrant on July 5th, 2018?

9  A.  Well, these were statements that were made to Peinkofer,

10  not to Marshall.  And they didn't happen outside, they

11  happened in the kitchen.  Which, again, things like two cats

12  died and I sent them through FedEx to Cornell University,

13  that was in direct response to them questioning me about cats

14  being in the garbage, which was the intro question.

15      It had nothing to do with Marshall outside.  It was

16  specifically in response to Peinkofer's questioning in the

17  kitchen.

18      And when I said that one is my house cat, it is an F1,

19  that was in response to him asking me when the cat came up

20  and rubbed against my legs.  These were not things that

21  happened on the porch.  They were things that happened in my

22  kitchen.

23  Q.  So these statements, you did provide, correct?

24  A.  I did, yeah.

25  Q.  And these are statements you said in the kitchen in

1    response to Investigator Peinkofer's question?

2    A.   Yes.  Yeah.

3    Q.   These were not statements you made on the porch?

4    A.   No, not at all.

5    Q.   Do you recall being on the front porch with Officer

6    Marshall during this -- the execution of the search warrant?

7    A.   I do.

8    Q.   And do you recall how long you were on that front porch

9    with Officer Marshall?

10   A.   Roughly ten minutes.

11   Q.   Do you remember having a discussion with him?

12   A.   I do.

13   Q.   What do you recall discussing with Officer Marshall on

14   the front porch?

15   A.   He was initially, again, very cordial, very polite.  He

16   thanked me for being polite and cordial and levelheaded.

17        I said, I know, this is really tough to have people like

18   this in your house.

19        He talked to me about doing the job for a long period of

20   time, and how he had been in other people's houses.  He was

21   happy I was so, you know, respectful and compliant.

22        I think he had mentioned to me that the job was great

23   99 percent of the time, and terrible 1 percent.  Something

24   kind of to that effect.

25        So it was like a small talk kind of scenario.

1    And I said to him, why can't I leave?  Why am I not

2  allowed to leave?

3    And he said, well, you could be a threat to us.  He said

4  well, for example, you see your car over there?  He said, if

5  you have -- you could have a gun in that car, or you could

6  have multiple guns in that car, and if we let you go to your

7  car, you could grab one of those guns, come back and be a

8  threat to us, and it's my job to make sure you're not a

9  threat to us.

10    And I said, well, what if I hop in the car and leave?

11    And he said, well, if you hopped in the car and left, you

12  could also get weapons and come back and be a threat to us.

13    And, so, you know, that was kind of the nature of that.

14 Q.  Chris, do you recall discussing anything about these

15  cats?

16 A.  No, not with Marshall on the porch, no.

17 Q.  Do you recall discussing anything about your

18  entrepreneurial spirit?

19 A.  Entrepreneurial spirit in general, yes.  He did say, oh,

20  you seem like you have an entrepreneurial spirit.

21    And I said, yeah, you know, I've always been an

22  entrepreneur and had businesses in my life.

23    So I did state that.  But we didn't get into anything

24  with regards to the cat case.  That was not a fact.

25 Q.  You didn't make any of the statements on the 710.30 to

1    Officer Marshall on the porch?

2    A.  That is correct.

3            MR. ROMANO:  Your Honor, may I have one second?

4            MAGISTRATE JUDGE ROEMER:  Sure.

5            MR. ROMANO:  No further questions, Your Honor.

6    Thank you.

7            MAGISTRATE JUDGE ROEMER:  Sure.  Mr. Mango?

8            MR. MANGO:  Thank you, Judge.

9            DEPUTY CLERK:  Hold on.

10           MR. MANGO:  I don't mind not getting it wiped down.

11           DEPUTY CLERK:  Those are the rules.

12           MR. MANGO:  I got it.

13           Judge, if I could just have a moment?

14           MAGISTRATE JUDGE ROEMER:  Sure, it's drying anyways.

15           MR. MANGO:  Thank you, Your Honor.  May I proceed?

16           MAGISTRATE JUDGE ROEMER:  Sure.

17           **CROSS-EXAMINATION BY MR. MANGO:**

18   Q.  Good afternoon, Mr. Casacci.

19   A.  Good afternoon Mr. Mango.

20   Q.  Am I saying it correct?

21   A.  Yes.

22   Q.  Close?  My name is Aaron Mango, and we've only met, I

23   believe, at the arraignment, and a couple other proceedings.

24   And I have a few questions for you.

25       First, you have a prior conviction for fraud?

1          MR. ROMANO:  Objection.

2          MAGISTRATE JUDGE ROEMER:  Felony conviction, or --

3          MR. MANGO:  Yes, I believe so, Judge.

4          MR. ROMANO:  Your Honor, may I be heard?

5          MAGISTRATE JUDGE ROEMER:  Sure.

6          MR. ROMANO:  The conviction is from 2004, it's over

7   ten years old.  And, Your Honor, I would submit it's unduly

8   prejudicial due to the age of the conviction.  It should not

9   be admissible.

10          MAGISTRATE JUDGE ROEMER:  Well, fraud, I don't think,

11   has that ten-year limitation on it, does it?

12          MR. ROMANO:  I believe they all do, Your Honor.

13          MAGISTRATE JUDGE ROEMER:  Why don't you check and

14   see?

15          MR. ROMANO:  All felony convictions.

16          MAGISTRATE JUDGE ROEMER:  Do you have the rules there

17   in front of you?

18          MR. ROMANO:  Yes, I do, Judge.

19          MAGISTRATE JUDGE ROEMER:  Mr. Mango, you're more than

20   welcome to research this yourself.

21          MR. MANGO:  Yes, Judge.

22          MR. ROMANO:  609(b), Your Honor.

23          MAGISTRATE JUDGE ROEMER:  What does it say,

24   Mr. Romano?

25          MR. ROMANO:  It says the limit on using the evidence

1  after ten years.

2          MAGISTRATE JUDGE ROEMER:  Okay.

3          MR. ROMANO:  And it applies to all criminal

4  convictions.

5          Your Honor, I would also cite to a 2nd Circuit case,

6  I apologize for the mispronunciation, but it's Farganis versus

7  Town of Montgomery, 397 F.App'x, 666 and 669 from 2010.

8          I can quote it for Your Honor.

9          The 2nd Circuit has repeatedly recognized that

10  Congress intended that convictions over ten years old be

11  admitted very rarely and only in exceptional circumstances.

12          MAGISTRATE JUDGE ROEMER:  Well, it says if it's older

13  than ten years old, the evidence is admissible only if its

14  probative value is supported by specific facts and

15  circumstances substantially outweighs its prejudicial effect,

16  and the proponent gives an adverse party reasonable written

17  notice of the intent to use it so that the party has a fair

18  opportunity to contest its use.

19          So it's not an automatically excluded ten years --

20          MR. ROMANO:  Agree.

21          MAGISTRATE JUDGE ROEMER:  -- correct?

22          MR. ROMANO:  Agree.

23          MAGISTRATE JUDGE ROEMER:  All right.  Did you give

24  him written notice that you might use this?

25          MR. MANGO:  Judge, we did.  We gave the criminal

1   history for the defendant previously as part of discovery.  I

2   think that goes without saying that if they decided to call

3   the defendant at an evidentiary hearing, we would try to use

4   it.

5            And I would note, Judge, that the conviction, I

6   believe is not 2004, but was actually -- he was sentenced in

7   2005, January 2005.  It's not much of a difference.  But it

8   was forgery in the second degree, official document.  He got

9   five years probation.  I think that that goes exactly to his

10  truth-telling ability.

11           MAGISTRATE JUDGE ROEMER:  Yeah, I'm going to admit it

12  based on the nature of the underlying crime, that it was a

13  fraud and goes to his credibility.  Okay?

14           BY MR. MANGO:

15  Q.  Mr. Casacci, have you been convicted in the past of

16  forgery in the second degree?

17  A.  Yes.

18  Q.  And that related to forgery of a document?

19  A.  Correct.

20  Q.  You had previously provided two written declarations in

21  this case; is that correct?

22  A.  Yes, I believe so.

23  Q.  To this Court, which you signed under penalty of perjury

24  and pursuant to a certain United States Code statute, and you

25  declared the following to be true and correct; is that right?

1    A.  Yes, if those are the statements that I've provided, yes.

2    Q.  Yes.

3           MR. MANGO:  Judge, I didn't mark these as part of our

4    initial exhibits.  These are all documents --

5           MAGISTRATE JUDGE ROEMER:  Well, they're part of the

6    record anyways, right?

7           MR. MANGO:  Yes.  I can give defense a copy.

8           MAGISTRATE JUDGE ROEMER:  Okay.

9           MR. MANGO:  Would the Court like a physical copy in

10   addition to what I will put on the screen?

11          MAGISTRATE JUDGE ROEMER:  I'm good.  Go ahead.

12          MR. MANGO:  Thank you, Judge.

13          BY MR. MANGO:

14   Q.  All right.  So, Mr. Casacci --

15          MAGISTRATE JUDGE ROEMER:  I do notice, though, that

16   he had -- some parts of it are redacted.

17          MR. MANGO:  Yes, Judge.

18          MAGISTRATE JUDGE ROEMER:  What's that about?

19          MR. MANGO:  This -- I'll put it up on the screen.

20   This is I think Government Exhibit 11 in evidence.  And

21   there's gonna be a Government Exhibit 12, as well, Judge.  And

22   Judge, these were redactions made in the defense submission.

23   These, as you can see the banner on the top, Judge, document

24   20-8.  These were part of the defense -- these were redactions

25   made in the defense submission --

 1           MAGISTRATE JUDGE ROEMER:  Okay.  And it looks like

 2   what's redacted is personal information, like his address,

 3   stuff like that, correct?

 4           MR. MANGO:  Yes, Judge.

 5           MAGISTRATE JUDGE ROEMER:  Okay.

 6           MR. MANGO:  I don't think there's any bearing on

 7   the --

 8           MAGISTRATE JUDGE ROEMER:  Okay.

 9           MR. MANGO: -- the questioning that's going to

10   proceed.

11           BY MR. MANGO:

12   Q.  Mr. Casacci, would you like a physical copy of this?

13   A.  Sure, that would be nice.

14   Q.  Let me give you --

15           MR. MANGO:  May I approach, Judge?

16           MAGISTRATE JUDGE ROEMER:  Sure.

17           BY MR. MANGO:

18   Q.  Do you want to review those before I proceed,

19   Mr. Casacci?

20   A.  Yes.

21   Q.  Okay.

22   A.  Okay, Mr. Mango, if you'd like to proceed.

23   Q.  Thank you.  This first declaration, which you signed on

24   May 8th of 2020, and was submitted on that same date to the

25   Court is a relatively brief declaration that includes only

1  seven paragraphs; is that right?

2  A.  Yes.

3  Q.  And in that declaration, there's nothing to indicate that

4  you were told you could not leave your residence; is that

5  right?

6  A.  Not in this declaration, no.

7  Q.  Right.  There's nothing in this declaration --

8          MR. ROMANO:  Objection, Your Honor.  This is improper

9  impeachment by omission.  I don't understand the nature of

10  this exercise.

11          MAGISTRATE JUDGE ROEMER:  It's a prior inconsistent

12  statement by the witness.

13          MR. ROMANO:  There's no statement involving what

14  Mr. Mango's asking him about.  This was a declaration that was

15  submitted with respect to his standing to challenge --

16          MAGISTRATE JUDGE ROEMER:  But it's a prior statement

17  of the witness, and Mr. Mango's contending it's inconsistent

18  with his testimony here today.

19          MR. ROMANO:  Your Honor, my understanding of

20  Mr. Mango's questioning is he's trying to impeach Mr. Casacci

21  by omission, saying that in this declaration --

22          MAGISTRATE JUDGE ROEMER:  That's -- that's

23  acceptable, you can impeach somebody by an omission.

24          MR. MANGO:  Thank you, Your Honor.

25          MAGISTRATE JUDGE ROEMER:  Do you have some authority

1   that says you can't?

2          MR. ROMANO:  No, I just -- I don't understand the

3   exercise.  It's not as if this declaration was all

4   encompassing of Mr. Casacci's statement on this issue.

5          MAGISTRATE JUDGE ROEMER:  It might not have been.

6          MR. ROMANO:  It's like using his résumé, and

7   impeaching by omission saying that in his résumé, he doesn't

8   talk about what law enforcement said to him on the day of the

9   execution of the search warrant.

10         MAGISTRATE JUDGE ROEMER:  And you think this -- this

11  is akin to a résumé?

12         MR. ROMANO:  No, Your Honor.  I guess I'm trying to

13  drive the point home that this declaration does not speak

14  about those interactions.

15         MAGISTRATE JUDGE ROEMER:  Okay.  Overruled.

16         MR. MANGO:  Thank you, Judge.

17         BY MR. MANGO:

18  Q.  Okay.  Mr. Casacci, it's seven paragraphs, seven numbered

19  paragraphs, spanning about a page and a quarter; is that

20  correct?

21  A.  Yes, correct.

22  Q.  And there's nothing in this declaration, which again, you

23  signed under the penalty of perjury, right?

24  A.  Yes.

25  Q.  And you understand what perjury is?

1  A.  I do.

2  Q.  Which means if you testify falsely, you're under oath,

3  and if you testify falsely, you could be prosecuted; do you

4  know that?

5  A.  Yes, I understand that.

6  Q.  You could go to jail for that?

7          MR. ROMANO:  Objection, Your Honor.

8          MAGISTRATE JUDGE ROEMER:  Overruled.

9          THE WITNESS:  Yeah, I mean, that's my presumption,

10  yes.  I mean, you have to be honest.

11          MR. MANGO:  I didn't -- I missed that.

12          THE WITNESS:  You have to be honest on such a

13  statement, yes.

14          BY MR. MANGO:

15  Q.  Right.  Right.  And the statement contains nothing in it

16  about that you felt you were not free to leave; is that

17  right?

18  A.  This statement does not.

19  Q.  Right.  The statement contains nothing that you were

20  physically barred from leaving, you were told you couldn't

21  leave; is that right?

22  A.  That is correct.

23  Q.  And there's nothing in this statement, as well, that you

24  wanted to speak to an attorney during the -- that you told

25  the agents during the search warrant that you wanted to speak

1   to an attorney before you spoke to them; is that right?

2   A.  Again, this is a basic summation, so no, it is not in

3   here.

4   Q.  It's not in there.

5         MR. MANGO:  Government Exhibit 12, please.

6         BY MR. MANGO:

7   Q.  After the government responded to your motion moving the

8   Court to suppress statements that you made to Mr. Marshall,

9   or ECO Marshall outside, then a second declaration gets

10  filed; is that right?

11  A.  Yes.  Again, that wasn't a statement to Officer Marshall,

12  but yes, this statement is a response to the government's

13  additional claims, which --

14  Q.  Yeah.  And those claims included that this declaration

15  you filed was inadequate to provide the Court the facts to

16  support your --

17        MR. ROMANO:  Objection, Your Honor.

18        MAGISTRATE JUDGE ROEMER:  How -- I don't know that

19  the defendant would know that.

20        MR. MANGO:  Okay.

21        MAGISTRATE JUDGE ROEMER:  I mean, that's his -- his

22  attorney asked him to file another affidavit, and he did.  I

23  don't know the why legally he was going to file it.

24        MR. MANGO:  I'll proceed, Judge.

25        BY MR. MANGO:

1  Q.  In this affidavit you filed, so you did file a second

2  affidavit; is that right?  And that's in Government

3  Exhibit 12?

4  A.  Yes.

5  Q.  Government Exhibit 12, which you again signed under the

6  penalty of perjury, which you know if you lie on, we can send

7  you to jail, on June 26th of 2020, you've now provided 23

8  numbered paragraphs; is that right?

9  A.  Yes, there's 23 paragraphs.

10  Q.  And in here, you do include statements that you believed

11  you were physically restrained from leaving your -- your

12  house?

13  A.  Where do you see that I was physically restrained in this

14  document?

15  Q.  Read paragraph 8 for me.

16  A.  Okay.  Yes.

17  Q.  You used the word "physically restrained;" is that right?

18  A.  I didn't know if you meant in terms of, like, in

19  handcuffs, or -- I didn't understand what you meant as far as

20  physically restrained.

21      I did not feel that I could leave.  I could not

22  physically leave the premises.  But I was not in any way

23  arrested with handcuffs.  So I misunderstood kind of the

24  nature of what was you were asking there.

25  Q.  Okay.  Well paragraph 8 here says -- and you swore under

1    perjury that that was correct?

2         MAGISTRATE JUDGE ROEMER:  Go ahead and read it,

3    Mr. Mango, into the record, please.

4         BY MR. MANGO:

5    Q.  That despite wanting to leave my home, I understood that

6    I was in custody and physically restrained from leaving based

7    upon these directives by law enforcement; is that --

8    A.  Yes, based upon their directives, yes.

9    Q.  Did they ever physically touch you and stop you from

10   leaving the residence?

11   A.  There was no physical contact.  I was not physically

12   touched.  But based on what they were saying, I felt that

13   I -- my body, I physically could not leave the site.

14       So the semantics of how you want to do that, I mean, that

15   was my understanding as opposed to what you had just asked.

16   So I hope that clarifies.

17   Q.  It does.  Thank you.

18       Can you point me to, in this document, Government

19   Exhibit 12, where Officer Peinkofer's name is mentioned?

20   A.  I don't know if his name is specified in the document.  I

21   think I refer to him in generalities.

22       For example, in paragraphs 13 and 14, it's referred to

23   the law enforcement officer.  That law enforcement in

24   paragraph 13, for example, was Officer Peinkofer.

25   Q.  Okay.  You don't use the name Peinkofer in this

1  declaration; is that correct?

2  A.  I don't believe so.

3  Q.  Read the whole thing then, if you don't believe so.  Just

4  tell me if it's there.

5  A.  I don't see any officer specified, including Peinkofer,

6  for all of the interactions.

7  Q.  In fact, no -- there's no officer's names listed in this

8  declaration at all; is that correct?

9  A.  I don't believe or see so.  So, I believe it is correct,

10  yes.

11      MAGISTRATE JUDGE ROEMER:  He stated that you said,

12  sir, paragraph 13 and 14 you were referring to Officer

13  Peinkofer?

14      THE WITNESS:  Yeah, more specifically.

15      MAGISTRATE JUDGE ROEMER:  Okay.  Mr. Mango, can you

16  read those two paragraphs, please?

17      BY MR. MANGO:

18  Q.  Yes.

19      13, you directed me to, Mr. Casacci?

20  A.  Yes.  At the moment again, I was quickly glancing through

21  and saw the law enforcement officer, and that was referring

22  to Officer Peinkofer.

23      MR. MANGO:  And that, for the record, Judge, is:  The

24  law enforcement deliberately elicited statements from me

25  related to my African Cat Project and Humane Society, which I

1  later learned was the focus of their search warrant and part

2  of a criminal case against me.

3       BY MR. MANGO:

4  Q.  Is that right?

5  A.  Yes.

6  Q.  Now, this is an important paragraph, and I'm glad you

7  pointed that out, Mr. Casacci.  'Cuz today, you testified

8  that at your door, they presented you a warrant; isn't that

9  right?

10 A.  They did.

11 Q.  And in that warrant, wasn't it very clear that the whole

12 issue of the search was your African Cat Project?

13 A.  Yes.  Again, I was a bit in shock.  And I was glancing

14 through it.  But yes, absolutely.  I didn't understand.  I

15 was, you know, trying to kind of understand why they were

16 even there, because in my mind, I had a Humane Society, and I

17 didn't understand why it was even occurring, why they would

18 come in with a warrant.

19      So I didn't understand the details of things until they

20 kind of proceeded down the road.

21 Q.  I think we might be -- we might be the missing the point

22 I'm getting at.  In paragraph 13 --

23      MR. ROMANO:  Objection, Your Honor, to the

24 commentary.

25      MR. MANGO:  I'll -- I'll rephrase.

1          MAGISTRATE JUDGE ROEMER:  Rephrase.

2          BY MR. MANGO:

3  Q.  In paragraph 13, doesn't the sentence end:  Which I later

4  learned was the focus of their search warrant and part of a

5  criminal case against me?

6  A.  Yes.

7  Q.  Is that what --

8  A.  That's what the paragraph says, yes.

9  Q.  Okay.  So wouldn't it be fair to conclude from that, that

10 you didn't know what the search warrant was about when you

11 were being asked questions?

12 A.  Well, I saw that it was about cats in general when I read

13 through it on the porch.  But I didn't understand the whole

14 scope and dynamics of it being a criminal case with things

15 being as heavy as they were until later.

16 Q.  Well, that also seems to contradict your assertions on

17 the stand here today and in your declaration that there was

18 this sort of overpowering law enforcement presence.

19         MR. ROMANO:  Again, objection to the commentary.

20         MR. MANGO:  Well, I'm just --

21         MR. ROMANO:  It's not a question.

22         MR. MANGO:  I'll -- I'll rephrase, Judge.

23         BY MR. MANGO:

24 Q.  You read the search warrant, correct?

25 A.  I did, yes.  I didn't go through it thoroughly on the

1    porch, but I read the basics, and understood the basics of

2    it.

3    Q.   Okay.  And number 1 of what's in the search warrant, from

4    Government Exhibit 1, is that you were shown -- you are

5    hereby authorized that law enforcement officers were given

6    authorization to seize six Serval kittens, and two Caracal

7    kittens, and other illegally possessed regulated wild

8    animals; is that right?

9    A.   Yes.

10   Q.   Did you read that?

11   A.   I didn't know what was really going on, the depth of it.

12   Q.   And then beyond that, Government Exhibit 12 here, and it

13   appears that you're telling the judge in this declaration

14   which you signed under the penalty of perjury?

15        MR. ROMANO:  Objection, again, Your Honor, to the

16   commentary.

17        MAGISTRATE JUDGE ROEMER:  Overruled on that.

18        BY MR. MANGO:

19   Q.   That you made these statements to the officers about your

20   African Cat Project and your Humane Society, which we'll talk

21   about in a minute, which you later learned was the focus of

22   the search warrant and part of the criminal case.

23        That indicates you didn't know what the search warrant

24   was about; isn't that true?

25   A.   I generally understood it, but not the depth of it.

1  Q.  So is paragraph 13 incorrect?  Did you -- did you provide

2  false information in paragraph 13?

3       MR. ROMANO:  Objection, Your Honor.  I believe

4  Mr. Casacci's answer is clear.  This has been asked and

5  answered about four times at this point.

6       MAGISTRATE JUDGE ROEMER:  Well, I guess I'm not even

7  following, Mr. Mango.  What's false?  I don't -- I guess I'm

8  not understanding the point you're trying make.

9       MR. MANGO:  Sure.  The paragraphs that lead up to

10 this talk about statements that were made or the defendant

11 allegedly claims he made when officers came into his house and

12 statements not -- not on the threshold of his door, but later

13 during the execution of the search warrant Officer Pein

14 explained -- Investigator Peinkofer elicited statements from

15 him in a demanding type of tone or while he was in custody, I

16 think is the -- is the claim.  And that it was only later that

17 that's when he made those statements.

18       It was only later, and that's what paragraph 13 is --

19 the essence of paragraph 13, in the government's view, is that

20 it was only later that he learned that those statements he was

21 making related to the search warrant.  And --

22       MAGISTRATE JUDGE ROEMER:  I guess I find -- I don't

23 know what difference it makes.

24       MR. MANGO:  I'll move on, Judge.

25       BY MR. MANGO:

1   Q.  How about, Mr. Casacci, point me to where in Government

2   Exhibit 12 that you have in front of you, where's your

3   then-girlfriend listed in that declaration?

4   A.  She's not.

5   Q.  Okay.  So -- so you didn't include her, any information

6   about your girlfriend in the declaration you submitted to the

7   Court; is that correct?

8   A.  No.

9   Q.  All right.  So did you not think it was important for the

10  Court to know that a law enforcement officer allowed your

11  girlfriend to leave, but wouldn't allow you to leave?

12          MR. ROMANO:  Judge, I'm going to object along the

13  same lines of my previous objection.  This is an improper

14  impeachment by omission.

15          MAGISTRATE JUDGE ROEMER:  I don't think it is,

16  overruled.

17          MR. ROMANO:  May I just make one point, Your Honor?

18          MAGISTRATE JUDGE ROEMER:  Sure.

19          MR. ROMANO:  My only point, Your Honor, is that

20  Mr. Casacci was not answering any questions.  This was not a

21  deposition, this wasn't a grand jury proceeding.

22          MAGISTRATE JUDGE ROEMER:  It's a statement he made.

23  And Mr. Mango is just pointing out that there were certain,

24  maybe, important things he might have thought would be in the

25  statement if -- if that were true.

1          It's a -- it's a common impeachment tactic,

2   especially by defense counsel.  Defense counsel uses it all

3   the time.

4          You made a statement, but you didn't say this, and

5   you didn't say that.  I mean, it's common.  Okay?

6          Overruled.

7          Do you want to repeat the question, please,

8   Mr. Mango?

9          MR. MANGO:  Yes, thank you.

10          BY MR. MANGO:

11  Q.  Did you not think it was important when you filled out

12  this declaration for the Court to know that law enforcement

13  officers allowed your girlfriend to leave, but did not allow

14  you to leave.

15  A.  Mr. Mango, I'm not a lawyer.  I don't know the specifics

16  of what is as relevant or what is less relevant.  That's a

17  very kind of -- discovered here as this case has gone on,

18  things that I thought were minute details or small details

19  that didn't have much of a bearing and found out later they

20  had enormous ones.  And then ones that I thought had a very

21  large bearing, and I come to find out they had very little.

22      So with regards to the statement, again, I'm a layman,

23  I'm not a lawyer.  And, you know, I'm doing my best, I

24  suppose.  And, yeah, it's not in there.  But, again, I don't

25  know this, I'm not a lawyer.  I don't know the specifics of

1    the importance of everything.  So, yeah.

2              BY MR. MANGO:

3    Q.  Okay.  We'll get back to the question, though.

4        And, by the way, that girlfriend you had, what did you

5    say her name was?  Keyser?

6    A.  Her last name was Keyser, yes.

7    Q.  Keyser.  She went to Hawaii with you shortly thereafter?

8    A.  She did, yes.

9    Q.  Okay.  And then did you break up while you were in

10   Hawaii?  Or on -- after you came back from Hawaii?

11   A.  While we were in Hawaii.

12   Q.  Is she still in the Buffalo area?

13             MR. ROMANO:  Objection, Your Honor, outside the

14   scope.

15             MR. MANGO:  No, it's not Judge.

16             MAGISTRATE JUDGE ROEMER:  Overruled.

17             MR. MANGO:  She's a potential witness in this case.

18             MAGISTRATE JUDGE ROEMER:  I just overruled the

19   objection.

20             MR. MANGO:  Thanks.  Sorry.

21             BY MR. MANGO:

22   Q.  Is she still in the Buffalo area?

23   A.  I'm not certain.  I --

24   Q.  When was the last time you were in contact with her?

25   A.  The last time was -- she sent me a text message.  I

1   haven't talked to her in quite a long period of time.  Over a

2   year and change.

3       And a couple days ago, she sent a text message to me,

4   because we had reached out to her as a potential witness

5   shortly before this hearing.  And she sent a text with

6   regards to that.

7   Q.  Now, okay.  You mentioned you've always had businesses in

8   your life during direct examination; is that right?

9   A.  During direct?  Oh, yes.  When he spoke to me, yes.

10  Q.  Was one of those businesses selling your sperm over the

11  internet?

12          MR. ROMANO:  Objection, Your Honor, outside the

13  scope, relevance.

14          MAGISTRATE JUDGE ROEMER:  What's the relevance?

15          MR. MANGO:  He was previously investigated criminally

16  for selling his semen over the internet.

17          MAGISTRATE JUDGE ROEMER:  Well, let's assume that's

18  true.  Is that a proper impeachment, that you were once under

19  investigation by somebody about something?

20          MR. MANGO:  I think it falls under --

21          MAGISTRATE JUDGE ROEMER:  No, sustained.

22          BY MR. MANGO:

23  Q.  Do you currently have another open criminal case?

24          MR. ROMANO:  Objection, Your Honor, same objection.

25          MAGISTRATE JUDGE ROEMER:  He didn't even get the

 1   question out, so it's hard to rule on it when I don't even

 2   know what the question is.

 3        BY MR. MANGO:

 4   Q.  Is it fair to say you have an open criminal investigation

 5   against you by the Homeland Security Investigation involving

 6   your selling and providing of KN-95 masks and other PPP gear

 7   as part of the COVID response?

 8        MR. ROMANO:  Objection, Judge.

 9        MAGISTRATE JUDGE ROEMER:  Sustained.

10        BY MR. MANGO:

11   Q.  Now, do you recall filing an affidavit in a state court

12   Article 78 proceeding?

13   A.  Yes, I recall it.

14        MR. MANGO:  Judge, may I have a moment?

15        MAGISTRATE JUDGE ROEMER:  Sure.  Did you want a copy,

16   Mr. Grable?

17        MR. GRABLE:  No, thank you.

18        MR. MANGO:  May I approach the witness?

19        MAGISTRATE JUDGE ROEMER:  Sure.

20        BY MR. MANGO:

21   Q.  Showing you what's marked as Government Exhibit 10.  Take

22   a look at that.  If you want to review it quickly, you can.

23        Have you reviewed this prior to today -- keep going.

24   Have you reviewed this prior to today?

25   A.  Yes, I'm using this moment to recall my memory.

1    Q.  Oh, I'm not challenging you, I'm just wondering if you've

2    reviewed this previously.

3    A.  Yeah.  Go ahead, Mr. Mango.

4    Q.  Okay.  Thank you.  I'll put this on the screen, as well.

5            MR. MANGO:  And, Judge, if you would like a copy, I

6    can provide it up or refer to it now.  And I move this into

7    evidence, Judge, Government Exhibit 10, as well as 11 and 12,

8    which we've already discussed.

9            MAGISTRATE JUDGE ROEMER:  Well, 11 and 12 are already

10   part of the record.

11           Mr. Romano, what's your position on this document?

12           MR. ROMANO:  Judge, we don't know the purpose of the

13   document.

14           MAGISTRATE JUDGE ROEMER:  I guess I don't either.

15           MR. ROMANO:  Or why it's being offered.

16           MAGISTRATE JUDGE ROEMER:  What's the relevance of the

17   document?

18           MR. MANGO:  It's a prior statement of the defendant,

19   Judge.

20           MAGISTRATE JUDGE ROEMER:  Okay.  Which prior

21   statement are we looking at, and how is it contradictory to

22   what he testified to here today?

23           MR. MANGO:  Yes, Judge.  This is a prior statement

24   that he made in Erie County Court which was a proceeding to

25   attempt to get his animals back.

1          MR. ROMANO:  Objection.

2          MR. MANGO:  And I'll ask some questions related to

3    that, and I guess we can take admission --

4          MAGISTRATE JUDGE ROEMER:  And your position is

5    contradictory to his direct testimony?

6          MR. MANGO:  Yes, Judge.

7          MAGISTRATE JUDGE ROEMER:  Okay.  Well, we'll see

8    where it goes, Mr. Romano.

9          MR. ROMANO:  Judge, and just for the record, if

10   Mr. Mango wants to use this for impeachment purposes, it's

11   understandable.  But to be offered as an exhibit, we would

12   object.

13         MAGISTRATE JUDGE ROEMER:  Yeah.  We'll -- is it

14   marked as an exhibit?

15         MR. MANGO:  Yes.  Government Exhibit 10.

16         MAGISTRATE JUDGE ROEMER:  Okay.  Well, let's not

17   admit it this time until we know what --

18         MR. MANGO:  Thank you.

19         BY MR. MANGO:

20   Q.  First off, this document, you indicate that you -- I

21   direct you to the paragraph -- paragraph 5.  As such, I

22   helped place unwanted animals, such as Serval cats, into

23   sanctuaries to assure their survival and wellbeing of the

24   relevant animal.  My primary concern in running this Humane

25   Society, which admittedly was in its embryonic stages, was

1 always the wellbeing and humane treatment of the animal in

2 question.

3      MR. ROMANO:  Objection, Your Honor.  Beyond the scope

4 of direct.

5      MAGISTRATE JUDGE ROEMER:  He did say something on

6 direct about Humane Society and made a statement about that, I

7 believe.

8      MR. ROMANO:  My recollection, Your Honor, is there

9 was no discussion of the business or the Humane Society in any

10 way.  No substance was testified to, just the suppression

11 issue.

12      MR. MANGO:  Well, it goes directly to his credibility

13 before Your Honor, Judge.  And whether he was running a --

14      MAGISTRATE JUDGE ROEMER:  Well, what did he say that

15 this is contrary to?

16      MR. MANGO:  Well, he --

17      MAGISTRATE JUDGE ROEMER:  Mr. Romano says he never

18 mentioned any Humane Society during the direct examination.

19      MR. MANGO:  Oh, I -- I believe he did, Judge, but

20 this just, again, this goes to the veracity, credibility, and

21 his ability to --

22      MAGISTRATE JUDGE ROEMER:  Well, it would if it's

23 contradictory to something that he said.

24      MR. MANGO:  Well, maybe if I can just tie it up --

25      MAGISTRATE JUDGE ROEMER:  It might be relevant to

1  something else in this case, but as far as whether or not his

2  statements are voluntary, I -- I'm not seeing it.

3          MR. MANGO:  I'll focus on.

4          MAGISTRATE JUDGE ROEMER:  I mean, I do have some

5  recollection he said something about Humane Society during

6  direct examination, but I could be wrong.

7          MR. MANGO:  Yes, Judge.

8          BY MR. MANGO:

9  Q.  The question really is:  What sanctuaries do you place

10 Servals into?

11         MR. ROMANO:  Your Honor, same objection.  Outside the

12 scope and irrelevant.

13         MR. MANGO:  It's relevant because he -- the

14 government's position is he lied in a prior sworn declaration.

15 There's no evidence that he's ever placed a Serval in any type

16 of sanctuary.  He sold them for profit.

17         MR. ROMANO:  Your Honor, this is an issue for trial.

18         MAGISTRATE JUDGE ROEMER:  I don't know that if at

19 sometime in the past you lied about something, is impeachment.

20 If you said something on direct and you got something that

21 says he was inconsistent on a prior time, that's one thing.  I

22 don't know -- and I don't think you can prove it by extrinsic

23 evidence.  Something that -- you know, some other time and

24 some other place in some other galaxy, he lied about

25 something.

1          MR. MANGO:  Well, Judge, this goes to his character

2    for truthfulness, which --

3          MAGISTRATE JUDGE ROEMER:  I'm going to sustain the

4    objection.  Okay?

5          MR. MANGO:  -- is always impeachable.

6          BY MR. MANGO:

7    Q.  All right.  Well, we'll focus on a different provision in

8    this affidavit.  If you can, can you read this paragraph, 13,

9    please?

10         MAGISTRATE JUDGE ROEMER:  We're still in this

11   declaration?

12         MR. MANGO:  Yes, we're still on this declaration.

13         THE WITNESS:  Yes, would you like me to read this,

14   Mr. Mango?

15         BY MR. MANGO:

16   Q.  If you want to review it, I can read it into the record.

17       I attempted to provide DEC agent in charge, Investigator

18   Peinkofer, with an animal's veterinary care plan, including

19   medication, so that the animals would be properly cared for.

20   He did not want any information.

21   A.  Yes, that is correct.

22   Q.  Okay.  You used Investigator's Peinkofer name in this

23   declaration though; is that right?

24   A.  Yes, I used it.  It's written here, right.

25   Q.  Right.  But in the declarations you submitted to this

1  Court, you never once mentioned Investigator Peinkofer by

2  name.

3  A.  Again, I'm not aware, I didn't even notice the difference

4  until you brought it up today as far as him being called out

5  in this document as opposed to a generality in document --

6  excuse me, 11 or 12.

7      So, again, I'm not a lawyer.  I can't speak to that, to

8  the specifics on how they have a weight and a bearing.  I'm

9  just a layman with regards to this, sir.

10  Q.  You are a layman.  But you're the one who signed this as

11  a layman, I guess, under penalty of perjury; is that right?

12  A.  Yes.  And they're true.  There's no factual issue here.

13  It's just --

14      MAGISTRATE JUDGE ROEMER:  I think he hit the nose on

15  the -- the nail right on the head.  He says it's true.

16  There's no -- you can't use extrinsic evidence to prove it,

17  that it's not true.

18      BY MR. MANGO:

19  Q.  Paragraph 17 of this declaration:  During the seizure, at

20  least one DEC agent was against the idea of seizing my house

21  cat, and seemed to recognize how cruel it would be for the

22  animal.

23  A.  Yes.

24  Q.  You don't identify that agent by name.  Who was that?

25  A.  That was Lieutenant O'Connor.

1    Q.   Lieutenant O'Connor?

2    A.   Yes.

3    Q.   Now you heard him testify here today that he told you

4    that the animal was going to be seized?

5    A.   It was Officer Peinkofer that told me the animal was

6    going to be seized after -- well, they both asked me if he

7    was an F1.  And Officer O'Connor was kind of more of a, like,

8    a kindhearted response.  Like, are you sure he's really an

9    F1?

10       And one of the people from the cat organization, I can't

11   recall which one, said, do we take his house cat, too?

12       And Officer Peinkofer said, yes, box him up and take him.

13       And Officer O'Connor said, don't take his cat.  Don't

14   take his house cat.

15       And Officer Peinkofer said, he's an F1, we have no

16   choice.  We have to take him.

17       So that was a more detailed version of what occurred

18   there, sir.

19   Q.   And this state court declaration that you signed in 2018,

20   you never once mentioned that you were selling these cats for

21   profit, do you?

22            MR. ROMANO:  Objection, Your Honor.

23            MR. MANGO:  It relates to a business interest ,

24   Judge.  He admitted he had multiple business interests in his

25   life, but yet he submits a state court declaration which he's

1  trying to hold himself out as a Humane Society.

2          MR. ROMANO:  Your Honor, again --

3          MAGISTRATE JUDGE ROEMER:  Sustained.  Next question.

4          BY MR. MANGO:

5  Q.  Is it true, Mr. Casacci, that the cat that you were

6  planning to sell that day, you expected somebody else to be

7  showing up, not the DEC with the search warrant; is that

8  right?

9  A.  I expected a USDA inspector, Inspector Ambrosia.  And

10  then potentially that person that was going to be buying a

11  cat and wanted to come visit to take a look at it, yes.

12  Q.  Okay.  But at the time, you understood that possessing

13  these cats in New York State would be illegal, right?

14          MR. ROMANO:  Objection, Your Honor.

15          MAGISTRATE JUDGE ROEMER:  Overruled.  You brought up

16  the issue.  He was shocked, he didn't know what was going on,

17  that sort of thing.  Overruled.

18          MR. ROMANO:  Just my objection, Your Honor, is to a

19  legal conclusion.  He's not an attorney.

20          MAGISTRATE JUDGE ROEMER:  Overruled.

21          Go ahead.  Rephrase the question.

22          BY MR. MANGO:

23  Q.  You claimed you were shocked, you didn't know what was

24  going on.  But yet you had an individual who was -- who was

25  purportedly, you expected, coming to look at a wild exotic

1  cat that you had for sale; is that right?

2  A.  So you're saying it's a wild exotic cat.  It was, again,

3  a Serval I believe they inquired about.  And I told them that

4  I could not sell them a cat without USDA approval.  So that

5  was what was stated in the email that we discussed earlier.

6           BY MR. MANGO:

7  Q.  But the question is, though, that you knew USDA approval

8  was different than any type of approval from the Department

9  of Environmental Conservation; is that true?

10          MR. ROMANO:  Objection, Your Honor.

11          MAGISTRATE JUDGE ROEMER:  Say that question again.

12          BY MR. MANGO:

13  Q.  The U.S. Department of Agriculture, or the USDA request

14  that you said in your email, that's separate and apart from

15  the regulations under state law?

16          MAGISTRATE JUDGE ROEMER:  Why is that relevant to

17  what we're doing right now?

18          MR. MANGO:  Well, he's about to engage in illegal

19  conduct, and is expecting somebody to show up at his door so

20  he can engage in illegal conduct, but now wants the Court to

21  believe that he was shocked and -- shy and/or shocked.

22          MAGISTRATE JUDGE ROEMER:  I'm not even sure that

23  position helps your position there, Mr. Mango, so I'm going to

24  sustain the objection.

25          BY MR. MANGO:

1    Q.  You had previously applied for licenses under the

2    New York State Department of Environmental Conservation, or

3    with the New York State Department of Department of

4    Environmental Conservation to possess these wild animals, and

5    those applications were rejected?

6            MR. ROMANO:  Objection, Your Honor.  Outside the

7    scope and irrelevant.

8            MAGISTRATE JUDGE ROEMER:  Mr. Mango --

9            MR. MANGO:  Judge --

10           MAGISTRATE JUDGE ROEMER:  -- it seems like you're

11   asking questions to get into the substance of the case, and

12   that's not why we're here today.  It's very focused.  We're

13   here just whether or not statements that he made to law

14   enforcement were voluntary.

15           MR. MANGO:  Yes, Judge.  In the government's view, it

16   flows into what he knew at the scene, what he expected,

17   whether he was shocked, and then the statement in his

18   declarations he submitted to you, it was only, only after I

19   answered all these questions, that I learned that they were

20   interested in my exotic cat business.  So we do think that his

21   prior --

22           MAGISTRATE JUDGE ROEMER:  So you're arguing that, you

23   know, they made the point that he was shocked, he didn't know

24   what was going on.

25           You say he did know what was going on before this

1  happened?

2       MR. MANGO:  That's right.

3       MR. ROMANO:  Judge, if I might respond.

4       I don't know how any of these questions relate to

5  whether the statements made in the 710.30 notice were

6  involuntary or voluntary.

7       MAGISTRATE JUDGE ROEMER:  Well, your side brought up

8  the issue about he was shocked.  He was -- he didn't know what

9  he was doing because he was shocked, and -- when the law

10 enforcement showed up to his house.  You made that a point

11 several times during this hearing.

12      And I think Mr. Mango was able to test that here as

13 to whether or not he was, in fact, shocked, or if he knew what

14 was going on, he really wasn't shocked.  He -- it wasn't a

15 surprise when the law enforcement showed up to his front door.

16      MR. ROMANO:  Well, my understanding, Judge, is he was

17 shocked that he had seven to 12 law enforcement officers on

18 his front porch with firearms, badges, and bullet-proof vests.

19 Just the show of force was shocking to him, not the substance

20 of the case or what he may have known about licensing

21 procedures and things of that nature.

22      MAGISTRATE JUDGE ROEMER:  Ask your question again,

23 Mr. Mango.

24      MR. MANGO:  Yes, Judge.

25      BY MR. MANGO:

1  Q.  You had previously applied on two occasions for a

2  New York State DEC permit to possess and collect wild exotic

3  animals, and you were denied; is that correct?

4  A.  The denial said it was the purview of the USDA and not

5  the DEC.  So it was my understanding it was not the purview

6  of the New York State DEC at all.  The response on that was

7  that you -- if that was for the application that I submitted,

8  if that was activity I wanted to engage in, I would have to

9  get a USDA exhibitor's permit, which I believe was the

10  wording that they put in the document.

11     And that they had no jurisdiction over Caracals and

12  animals in this category, which led me to believe that it was

13  not something to be expected from the DEC at all.

14  Q.  Right.  Would that exhibitor permit, that you were led to

15  believe after being denied that the permit from DEC -- that

16  exhibitor permit from the U.S. Department of Agriculture,

17  would that have allowed you to sell wild exotic animals?

18          MR. ROMANO:  Same objection, Judge.  Outside the

19  scope.  Outside the scope and irrelevant.  These are

20  substantive issues that are to be addressed at trial, not

21  during a suppression hearing.

22          MAGISTRATE JUDGE ROEMER:  Overruled.  But we're not

23  doing a lot more questions like this, Mr. Mango.

24          MR. MANGO:  Yes, Your Honor.

25          THE WITNESS:  Would you be so kind as to repeat and

1  clarify?

2          MR. MANGO:  Sure.

3          BY MR. MANGO:

4  Q.  Were you under the belief that by applying for, and if

5  you were even given a U.S. Department of Agriculture

6  exhibitor permit, that you would have been able to sell these

7  commercially?

8  A.  I was advised of different things over a period of six

9  months from the USDA.

10      What I was told, by a man named Dr. Gaj, at a later date

11 was that I would need a USDA broker's license, which is what

12 I had later applied for and what Officer Ambrosia was coming

13 in for, not an exhibitor's license.  They are two different

14 categories, as I started to learn later, as I got into the

15 thickness of how the laws and licenses pertain to having

16 and/or selling these animals.

17          MR. MANGO:  I'd like to pull up, Judge, if we can,

18 I'd like to show you what's in evidence as Government

19 Exhibit 6 (unintelligible).

20          THE WITNESS:  It's a bit tough to see at the moment.

21          BY MR. MANGO:

22 Q.  Okay.

23 A.  It appears so, yes.  I mean that would be my presumption,

24 although my phone number appears to be redacted.

25 Q.  Yes.  And that (unintelligible) -- let me go down to the

1   bottom of the second page, July 6th, shows you're in

2   Honolulu.  So is this accurate?

3   A.  Yes.

4   Q.  You brought this phone, your phone, to Honolulu?

5   A.  Yes, that is accurate, Mr. Mango.

6   Q.  July 5th, during the execution of the search warrant, we

7   have an incoming call at 9:58.  Do you see that there?

8   A.  I do.

9   Q.  One minute in length.  Did you take that call?

10  A.  I don't recall, but I don't believe I did.  I believe I

11  would have let everything go to voicemail.

12  Q.  Okay.  10:29.  There's another incoming call, one minute.

13  Did you take that call?

14  A.  I don't believe so.  I believe I let it go to voicemail.

15  Q.  11:05, it appears you called your voicemail for two

16  minutes; is that right?

17  A.  Yes.

18  Q.  All right.  At 11:51, you take another call for two

19  minutes, I'm sorry, you made a call for two minutes to

20  844-1562.  Is that your girlfriend's number?

21  A.  I don't recall.  I think it's -- might be someone from my

22  work.  I think it was a sales rep named Frank at my work who

23  stated there was some kind of emergency on my voicemail, and

24  I believe I called him back to state that that I couldn't

25  deal with it right now, and I would catch him later, kind of

1  thing.

2  Q.  Okay.  And then -- and then after you -- is the entry and

3  exit log correct that you saw earlier in the hearing, that

4  you left the premises at 12:13 p.m.?

5  A.  With regards to myself on the entry log, Mr. Mango?

6  Yeah, overall, correct.

7  Q.  Just you.

8  A.  Okay.

9  Q.  You leave at 12:13.  Is that an accurate notation that

10 you left your premises at 12:13 p.m.?

11 A.  Yes, I believe that's a safe assumption.

12 Q.  I'm not asking for an assumption.  Is it accurate?

13 A.  I didn't write down the time that I left.  I didn't

14 personally log in.  I didn't see the log.  I didn't see

15 anybody write it down.  But I'm presuming that the officers

16 logged the time that I left correct, but I don't know for

17 certain.

18 Q.  Okay.  And it indicates that you also left with your

19 girlfriend, who also left at 12:13; is that right?

20 A.  That's what the log indicates, correct.

21 Q.  Is that accurate?

22 A.  I believe so, yes.

23 Q.  Did you leave the premises in the same car?

24      MR. ROMANO:  Objection, Judge.  I don't think there's

25 been any testimony from Mr. Casacci they left in the same car.

 1   The logs are -- it doesn't say that.  They left at the same

 2   time, according to the log.  I just don't think the

 3   recollection of Mr. Mango is accurate.

 4          MR. MANGO:  I think I'm allowed to ask him.

 5          MAGISTRATE JUDGE ROEMER:  Overruled, go ahead.

 6          BY MR. MANGO:

 7   Q.  Did you leave with your girlfriend at the same time?

 8   A.  I believe I did, yes.

 9   Q.  And did you drive her car or your car?

10   A.  I don't recall.  I'm not sure if I left in mine or --

11   yeah, I don't remember.

12   Q.  And then after you left at 12:13, at 12:19 p.m., there's

13   an eight-minute call to 510-8627.  Is that your brother's

14   number?

15   A.  No, it's not.

16   Q.  Okay.  Whose number is that?

17   A.  That's my father.

18   Q.  All right.  And then I want to direct your attention to

19   1:27 p.m.  716-852-3100.  Do you see that?  You made a

20   seven-minute call?

21   A.  I do.

22   Q.  Okay.  Are you aware that that number is the attorney

23   referral service for the Erie County Bar Association?

24   A.  Yes.

25   Q.  So, did you call the Erie County Bar Association attorney

1    referral line; is that right?

2    A.   Yes.

3    Q.   And earlier, you testified before this Court today and in

4    your declarations, you also swore under penalty of perjury,

5    that you told the agents the law enforcement agents while

6    they were executing the search warrant, you didn't want to

7    talk to them without your attorney; is that right?

8    A.   Yes.  Yes.

9    Q.   But you didn't have an attorney, did you?

10   A.   I didn't have one specific to animal cat cases, or

11   specific to this type of thing.

12      So, no, I was speaking in generalities, I would like my

13   attorney because I don't feel comfortable talking with you.

14   It wasn't this specific individual that I had outlined and

15   prepared and retained at that point.

16      But as soon as I left, I worked diligently on trying to

17   get that done.

18          MAGISTRATE JUDGE ROEMER:  Is that what he -- is that

19   what he -- is that what was on the tape, that he wanted to

20   call his attorney?

21          My recollection was he wanted to talk to an attorney.

22          MR. ROMANO:  Yes, Judge.

23          MR. MANGO:  Well --

24          MAGISTRATE JUDGE ROEMER:  Who just said, yes, Judge?

25   I'm sorry?

1          MR. ROMANO:  I did, Your Honor.  That was the

2    recollection from the audio recording.

3          MR. MANGO:  That's fine, Judge.  I was going to just

4    going to go to a different part where it's, I think, a little

5    clearer and gets directly to what the Court is asking.

6          MAGISTRATE JUDGE ROEMER:  Okay.  Okay.

7          BY MR. MANGO:

8    Q.  If you can pick up Government Exhibit 12 again,

9    Mr. Casacci, and second page, paragraph 6.  I'll read it into

10   the record.

11         MAGISTRATE JUDGE ROEMER:  What are we -- what

12   document are we on?  I'm sorry.

13         MR. MANGO:  This is Government Exhibit 12.

14         MAGISTRATE JUDGE ROEMER:  12?  Okay.

15         BY MR. MANGO:

16   Q.  Paragraph 6.  I then stated I did not want to speak with

17   them or answer any questions without my lawyer.

18       Did you write that and swear to it, its truthfulness,

19   when you submitted it to the judge here?

20   A.  Yes.

21   Q.  And you say "my lawyer."

22   A.  Yes.

23   Q.  Don't you think that would indicate you had a lawyer at

24   the time?

25   A.  No.

1    Q.   It doesn't say "a lawyer."

2    A.   I'm --

3    Q.   Does it?

4    A.   You know, again, Mr. Mango, I am not a legal expert

5    splitting hairs.  I understand that when they came, I wanted

6    and needed a lawyer that specialized in it.

7         I apologize for -- if there's an issue with the semantics

8    of "my" versus "a."  To be quite frank, I didn't even

9    understand that that would or could be potentially an issue

10   of truthfulness or of the way that I'd be putting myself --

11   or, I guess, I kind of don't understand what you're getting

12   at here.

13        Can you -- can you clarify, what you're -- what you're

14   trying to say?

15   Q.   I don't think I need to clarify, Mr. Casacci.  I'll ask

16   you the question.  You don't say without -- without a lawyer,

17   you say my lawyer.

18        To me, that indicates you had a lawyer at the time.

19        But you did not; is that right?

20   A.   I did not know --

21            MR. ROMANO:  Objection, Your Honor.  This question's

22   been asked and answered.

23            MAGISTRATE JUDGE ROEMER:  Now you're arguing with

24   him, Mr. Mango.

25            MR. MANGO:  Yes, I'll move on.

1        BY MR. MANGO:

2    Q.  You didn't call a lawyer, did you, while you were on the

3    scene?

4    A.  I don't believe I did until I left.

5    Q.  We just reviewed your cell phone logs.  None of those

6    calls are to a lawyer; is that right?

7        In fact, you have all incoming calls except one?

8    A.  I believe several calls were an attempt to call a lawyer

9    after I left.

10   Q.  Okay.  You're at the scene, you have access to your cell

11   phone, but you don't call a lawyer; is that correct?

12   A.  I do not call a lawyer while I was there.

13   Q.  You weren't arrested; is that right?

14   A.  No.

15   Q.  You were told, according to your declaration and your

16   testimony, you were told that you, if you left, or attempted

17   to leave, you would be arrested?

18   A.  Yes.  Yes, I was.

19   Q.  But you were ultimately allowed to leave?

20   A.  At the very end, when we went to sit at the table, gears

21   shifted and it went from being a more aggressively stronger

22   stance, again, particularly from Officer Peinkofer, to oh,

23   okay, now you're free to go.  Now you have the right to a

24   lawyer.

25       So, there was a dramatic shift in the atmosphere and in

1  the treatment of me prior to, and then at the point that they

2  had me sit at the table.

3  Q.  So -- so that -- that the table was the shift?  When you

4  sat at the table with that recorded audio interview, it had

5  shifted by then, you're saying?

6  A.  The attitude had shifted from the way that I was treated,

7  yes.

8          MR. MANGO:  Judge, can I have a moment, please?

9          MAGISTRATE JUDGE ROEMER:  Sure.

10          BY MR. MANGO:

11  Q.  What did the recorder look like that you claim you saw

12  Agent Schneckenberger using?

13  A.  I think it was his phone.  It looked like he had his

14  phone, and he put it down on the table next to a black, like,

15  a black zip-out leather binder with some sheets.  And I

16  presume that's what he was recording with.

17  Q.  Okay.  It looked like a phone?

18  A.  Yes.

19  Q.  What color was it?

20  A.  I don't recall precisely.  I just remember seeing him put

21  the phone down, and me thinking, oh, my God, this might be

22  recorded, too.  And getting, like, on edge.

23      But, again, it was just kind of an overwhelming thing.  I

24  don't remember the details of the phone.

25  Q.  Now it was your testimony here today that Peinkofer's

1  overwhelming you with questions, is that it?  And telling

2  you, you can't leave until you answer my questions?

3  A.  In the earlier part of his entering my home, yes.

4  Q.  Okay.  It wasn't until you got your wits about -- and you

5  answered some of those questions?

6  A.  Initially, yes.

7  Q.  And are those questions -- you saw the 710.30 statement?

8  A.  Yes.

9  Q.  Were those all accurate, those 710.30 (unintelligible.)

10 A.  Would you be so kind as to zoom?

11 Q.  At the time of the search warrant, had you been doing

12 this for three months?  Sold 14 cats to people all around the

13 country?

14 A.  No, that statement is not precisely accurate.

15 Q.  And how is it not accurate?

16 A.  It was for more than a period of three months.

17 Q.  Okay.  How much more than three months?

18 A.  They came in -- that was, what, July 5th?  Five, six

19 months, closer to that zone.

20 Q.  Okay.  And next bullet point.  You sold them for between

21 7,500 and $10,000 each; is that accurate?

22 A.  Some were sold for less, dramatically less.  But that was

23 the asking price on my website for them.

24 Q.  What's the lowest you ever sold one for?

25 A.  I believe it was right around 3,000.

1  Q.  So --

2  A.  And then some I've given away for free, as well.

3  Q.  How many did you give away for free?

4  A.  I know at least three.  Beyond that, I don't recall the

5  specifics.  I'd have to look into it.

6  Q.  People in New York State?

7       MR. ROMANO:  Objection, Your Honor.

8       MAGISTRATE JUDGE ROEMER:  Mr. Mango, now you're

9  asking him are these statements true or false.

10      I don't understand how that does with the

11  voluntariness of this statement.  I -- when Mr. Grable was

12  asking questions, I got into the same thing where he was

13  getting into whether or not this was accurate or not, whether

14  it was an accurate representation, and I didn't allow him to

15  go into that either.

16      MR. MANGO:  I'll move on, Judge.

17      MAGISTRATE JUDGE ROEMER:  Okay.

18      MR. MANGO:  I think the accuracy of this statement is

19  in play, and I won't go beyond that.

20      BY MR. MANGO:

21  Q.  How about, I pay between 3,500 and $5,000?

22      MAGISTRATE JUDGE ROEMER:  I thought I just said you

23  can't ask those questions.

24      MR. MANGO:  Oh, I'm sorry.  I thought you told me I

25  couldn't ask if it was incorrect, how so.

1          I'll move on.

2          MAGISTRATE JUDGE ROEMER:  What's the difference

3    between that and asking him is this true or not?

4          MR. MANGO:  Well, I think it --

5          MAGISTRATE JUDGE ROEMER:  He's either going to say

6    it's true or it's false.

7          MR. MANGO:  I think it matters --

8          MAGISTRATE JUDGE ROEMER:  It doesn't have anything to

9    do with the voluntariness of the statement.

10         It might be that it's all inaccurate, it might be

11   it's all true, but that's for a jury to decide at the time of

12   trial if it's admitted, right?

13         MR. MANGO:  I think it does, because if he's

14   overwhelmed and his senses are overwhelmed, you would expect

15   false information to be provided or not accurate.  So it's the

16   government's view, this is relatively --

17         MAGISTRATE JUDGE ROEMER:  Yeah, sustained.  I -- no

18   more questions like that.

19         BY MR. MANGO:

20   Q.  And you mentioned your girlfriend was allowed to leave,

21   again, which was not included in any of your prior

22   declarations to this Court?

23         MR. ROMANO:  Objection, Your Honor.  Asked and

24   answered.

25         MAGISTRATE JUDGE ROEMER:  Overruled.

BY MR. MANGO:

Q.  Your girlfriend was allowed to leave; is that right?

A.  Yes.

Q.  How did she leave?

A.  She drove away.

Q.  Where was her car parked?

A.  I don't remember precisely where he car was parked.

Q.  Okay.  And who gave her permission to leave?

A.  Well, I had asked if we could leave.

Q.  Who did you ask that to?

A.  Officer Peinkofer.

Q.  And what did Officer Peinkofer say?

A.  He said that she could, but that I could not.

Q.  And you don't think that was an important fact to bring up to the judge in your declaration?

MR. ROMANO:  Objection, Judge.  That's been asked and answered.

MAGISTRATE JUDGE ROEMER:  Yeah, we've been through it this a few times.

MR. MANGO:  Yes, Judge, but I don't think I ever got an answer, Judge, honestly.

Did you think that was an important point that you should have brought up to the judge?

I think when he answered it, Judge, he just plain, well, I'm not a lawyer, I'm sorry.

1          But I'm asking him today, is that an important point

2    that should have been brought up to the judge?

3          MR. ROMANO:  Same objection, Judge, and --

4          MAGISTRATE JUDGE ROEMER:  Overruled.

5          THE WITNESS:  It's the same answer, Mr. Mango.  I

6    didn't understand the dynamics and importance of different

7    aspects of what happened during this event.

8          BY MR. MANGO:

9    Q.  I'm asking you today:  Did you think that's an important

10   point that you should have brought up to the judge?

11         MR. ROMANO:  Objection.

12         MAGISTRATE JUDGE ROEMER:  Well, it's not even

13   relevant, whether he thinks so today or not.

14         MR. ROMANO:  Right.

15         MAGISTRATE JUDGE ROEMER:  You're talking about what

16   he did when he made the statement.

17         BY MR. MANGO:

18   Q.  Did you testify earlier that you thought your

19   girlfriend's car was blocked in?

20   A.  I thought it was, but I'm not certain.

21   Q.  Was she parked in the driveway?

22   A.  She usually does, but I'm not certain that morning.  Not

23   100 percent certain.

24   Q.  Okay.  So --

25   A.  She usually -- she usually does, and it was my

1   understanding that someone had to move their vehicle to let

2   her out.  So my presumption was that she was, but I'm not

3   certain.

4   Q.  How did you learn that somebody had to move their

5   vehicles?

6   A.  Because she said she couldn't leave because she was

7   blocked in.  And someone, I can't remember who it was, went

8   out to move their vehicle to allow her to get out.  I don't

9   know if that was at the street, or if that was in my

10  driveway.  I don't remember that specific element.  So, I

11  apologize.

12          MR. MANGO:  One more moment, Judge?

13          MAGISTRATE JUDGE ROEMER:  Sure.

14          MR. MANGO:  Nothing further, Judge.  Thank you.

15          MAGISTRATE JUDGE ROEMER:  Mr. Romano?

16          MR. ROMANO:  No redirect, Your Honor.  Thank you.

17          MAGISTRATE JUDGE ROEMER:  Before we -- can we put up

18  Government Exhibit 12, paragraph 13?

19          MR. MANGO:  (Inaudible.)

20          MAGISTRATE JUDGE ROEMER:  Mr. Casacci, paragraph 13,

21  you say law enforcement officer deliberately elicited

22  statements from you.

23          When you say law enforcement officer, you were

24  referring to Officer Peinkofer?

25          THE WITNESS:  Yes, Officer Peinkofer was --

1      MAGISTRATE JUDGE ROEMER:  Okay.  That's all I asked,

2 sir.

3      THE WITNESS:  Okay.

4      MAGISTRATE JUDGE ROEMER:  Paragraph 14, you say the

5 law enforcement officer asked me how long I have been involved

6 with African cats.

7      Again, when you say law enforcement officer, were you

8 referring to Officer Peinkofer?

9      THE WITNESS:  Yes.  Yes, Your Honor.

10      MAGISTRATE JUDGE ROEMER:  Okay.  Paragraph 15.  I was

11 nervous and uncomfortable.  I did not want to answer his

12 questions.  Are you referring to Officer Peinkofer there?

13      THE WITNESS:  Yes, Your Honor.

14      MAGISTRATE JUDGE ROEMER:  Paragraph 16.  After a few

15 minutes, I repeated that I did not want to answer any

16 questions, and I wanted to leave.  I repeated this multiple

17 times.  A law enforcement officer then told me to stop and

18 directed me to sit in my living room armchair.

19      Was that Officer Peinkofer?

20      THE WITNESS:  Yes.  Absolutely, Your Honor.

21      MAGISTRATE JUDGE ROEMER:  Okay.  Sir, when you

22 finally left the premises, you got in your car, you backed out

23 of the driveway?

24      THE WITNESS:  I believe I left with my girlfriend at

25 the time, Haley.

1          MAGISTRATE JUDGE ROEMER:  Okay.  In her car, not in

2    that white SUV that we saw in the pictures?

3          THE WITNESS:  Yeah, I don't remember specifically,

4    but I think -- it was either I left with her, or I left in

5    that vehicle.  I'm not certain.

6          MAGISTRATE JUDGE ROEMER:  Okay.  Because earlier

7    there was a picture shown of a black pickup truck that was

8    blocking the driveway.  When you went to leave, you weren't

9    blocked in any way?

10          THE WITNESS:  I don't recall if they had to move a

11    vehicle or not.  I'm not certain.

12          MAGISTRATE JUDGE ROEMER:  Okay.  You can step down,

13    sir.  Thank you.

14          THE WITNESS:  All right.  Thank you.

15          (Witness excused at 5:05 p.m.)

16          MR. GRABLE:  The defense rests, Your Honor.

17          MAGISTRATE JUDGE ROEMER:  Okay.  Mr. Mango?

18          MR. MANGO:  Judge, I'd like a moment if I can real

19    briefly to speak with my co-counsel --

20          MAGISTRATE JUDGE ROEMER:  Okay.

21          MR. MANGO:  -- who's on the phone and determine --

22          MAGISTRATE JUDGE ROEMER:  Can you step out in the

23    hall?  I'll give you a couple minutes.

24          MR. MANGO:  -- if we should call a rebuttal witness.

25          MAGISTRATE JUDGE ROEMER:  Okay.  We're not going to

1  have a rebuttal witness today, I can tell you that.  It will

2  have to be continued to another day.

3          MR. MANGO:  Yes, Your Honor.

4          (Off the record at 5:05 p.m.)

5          (Back on the record at 5:08 p.m.)

6          MR. MANGO:  Judge, the testimony -- we would seek

7  permission of the Court to call a rebuttal witness.  It would

8  be Investigator Peinkofer, to establish facts that the

9  government believes --

10          MAGISTRATE JUDGE ROEMER:  Okay.  We'll schedule a new

11  date for that.

12          While Rosalie is scheduling, is that going to be it,

13  Officer Peinkofer testifying?  I mean, does anybody foresee

14  anybody else testifying?

15          MR. MANGO:  Not from the government, Judge.

16          MR. GRABLE:  At this point, Judge, I don't anticipate

17  anyone additional.

18          MAGISTRATE JUDGE ROEMER:  Okay.  What about the

19  individual you asked to be dismissed today?

20          MR. GRABLE:  Investigator Schneckenberger, I don't

21  believe, I think it's very extremely unlikely that we would

22  call him in rebuttal.  I can't imagine that there would be a

23  basis.

24          MAGISTRATE JUDGE ROEMER:  Okay.

25          MR. MANGO:  Well, I should tell the Court that he's

1  going to Vietnam, he'll leave the end of September for a

2  multi-year detail.  So if the defense is going to call him,

3  they should probably make that decision and decide it quickly.

4         MR. GRABLE:  We're not -- certainly aren't calling

5  him at this point.  But if there's something said by

6  Investigator Peinkofer that implicates him --

7         MAGISTRATE JUDGE ROEMER:  Okay.  I need to know as

8  soon as possible --

9         MR. GRABLE:  Right.

10         MAGISTRATE JUDGE ROEMER:  -- that you're going to

11  call him, all right?

12         MR. GRABLE:  It's my present intention not call him,

13  and we have no basis to --

14         MAGISTRATE JUDGE ROEMER:  I understand, but if you

15  get back to the office and you discuss it or whatever, and you

16  say, well, maybe we should call him, I need to know that,

17  like, right away, okay?

18         MR. GRABLE:  Yes.

19         DEPUTY CLERK:  I'm sorry, it's just that we're sort

20  of booked up here.

21         MAGISTRATE JUDGE ROEMER:  We're on the COVID rebound

22  here, so --

23         DEPUTY CLERK:  How about September 3rd at 10:30?

24         MR. MANGO:  Yes, that works for the government,

25  Judge.

1          DEPUTY CLERK:  Thank you.

2          MR. GRABLE:  That works for the defense, as well.

3          DEPUTY CLERK:  Thank you.

4          MAGISTRATE JUDGE ROEMER:  Everybody's good?  Okay.

5   All right.  September 3rd at 10:30.  Okay.

6          Anything else then today, Mr. Mango?

7          MR. MANGO:  No, Your Honor.

8          MAGISTRATE JUDGE ROEMER:  Mr. Grable?

9          MR. GRABLE:  No, thank you.

10         MAGISTRATE JUDGE ROEMER:  Mr. Romano?

11         MR. ROMANO:  No, Your Honor.  Thank you.

12         (Proceedings commenced at 5:11 p.m.)

13             *    *    *    *    *    *    *

14

15

16

17

18

19

20

21

22

23

24

25

1          **CERTIFICATE OF TRANSCRIBER**

2

3          In accordance with 28, United States Code,

4    Section 753(b), I certify that this is a true and correct

5    record of proceedings to the best of my ability from the

6    official electronic sound recording of the proceedings held in

7    the United States District Court for the Western District of

8    New York before Magistrate Judge Michael J. Roemer on

9    August 21, 2020.

10

11                    /s/   Ann M Sawyer
                              Transcriber
12                    Dated: August 31, 2020

13

14

15

16

17

18

19

20

21

22

23

24

25

1          <u>**EVIDENTIARY HEARING INDEX**</u>

2
**<u>EXAMINATION</u>**                                                        <u>PAGE</u>

3

4     **R O B E R T   O ' C O N N O R**                          6

5          DIRECT EXAMINATION BY MR. MANGO:                   7

6          CROSS-EXAMINATION BY MR. GRABLE:                  39

7          REDIRECT EXAMINATION BY MR. MANGO:               104

8          RECROSS-EXAMINATION BY MR. GRABLE:               109

9     **S C O T T   M A R S H A L L**                          115

10         DIRECT EXAMINATION BY MR. MANGO:                 115

11         CROSS-EXAMINATION BY MR. GRABLE:                 146

12         REDIRECT EXAMINATION BY MR. MANGO:               208

13         RECROSS-EXAMINATION BY MR. GRABLE:               209

14    **C H R I S T O P H E R   D E A N   C A S A C C I**     210

15         DIRECT EXAMINATION BY MR. ROMANO:                210

16         CROSS-EXAMINATION BY MR. MANGO:                  227

17

18

19

20

21

22

23

24

25